Jenn Rolnick Borchetta*
Allison Frankel*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (914) 462-2363
jborchetta@aclu.org
afrankel@aclu.org

Jorge Castillo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St NW
Washington, D.C. 20005
Tel: (212) 549-2500
JorgeCastillo@aclu.org

Emma Andersson*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA, 94104
Tel: (212) 549-2500
eandersson@aclu.org

*Pro hac vice motions concurrently filed

Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Wendy J. Olson (ISB No. 7634)
STOEL RIVES LLP
101 S Capitol Boulevard, Suite 1900,
Boise, ID 83702
Tel: (208) 387-4291
wendy.olson@stoel.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JUANA RODRIGUEZ, *on behalf of herself and her minor child* Y.R.; X.Z., *on behalf of himself and his minor child* Y.Z.; IVAN POPOCA, *on behalf of himself and his minor children* E.I.P. *and* A.S.P.; *and on behalf of all others similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KENNETH PORTER, Acting Director of the Boise U.S. Immigration and Customs Enforcement Field Sub-Office, *in his* | Case No. <br><br> **CLASS ACTION COMPLAINT** |

1

*individual capacity*; ROBERT BOHLS,
Special Agent in Charge of the Salt Lake City
Office of the Federal Bureau of Investigation,
*in his individual capacity*: CHRIS SHEEHAN
Supervisory Special Agent of the Federal
Bureau of Investigation's Boise Resident
Agency, *in his individual capacity*; JAKE
SHERIDAN, Special Agent of the Federal
Bureau of Investigation, *in his individual
capacity*; KIERAN DONAHUE, Canyon
County Sheriff, *in his individual capacity*;
REX INGRAM, Chief of the Caldwell Police
Department, *in his individual capacity*; JOE
HUFF, Chief of the Nampa Police
Department, *in his individual capacity*; BILL
GARDINER, Director of the Idaho State
Police, *in his individual capacity*; CANYON
COUNTY; CITY OF CALDWELL; CITY OF
NAMPA; and JOHN DOES 1-20, *in their
individual capacities*,

　　　　*Defendants.*

---

## INTRODUCTION

1.　　　On October 19, 2025, in Wilder, Idaho, approximately 400 spectators gathered at

La Catedral racetrack to enjoy festivities that included horse-racing, food vendors, and games for

children. The events at La Catedral commonly attract between 250 and 500 attendees, offering one

of the few family-friendly events in the area. The crowd is always almost entirely Latino. At La

Catedral events, the local Latino community gathers to enjoy Mexican culture, including their

favorite Mexican foods. Families with young children and elderly grandparents go for a nice

outdoor activity, looking forward to the moments between races when kids are allowed to run

down the track. Some attendees with experience as ranchers seek out time with the horses in the

barn.

2.      At around 1:00 PM on October 19, it should have been the height of the fun. Instead, a swarm of 200 law enforcement officers from numerous federal, state, and local agencies descended with armored trucks, flashbang grenades, and guns drawn (the "Raid"). Wearing militarized gear and face coverings, they pointed guns and screamed orders at frightened families. They broke the windows of cars parked on the property, sending glass pouring onto those inside, including children who had taken refuge in cars because of rain. They threw compliant people to the ground and shot rubber bullets over the heads of teenagers.

3.      After this violent arrival, law enforcement rounded up the entire crowd, zip-tied most of the adults and many teenagers, and ordered everyone onto the track. Law enforcement then detained the crowd of hundreds for four hours without food, refusing to let mothers feed their hungry and crying babies. They lined up the crowd, sorting them into groups partly based on perceived immigration status, while wrongly presuming light-skinned individuals to be citizens and dark-skinned individuals to be undocumented. Law enforcement used racial epithets for Latinos and, in denying some Latino detainees water, they said "that's what you get for being here."

4.      The massive law enforcement presence came to the Raid prepared to zip-tie a huge crowd but unprepared to provide water or bathroom access—forcing some to urinate on the field in public view during detainment. And while law enforcement did not appear to bring medics—and failed to provide medical treatment to those in obvious need of care, like a man bleeding from his head after they hit him with a rifle—they did bring a massive tent that they erected on the edge of the La Catedral property. After hours of detention, detainees were brought inside that tent, where officers from Immigrations and Customs Enforcement ("ICE") interrogated each detainee about

3

immigration status. No one was set free unless and until they verified lawful presence in the United States.

5.     The defendants in this action are the federal and state actors who conspired to conduct the Raid. Defendants told the public that they detained the attendees at La Catedral to execute a search warrant, under an exception to the Fourth Amendment's usual requirement of reasonable suspicion for seizures that permits law enforcement to automatically detain those in the immediate vicinity of a judicially authorized search. But that cannot be. The criminal investigation related to the warrant involves narrow, non-violent charges of gambling. Specifically, five individuals were allegedly facilitating betting pools on La Catedral races without the required state license. Law enforcement had arrest warrants for those individuals prior to the Raid and, upon information and belief, took custody of them soon after arriving. While law enforcement appears to have searched small buildings on the La Catedral property, the crowd was not detained in the immediate vicinity of those buildings; rather, they were detained on the track and then questioned by ICE about immigration status in the tent at the other end of the property from the buildings.

6.     The mass seizure of the crowd at La Catedral was not merely incident to the execution of this narrow search warrant. Instead, the defendants in this action conspired to abuse a criminal search warrant as cover to go fishing for immigration arrests at an event where they knew they would encounter a large number of Latino individuals. Defendants used the existence of the criminal search warrant like it was a general warrant granting them authority to conduct a mass, suspicionless detention.

7.     Meanwhile, before, during, and after the Raid, defendants conflated Latino ethnicity with illegality and danger, and engendered fear of Latino individuals by using disparaging terms like "monsters" and "enemies." In executing the Raid, the defendants shared a goal of

4

advancing the Trump Administration's immigration arrest quotas, and, after forcing attendees to answer questions about immigration status, they arrested 105 individuals for alleged immigration violations. As Defendant Kenneth Porter of ICE said in an email to the other coordinating law enforcement agencies afterward, the Raid "wouldn't have been possible without everyone here." It did not matter to the defendants that 70% or more of those detained were United States citizens and others lawfully present in this country.

8.     Plaintiffs are three Latino families, including children ages 3 to 16 years old, who attended the La Catedral event and were detained for four hours or more in the Raid. They are United States citizens and lawful permanent residents who were only set free from the Raid after verifying lawful status. They bring this action under 42 U.S.C. Sections 1983, 1985, and 1986 on behalf of themselves and those similarly detained to vindicate rights guaranteed them by the United States Constitution and the Civil Rights Act of 1871.

9.     Originally codified in the Ku Klux Klan Act of 1871, these laws were passed in the aftermath of the Civil War, when private citizens and state officials in the South launched a campaign of racialized terror against the newly emancipated Black population.  Congress intended to provide a federal forum for vindicating equal protection rights against those who used the instruments of state power to oppress people based on immutable characteristics like race or ethnicity. Together, these laws prohibit actors from conspiring to use state power to deprive individuals of equal protection of the law. At the Raid on La Catedral, defendants defied precisely that prohibition. By this action, Plaintiffs seek to hold the federal and state conspirators accountable for disregarding their right to be free from unreasonable seizures and for violently depriving them of equal protection of the law.

## JURISDICTION AND VENUE

10.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act), and 28 U.S.C. § 1651 (All Writs Act).

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) and § 1391(e)(1) because a substantial part of the actions or omissions giving rise to the claim occurred in this judicial district; and under 28 U.S.C. § 1391(c)(1) and § 1391(e)(1) because at least one plaintiff is a natural person, including an alien lawfully admitted for permanent residence in the United States, who resides in this judicial district.

## PARTIES

12.    Plaintiff JUANA RODRIGUEZ is a thirty-year-old U.S. citizen and mother of four children who was born and raised in Idaho. She works with bilingual children and their families, and she seeks to ensure children feel welcome and secure. Ms. Rodriguez is Latina.

13.    Plaintiff Y.R. is a three-year-old U.S. citizen and the son of Plaintiff Juana Rodriguez. He was born and raised in Idaho. He likes attending horse races with his mother. Y.R. is Latino.

14.    Plaintiff X.Z. is a Lawful Permanent Resident who has lived in the United States for almost thirty years. He has lived in Idaho for almost ten years and works in construction. Mr. Z. is the father of two sons, a fifteen-year-old and an eighteen-year-old. Mr. Z. is Latino.

15.    Plaintiff Y.Z. is a fifteen-year-old Lawful Permanent Resident and the son of Plaintiff Mr. Z. Y.Z. is a high school student where he is involved in sports and student government, and where he volunteers to help students in crisis. Y.Z. is Latino.

16.     Plaintiff IVAN POPOCA is a forty-year-old Lawful Permanent Resident who has lived in Idaho for most of his life. He raised five children with his partner of over eighteen years. He has worked in construction for the last twenty-one years. Mr. Popoca is Latino.

17.     Plaintiff E.I.P. is a sixteen-year-old U.S. citizen and the son of Plaintiff Ivan Popoca. He was born and raised in Idaho. He works in construction. E.I.P. is Latino.

18.     Plaintiff A.S.P. is a ten-year-old U.S. citizen and the daughter of Plaintiff Ivan Popoca. She was born and raised in Idaho. She enjoys being with her friends and is learning to play the flute. A.S.P. is Latina.

19.     Defendant KENNETH PORTER is the Acting Director of the Boise U.S. Immigration and Customs Enforcement Field Sub-Office and/or was responsible for overseeing and/or directing operations in that office related to the Raid. Plaintiffs sue Defendant Porter in his individual capacity.

20.     Defendant ROBERT BOHLS is the Special Agent in Charge of the Salt Lake City Office of the Federal Bureau of Investigation ("FBI"). Plaintiffs sue Defendant Bohls in his individual capacity.

21.     Defendant CHRIS SHEEHAN is the Supervisory Special Agent of the FBI's Boise Resident Agency. Plaintiffs sue Defendant Sheehan in his individual capacity.

22.     Defendant JAKE SHERIDAN is a Special Agent of the FBI. Plaintiffs sue Defendant Sheridan in his individual capacity.

23.     Defendant Sheriff KIERAN DONAHUE is the Sheriff of the Canyon County Sheriff's Office ("County Sheriff's Office") and is responsible for the policies and practices of the County Sheriff's Office. Defendant Donahue also directs the deputy sheriffs under his supervision

and command, and he is a final policymaker for Canyon County. Plaintiffs sue Defendant Donahue in his individual capacity.

24.     Defendant REX INGRAM is the Chief of the Caldwell Police Department ("Caldwell PD") and is responsible for the policies and practices of the Caldwell PD. Defendant Ingram also directs the members of the Caldwell PD under his supervision and command, and he is a final policymaker for the City of Caldwell. Plaintiffs sue Defendant Ingram in his individual capacity.

25.     Defendant Chief JOE HUFF is the Chief of the Nampa Police Department ("Nampa PD") and is responsible for the policies and practices of the Nampa PD. Defendant Huff also directs the members of the Nampa PD under his supervision and command, and he is a final policymaker for the City of Nampa. Plaintiffs sue Defendant Huff in his individual capacity.

26.     Defendant Colonel BILL GARDINER is the director of the Idaho State Police ("ISP") and is responsible for the policies and practices of the ISP. Defendant Gardiner also directs the members of the ISP under his supervision and command, and he is a chief policymaker for ISP. Idaho Governor Bradley Little appointed Gardiner to lead ISP in 2024, noting that he would work closely with Gardiner to support border security efforts. Plaintiffs sue Defendant Gardiner in his individual capacity.

27.     Defendant CANYON COUNTY is a political subdivision of the State of Idaho and can be sued in its own name. Defendant Canyon County includes, operates, governs, and is responsible for the County Sheriff's Office.

28.     Defendant CITY OF CALDWELL is a political subdivision of the State of Idaho and can be sued in its own name. Defendant City of Caldwell includes, operates, governs, and is responsible for the Caldwell PD.

29.    Defendant CITY OF NAMPA is a political subdivision of the State of Idaho and can be sued in its own name. Defendant City of Nampa includes, operates, governs, and is responsible for the Nampa PD.

30.    Defendants JOHN DOE 1 through 20 were, at all relevant times, officers, employees, or otherwise representatives of the ISP, County Sheriff's Office, Caldwell PD, or Nampa PD. At all relevant times, Does 1 through 20 were acting under color of state law. When Plaintiffs become aware of the true identities of the Doe defendants, Plaintiffs will amend this complaint to add or substitute them as named Defendants.

31.    As more specifically alleged herein, each of the Defendants caused, and is liable for, the unlawful conduct and resulting injuries alleged herein, by, among other things, personally participating in said conduct or acting jointly with others who did so; by authorizing, acquiescing or setting in motion policies, plans, or actions that led to the unconstitutional or unlawful conduct; by failing to prevent the unlawful conduct; and/or by ratifying the unlawful conduct taken by employees under their direction and control.

32.    The named plaintiffs have claims under the Federal Tort Claims Act ("FTCA") against the United States. The named plaintiffs intend to amend the complaint to add those claims consistent with applicable FTCA procedures.

33.    Defendants Porter, Bohls, Sheehan, and Sheridan are referred to collectively as the Federal Defendants.

34.    Defendants Donahue, Ingram, Huff, Gardiner, Canyon County, City of Caldwell, and City of Nampa are referred to collectively as the State Defendants.

## FACTUAL ALLEGATIONS

### The Wilder Area Latino Community and Events at La Catedral

35.    Wilder, Idaho is a small community of about 1,700 people in southwest Idaho, within Canyon County.[1] It is an agricultural area, with a robust farming industry and vast vineyards and wineries. Wilder community members describe an experience of knowing everyone in town.

36.    While the population of Idaho generally is predominantly white, Wilder is predominantly Latino, with Hispanic[2] individuals comprising at or over 60% of the population in recent years.[3] The statewide population is almost 80% non-Hispanic white,[4] and Canyon County—the county in which Wilder sits—is only about 27% Hispanic.[5] The most common birthplace among foreign-born Wilder residents is Mexico.[6] Most Wilder residents are U.S. citizens, and most Hispanic residents in Wilder are U.S. citizens.[7] Wilder was once a predominantly white city. A demographic shift over time has resulted in a shift in political representation. The city has recently had strong Latino representation in local government and business—even earning news coverage for electing an all-Latino city council.[8]

37.    Wilder, Idaho and the surrounding communities are home to a variety of Mexican cultural events, including dances, concerts, horse races (carrera de caballos), and rodeos featuring

---

[1] *Wilder, ID*, Census Reporter (last visited Feb. 2, 2025), https://perma.cc/XD7D-QKJL.
[2] Plaintiffs use "Hispanic" and "Latino" interchangeably, but use "Hispanic" here because the data cited use that term.
[3] *See Wilder, ID*, Census Reporter, *supra* note 1.
[4] *QuickFacts: Idaho*, U.S. Census Bureau (last visited Feb. 2, 2025), https://perma.cc/NEA6-GPBG.
[5] *Canyon County, Idaho: American Community Survey, Demographic and Housing Estimates*, U.S. Census Bureau (last visited Feb. 2, 2025), https://perma.cc/728U-3UQ4.
[6] *See Wilder City, Idaho: American Community Survey*, U.S. Census Bureau (last visited Feb. 5, 2025), https://perma.cc/2RDB-RCTX.
[7] *See id.*
[8] *See* Roque Planas, *A Tiny Rural Town Just Elected An All-Latino City Council*, HuffPost (Dec. 1, 2015, 7:33 AM), https://perma.cc/DL9K-ECVS.

popular bands (jaripeos). These events are celebrations of food, music, competition, the outdoors, culture and customs, and La Catedral is considered part of this event circuit.

38.     Events at La Catedral feature horse races, specialty Mexican foods, toy vendors, and local businesses. Many of the families involved in horse racing come from a background of cattle farming (ranchos) and working with horses. Sometimes the horse-racing stops to let kids run down the track. When La Catedral events are over, families often leave to attend Mexican dances and other cultural events at surrounding locations.

39.     Between 250 and 500 individuals typically attend events at La Catedral.

40.     The vast majority of attendees at La Catedral events are Latino. Many attendees speak Spanish, and official announcements during races are in Spanish.

### The Raid

41.     On the morning of October 19, 2025, the scene at La Catedral was festive yet calm. The event was full of families with children—approximately 400 attendees in all.[9] Some families who attended had gone to events at La Catedral several times in recent years. Others were not regulars but decided to go that day to give their families a fun activity. Attendees were buying treats and toys from vendors, playing games, and watching the races. Consistent with prior events at La Catedral, the crowd on October 19, 2025, was mostly Latino.

42.     Upon arriving, each attendee went through a screening provided by a private security team, as is typical for La Catedral events. Security required attendees to step out of their vehicle to be searched for weapons, alcohol, and other prohibited items. Security scanned all attendees with metal detector wands. Security confiscated prohibited items. Security also checked

---

[9] *See* Press Release, Brad Little, Governor of Idaho, Gov. Little comments on arrests in Wilder (Oct. 21, 2025), https://perma.cc/VMU3-ADTP.

the identification of people wishing to drink alcohol and gave them wristbands. The named plaintiffs each went through this screening. The security team also patrolled the grounds during the event.

43.     Plaintiff Juana Rodriguez, her father, and her three-year-old son, Plaintiff Y.R., arrived around 10:00 AM, hoping to eat food typically made in her father's hometown in Guanajuato, Mexico. Plaintiff Mr. Z. and his sons arrived around then, too, ready to enjoy the races. Plaintiff Ivan Popoca arrived a little later with his kids. His ten-year-old daughter, Plaintiff A.S.P., stayed with him as he connected with friends, while his sixteen-year-old son, Plaintiff E.I.P., went to see the horses with his friends.

44.     It was chilly, and it rained through the late morning. Some children decided to watch the festivities from their family cars, which were parked on the La Catedral property nearby. Ten-year-old A.S.P. was in her father's pick-up truck. And three-year-old Y.R. took a nap back in his mom's truck, wrapped in a blanket.

45.     As lunchtime neared, many were enjoying the Mexican food provided by vendors. Mr. Z.'s fifteen-year-old son, Plaintiff Y.Z., went with his brother to buy tacos and horchata. Ms. Rodriguez and her family planned to do the same. Sixteen-year-old E.I.P. headed to the food vendors after seeing the horses and bought four quesabirria and an horchata for lunch.

46.     Sometime between 1:00 PM and 1:30 PM, during peak time for the event, a black military-style helicopter flew over La Catedral. Ms. Rodriguez was near her truck with a friend, and they noted how it flew so low it looked like it could land on top of a nearby building. It made her nervous. The helicopter began to circle the field.

47.    Suddenly, approximately 200 law enforcement officers[10] from federal, state, and local agencies descended. Many were in full tactical gear—helmets, masks, multiple firearms, and tasers. Most officers came with automatic rifles drawn. At least five armored vehicles came onto the property. They were followed by several other marked and unmarked law enforcement vehicles, some with armed officers hanging on the sides and some with sirens on. At least two drones joined the hovering helicopter over the field. Canine units also arrived. Snipers set up on top of the barn and the silo, with spotters on another building's roof.

48.    As law enforcement advanced, they used aggressive force. With their hands on their rifles, officers pushed people, including children and the elderly. Many attendees who were compliant—including the named plaintiffs—were thrown to the ground. Officers broke the windows of several vehicles, some of which had children inside. Officers forcibly dragged some individuals out of cars, including children. Officers shot several attendees with rubber bullets, including shooting at several teenagers inside a vehicle. Officers threw numerous flashbang grenades—one attendee counted at least ten—and even threw flashbang grenades into vehicles with people inside.

49.    The 200 law enforcement officers were conducting a joint operation, and included the FBI and several United States Department of Homeland Security ("DHS") divisions such as ICE; and state and local agencies, including but not limited to the County Sheriff's Office, ISP, Caldwell PD, and Nampa PD.

50.    Several of the agencies worked in partnership through the Treasure Valley Metro Violent Crime and Gang Task Force ("Treasure Valley Task Force" or "Task Force").

_____

[10] Plaintiffs use "officers" herein to refer to law enforcement personnel on the scene, including but not limited to officers, agents, and deputies.

51.     As described further below, the Task Force is a local, state, and federal partnership that includes, among others, the FBI Salt Lake City and Boise offices and, through their respective police departments, Defendants Canyon County, City of Caldwell, and City of Nampa. Defendants Donahue, Ingram, and Huff directly participate in the Treasure Valley Task Force and are responsible for the direction and implementation of their agency's participation in the Task Force. Upon information and belief, Defendant Sheridan participates in the Task Force, and Defendants Bohls and Sheehan participate in the Task Force and/or are responsible for the direction and implementation of their agency's participation in the Task Force. *See infra* ¶¶ 164-231.

52.     At least four agencies sent Special Weapons and Tactics ("SWAT") teams to the Raid. SWAT teams are militarized, heavily armed units that typically deploy to high-risk situations such as active shooter situations and hostage rescues. SWAT teams typically do not participate in executing warrants when there is no expectation of violence.

53.     Attendees observed ICE—including officers with green vests that said "ICE"—on the scene from the outset of the Raid.

54.     Many of the law enforcement officers were masked, and some did not have easily identifiable insignia. As a result, attendees at the event were left unsure what actors or agencies directly engaged them. This confusion was by design. Federal authorities including DHS have increasingly hidden their identities when engaging the public, and it is now commonplace for federal agents to wear masks and obscure their identities during enforcement actions involving immigration.

55.     Officers pointed guns directly at some Latino-appearing attendees, or threw them to the ground despite their cooperation, as they did to Mr. Z. Ten-year-old A.S.P. came down from

the family's truck crying and tried to hug her father, Mr. Popoca, but officers with guns drawn pushed him and grabbed A.S.P. by the neck, scratching her.

56.     White-appearing event attendees generally did not have guns pointed directly at them and were not treated as roughly as Latino-appearing people. For example, while officers were quick to use physical force on attendees like Mr. Popoca after giving orders, they gave C.C., a white teenage girl who attended the event, time to respond to commands without taking her down.

57.     Law enforcement seemed intent on provoking attendees. They used racial epithets, including "spic," "wetback," and "alien." Officers also swore at many attendees, including minors. One FBI officer walked through the crowd deliberately hitting detainees with his shoulders or elbows in an aggressive manner.

58.     Law enforcement rounded up the attendees and held them on the racetrack, where they were then detained for hours.

59.     During this mass seizure, law enforcement did not permit parents to reunite with their children. After being taken down by officers, Mr. Z. pleaded with officers to allow him to find his sons, including fifteen-year-old Y.Z., who had gone to get food. He was scared for their safety. Officers ignored his request and instead yelled at him to "move the fuck back" towards the track. Mr. Popoca and his daughter were taken to the track, where he was zip-tied. Mr. Popoca looked around to see if he could find his son, sixteen-year-old E.I.P., who he feared could have been hurt or killed. When he saw E.I.P. on the track almost an hour later, zip-tied but alive, Mr. Popoca was on the verge of tears.

60.     Law enforcement zip-tied most adults and many teenagers. As soon as officers zip-tied fifteen-year-old Y.Z., he told them his age and that he was a minor. The officer responded in a

mocking tone and refused to untie him. By contrast, C.C., also fifteen but white, was untied from her zip-ties after her parents complained that she was a minor.

61.     Sixteen-year-old E.I.P. and his minor-aged friends were detained by officers at gunpoint, who yelled at them in English to put their hands up. E.I.P. knew some people around him did not speak English, so he translated the orders into Spanish. This appeared to anger an officer, who yelled to "get the fuck down on the floor" or he would shoot. Officers forced the teens to their knees and zip-tied them. As officers then moved the group towards the track, they ordered them on their knees again next to a military vehicle. At that point, officers shot at a nearby SUV, including with an automatic rifle from the top of the vehicle. The shots went directly over the heads of E.I.P. and others there on their knees.

62.     Law enforcement zip-tied parents with small children and refused to release parents to care for their children. Ms. Rodriguez was zip-tied, and her son, three-year-old Y.R., was upset and did not understand what was happening. Officers repeatedly refused Ms. Rodriguez's requests to be untied so she could hold and console him. As he grew more restless, one officer put Y.R.'s hands in the pocket of Ms. Rodriguez's vest and told him to stay put. This only further distressed Y.R., and he continued to cry. After a few hours, Ms. Rodriguez was temporarily untied so she could use the restroom, and she asked again, with Y.R. in her arms, if she could remain untied to help console Y.R. Officers refused and put new zip-ties on her, which caused Y.R. to cry again.

63.     The zip-ties were painful. Numerous detainees asked law enforcement to loosen them to relieve the pain, but officers refused. Sixteen-year-old E.I.P. complained to officers at several points that his zip-ties were too tight. One replied "that's fine" and another claimed there was nothing he could do. E.I.P. left that day with bruised wrists that hurt for over a week. For fifteen-year-old Y.Z., a couple of hours after first asking officers to loosen his ties and telling them

he was only fifteen, he tried again with another officer. Y.Z. said his zip-ties were too tight and painful; his wrists had started to turn red. The officer laughed and told Y.Z. his ties were too loose. The officer then tightened Y.Z.'s zip-ties, increasing his pain. About thirty minutes later, Y.Z. started to feel the sting of sweat entering an open wound on his now-bleeding wrists. He told yet another officer about his pain. At last, that officer cut Y.Z.'s zip-ties. Y.Z. still has scars from the zip-ties that are visible today. John Carter, another U.S. citizen and a member of the private security team who was detained during the Raid, also asked to have his zip-ties loosened, explaining that he was recovering from a broken clavicle. The nearest officer ignored his request. Eventually another officer loosened the restraints but did not remove them. His children took turns holding up his ailing arm for support during the detainment.

64.     The attendees were detained on the racetrack for four or more hours.

65.     During this prolonged detention, law enforcement did not initially permit detainees to use the porta-potties provided by La Catedral. About an hour into the detention, law enforcement brought porta-potties to the scene and allowed some detainees to use them.

66.     Some detainees were never permitted to use the bathroom. Some, including children, were made to urinate in view of other detainees and law enforcement. Ten-year-old A.S.P. needed the bathroom urgently. Officers refused to let her go, so she had to relieve herself in the middle of the crowded track. A stranger who was detained near them tried to cover up A.S.P. with her sweater. Other attendees who were detained used the space between two white law enforcement vans parked perpendicular to each other to relieve themselves—in full view of detainees, officers, and the public road alongside the racetrack.

67.     The lack of access to bathrooms was particularly harmful for Mr. Z., who has diabetes and needs to use the restroom frequently. Officers denied his repeated requests to use the

bathroom during his four-hour detention. He was only able to go after he was released from custody.

68.     Despite the length of the detainment, law enforcement did not consistently provide water. In some cases, they denied water outright. An officer carrying a twenty-four pack of water bottles walked right past three-year-old Y.R., who pointed and cried out, "Agua! Agua!" Yet an officer snuck Mr. Carter—the white security guard—and his family a bottle of water, making clear they should not tell anyone and should hide the bottle. And when one group of Latino detainees asked for water, law enforcement denied it to them, saying things like "that's what you get for being here." Where water was provided to detainees, most could not drink it themselves because of the zip-ties. Instead, young children such as ten-year-old A.S.P. had to pour water into their mouths.

69.     Detainees were not permitted to eat while being held. Because the Raid began around lunchtime, many detainees had not eaten lunch. Sixteen-year-old E.I.P. was ordered to throw his food away when he was detained. Law enforcement refused to permit parents to feed their young, hungry children, including toddlers and babies. Three-year-old Y.R. cried from hunger and thirst; officers denied Ms. Rodriguez's request to get him snacks from her truck. Other detainees tried to console Y.R. with promises of carne seca and other treats if he could make it through the detention.

70.     Law enforcement continued to use violence during the detainment. At one point, after hours of detainment, officers asked whether anyone was a citizen. When attendee Willis Parrill said he was a citizen, officers responded to him in Spanish. He said he did not speak Spanish and an officer hit him on the head with the butt of a rifle. This caused Mr. Parrill to bleed, see stars,

and drop to the ground on one knee. Mr. Parrill is white but, because he has a darker skin tone, officers perceived him to be Latino and kept speaking to him in Spanish.

71.    Law enforcement did not provide medical care to detainees in obvious need of treatment. Indeed, they did not appear to have medics on scene. Attendee Kenzie Davis, who was among those detained, fainted due to a panic attack when the Raid began. Despite requests from her mother, officers did not give Ms. Davis medical treatment at any point during her detention. Mr. Parrill—bleeding from the head from the rifle hit—never received treatment for his injury. Officers ignored detainees who complained their arms were hurting or numb due to the restraints.

72.    At different points during the Raid, law enforcement searched detainees without individualized cause or consent. This involved reaching into and emptying the pockets of people who were zip-tied, then placing belongings into clear plastic bags that were strung over the detainees' necks. Some officers marked the bags with actual or assumed immigration status.

73.    None of the named plaintiffs were asked questions about gambling—the purported purpose of the investigation. Although law enforcement searched detainees by emptying their pockets, it did not appear that law enforcement examined the contents of items removed, such as for evidence of gambling.

74.    Law enforcement sorted detainees into groups. One reason for the separated groups was to segregate detainees based on perceived immigration status, with individuals with legal status in one group and those without legal status in another. In ordering detainees into a group, law enforcement made assumptions about immigration status based on whether an individual appeared white or Latino. Law enforcement's assumptions about immigration status and ethnicity were at times incorrect. Mr. Carter and his family, who are white, were in the group for people with legal status but Mr. Parrill, who is also white but much darker, was put in the group for people

without legal status. Officers ultimately put Mr. Parrill in the legal status group after several of the detainees around him said he was not Latino.

75.    After four hours of detention, the State and Federal Defendants processed detainees through a tent that law enforcement had erected on the La Catedral grounds (the "ICE Tent").

76.    Law enforcement searched small buildings on the La Catedral property, including a small residence. The detainees were not held in the immediate vicinity of those buildings, either during their hours-long detention on the racetrack or during their processing through the ICE Tent. Further, upon information and belief, law enforcement began processing detainees through the ICE Tent after completing their searches of the buildings on the La Catedral property. The ICE Tent was on the opposite end of the property from the buildings.

77.    The picture below shows the La Catedral property, marked with a red boundary.[11] The small buildings are at the bottom of the picture. The "J"-style racetrack goes from the bottom right of the La Catedral property and proceeds up to the top of the property at an angle. The ICE Tent was set up at the top left of the La Catedral property as viewed in this picture. Jackson Hop LLC is the property next to La Catedral.

---

[11] Aerial Photograph of La Catedral property, pulled from Onyx Maps, www.onxmaps.com, and marked by the plaintiffs' legal team.



78.    After hours of detention, the Federal and State Defendants worked together to process each detainee through the ICE Tent, including escorting detainees to the ICE Tent and then escorting them from there, either off the property or to waiting vans.

79.    Law enforcement held zip-tied detainees in plain view of journalists and members of the public who had gathered outside the La Catedral grounds during the Raid near the ICE Tent. Images of detainees in zip-ties in law enforcement custody in the open areas around the ICE Tent were circulated to large audiences.

80.    Below is a picture showing the expansive ICE Tent, with detained individuals in zip-ties around the outside of it. [12]

---

[12] Photograph of law enforcement raid in Wilder, Idaho, *in* Kyle Pfannenstiel, *After FBI raid in southwest Idaho, advocates denounce 'military-style' tactics and detaining kids*, Idaho Capital Sun (Oct. 20, 2025, 5:46 PM), https://perma.cc/8RDA-SL5B.



81.     ICE officers were inside the ICE Tent. When detainees were brought into the ICE Tent, their zip-ties were removed. The officer that cut Ms. Rodriguez's ties asked her if she was going to run or "be good," even though she had not tried to flee at any point. Mr. Parrill's arms felt like rubber, with pins and needles, after they were untied. An officer told him to "give it a couple of minutes and you'll get full movement back;" it actually took several days.

82.     Inside the ICE Tent, ICE officers questioned detainees about immigration status, not gambling. Some Latino-appearing detainees noted they were treated with more suspicion than white-appearing detainees. For example, when Mr. Popoca gave ICE officers his driver's license, they bent it severely and asked him if it was "good" several times.

83.     Detainees who verified lawful immigration status in the ICE Tent were immediately released after such verification. Approximately 70% or more of attendees had lawful immigration status and were released.

84.    Detainees who allegedly did not have lawful status were taken from the ICE Tent to waiting vans that brought them to a detention center. According to public reports, 105 individuals were brought from the Raid to nearby detention centers.

85.    The Raid caused lasting harm to those detained. Ms. Rodriguez continues to experience emotional distress from the Raid, particularly on the nineteenth day of each month. She's scared to go to Latino cultural and other public events she once enjoyed. Three-year-old Y.R. now notices law enforcement officers wherever he goes. Ms. Rodriguez is concerned that Y.R. is now scared of police. Fifteen-year-old Y.Z. struggled with the trauma of the Raid; at school the next day, his teachers noticed a stark change in his behavior and called home. His grades suffered, he grew anxious of small noises, and he had trouble sleeping, including having recurring nightmares of being detained at gunpoint. Ten-year-old A.S.P. also suffered recurring nightmares. Mr. Parrill has had trouble sleeping, to the point that his girlfriend wakes him up during the night when he is flinching from nightmares about the Raid. Kenzie Davis left feeling scared and anxious. These are only examples; the lasting fear and emotional distress is widespread among the named plaintiffs and other detainees.

## The Raid was an Immigration Dragnet Targeted at the Latino Community

86.    Members of the Task Force have cast the Raid as merely the execution of a criminal search warrant, and they have sought to excuse the hours' long detention of hundreds of attendees in deplorable conditions as a measure taken to secure the scene. But, in reality, the Raid was a coordinated immigration dragnet targeted at the Latino community.

87.    As shown below, the Raid was an unreasonable mass seizure of hundreds of individuals. It ran far afoul of permissible automatic detentions that may attend a search warrant execution. It was done in a manner that gratuitously exacerbated the harm to those detained, and

it was inconsistent with typical criminal warrant executions in Idaho. Instead of a tailored detention incidental to the execution of a search, this was a large-scale immigration dragnet, where the search warrant was transformed into a general warrant to seize hundreds. The search warrant provided Defendants with a convenient cover as they went fishing for immigration arrests of Latino individuals at a public event that drew attendees celebrating Mexican culture, in service of their shared mass deportation goals.

### *The Raid was an Unreasonable Seizure of Hundreds of Event Attendees*

### **(1) The Search Warrant Concerned a Narrow Investigation into Non-Violent Crime**

88.    Prior to the Raid, the Federal Defendants were investigating allegations of unlicensed gambling on races at La Catedral. The type of gambling at issue requires a license under state law, and the La Catedral owner allegedly did not have the required license.

89.    The criminal investigation stemmed from a single tip from an unidentified individual who reached out to the FBI in February of 2025 to complain about the La Catedral races because of a concern that "some individuals" are "a danger to the local community."[13] This individual alleged that illegal gambling was taking place at La Catedral.

90.    As part of the investigation, Defendants secured a search warrant, which is under seal.[14] On Wednesday, October 15, 2025, four days prior to the Raid, Defendant Sheridan secured arrest warrants for five individuals—Ivan Tellez (Tellez), Samuel Bejarno Colin (Colin), Dayana Fajardo (Fajardo), Cesar Inguez Orozco (Orozco), and Alejandro Torres Estrada (Estrada)—from the United States District Court for the District of Idaho. Defendant Sheridan asserted probable

---

[13] *See* Crim. Compl. ¶ 6, *United States v. Tellez*, No. 1:25-mj-00263 (D. Idaho Oct. 15, 2025), ECF No. 2.

[14] Plaintiffs do not know whether there is more than one search warrant, or whether there might be both a state and federal search warrant.

cause for only the crime of illegal gambling, which was, more specifically, a charge of gambling without the required license.

91.    The criminal allegations are that Colin administered an unlicensed gambling operation on horse-races at La Catedral involving parimutuel bets placed online through social media and at the racetrack; that Orozco, Estrada, and Fajardo—Colin's wife—facilitated the exchange of money on bets; and that Tellez helped to facilitate betting. The criminal complaints do not contain any allegations of observed or suspected violence or drug activity.

92.    Tellez is the owner of the La Catedral property. While he allegedly did not have a license for gambling, he did have a permit to conduct horse-racing at La Catedral.

93.    Two days after the Raid, Tellez, Fajardo, Orozco, Colin, and Estrada were indicted on two counts related to unlicensed gambling. The indictments do not contain any charges related to drugs or violent crime.

94.    Colin, Fajardo, Tellez, and Estrada were the only individuals arrested during the Raid on federal gambling charges, and, upon information and belief, no one else has been indicted in federal court related to those charges since the Raid.

95.    The criminal investigation therefore involved low-level, non-violent allegations. Further, according to publicly available information, Defendants did not have information suggesting that there was a credible or specific threat of violence at La Catedral during the Raid. Moreover, undercover agents attended events at La Catedral in August and September of 2025 and would have known that events at La Catedral were staffed with private security who screened all attendees for weapons and who took possession of weapons brought to an event.

96.    Following indictment, prosecutors moved to detain two of the five charged individuals pending trial. Additional disclosures about the criminal investigation in those motions

suggest that law enforcement did not have credible or specific safety concerns about events at La Catedral, and that the alleged criminal enterprise at issue concerned only unlicensed gambling.

### (2) The Mass Seizure Went Far Beyond the Criminal Investigation

97.    The prolonged seizure of the La Catedral crowd was staggeringly disproportionate to any legitimate criminal law enforcement need.

98.    Defendants knew in advance of the Raid that 250 to 500 members of the public typically attend events at La Catedral. The Raid began during peak time for the event, when attendance would be high.

99.    Though the criminal investigation involved low-level and non-violent allegations, and though there were no credible or specific safety threats, Defendants Bohls, Sheehan, and Sheridan (FBI), Porter (ICE), Donahue (County Sheriff's Office), Ingram (Caldwell PD), Huff (Nampa PD), Gardiner (ISP), and others coordinated to deploy approximately 200 law enforcement officers who had guns drawn from the outset, and used military-style gear including armored trucks and flashbang grenades.

100.    Officers from Defendants' agencies detained the entire crowd, including babies, toddlers, and the elderly.

101.    Officers from Defendants' agencies came prepared to zip-tie a large number of individuals.

102.    Officers from Defendants' agencies zip-tied most of the adults in the crowd and many teenagers.

103.    The detentions lasted four or more hours.

104.    Upon information and belief, pursuant to the search warrant, officers from Defendants' agencies conducted searches of small buildings on the La Catedral premises during

the Raid. But the crowd was detained on the racetrack and not in the immediate vicinity of those buildings.

105.    The arrest warrants for Colin, Fajardo, Tellez, and Estrada were executed during the Raid, but Colin and Fajardo were taken into custody soon after law enforcement arrived, and upon information and belief, Tellez, and Estrada were as well. Orozco was taken into custody in another town.

106.    Officers from Defendants' agencies searched the pockets of detainees without individualized suspicion.

107.    Officers from Defendants' agencies searched the cars of attendees without individualized suspicion.

108.    Officers from Defendants' agencies detained attendees without ever asking them questions about gambling.

109.    According to publicly available information, the only evidence uncovered during the Raid is from inside Colin's backpack, as well as "large amounts of cash" found on "several" individuals out of the hundreds of individuals detained.[15] In their press statement announcing the Raid, Defendants, including Defendant Bohls, did not mention recovering any drugs, weapons, or other contraband and, upon information and belief, that's because they found none.[16]

110.    Were Defendants merely securing the scene for searches of the buildings on the La Catedral property, they could have quickly and efficiently dispersed the crowd, rather than detaining them for hours in zip-ties. And they could have executed the search and arrest warrants

---

[15] *See* U.S. Mem. Supp. Det. at 4, *United States v. Colin*, No. 1:25-cr-00291 (D. Idaho Oct. 27, 2025), ECF No. 21.
[16] *See* Press Release, FBI Salt Lake City, FBI, Partner Agencies Make Arrests in Illegal Gambling Operation (Oct. 19, 2025), https://perma.cc/2ENX-APLJ.

at a time or in a manner that did not ensnare hundreds of uninvolved community members. Indeed, detaining hundreds of individuals likely increased the security management issues on the scene.

### (3) The Mass Seizure was Gratuitously Burdensome

111.    Defendants conducted the Raid in a manner that caused gratuitous burdens on the detained crowd.

112.    Officers from Defendants' agencies used unnecessary force, including pointing guns when there was no safety threat and when individuals were complying with orders. Officers from at least Caldwell PD zip-tied children.

113.    Officers from Defendants' agencies used gratuitous violence, such as hitting individuals with rifles, smashing car windows onto those inside, firing rubber bullets into the crowd, and throwing compliant individuals to the ground.

114.    Defendants were unprepared to provide water or access to restrooms. Officers from Defendants' agencies deliberately denied some individuals water despite water being available at the time, and forced some individuals to urinate in view of law enforcement and other detainees.

115.    Despite being prepared to zip-tie a large number of individuals, Defendants did not, on information and belief, come prepared to provide medical care and did not have medics on the scene. Individuals obviously in need of medical treatment were not given medical treatment.

116.    Defendants initiated the Raid at lunchtime and then denied access to food, including taking food from attendees and refusing to let parents feed hungry children.

117.    In processing groups through the ICE Tent, law enforcement paraded each detainee in front of members of the public and press who had gathered near the tent to observe the Raid, with many of those detained in public view while wearing zip-ties. This amounted to public shaming.

118.    Defendants went into the Raid prepared to physically bind all the individuals in the crowd but not to provide them with basic human necessities.

### (4) The Mass Seizure was a Departure from Typical Criminal Investigations

119.    It is not uncommon for federal and local law enforcement to coordinate the execution of a criminal search warrant, and search warrant execution is a common feature of criminal investigations. Yet typical search warrant execution in Idaho looks very different from the La Catedral Raid, with typical searches far more tailored to finding evidence of suspected crime at discrete locations. Further, the execution of search warrants typically does not ensnare hundreds of bystanders.

120.    First, typical search warrant execution is conducted at discrete locations that are targeted because they are likely to return evidence tied to the suspected crime, such as a home or business where crime is suspected to be occurring inside. Caldwell PD and Nampa PD, for example, recently executed search warrants at homes, and law enforcement in Boise executed search warrants at two store front properties; drug trafficking was suspected to be taking place inside each location.[17] Upon information and belief, there is no recent example of law enforcement in Idaho executing a search warrant at a public event venue on a large, open field.

121.    Second, raids executing search warrants are typically far more tailored to the suspected criminal charges. For example, searches related to investigations into drug trafficking or organized crime enterprises typically recover significant amounts of drugs and weapons, and they typically result in charges reflecting those crimes soon afterward. The Task Force, for

---

[17] *See* Kate Jacobson, *Boise Police raid smoke shops, two arrested on drug charges*, Idaho News 6 (Jul. 28, 2025, 12:20 PM), https://perma.cc/8YT3-M8ZK; Press Release, Caldwell Police Department, Explosive Devices, Drugs, 23 Dogs Found During Search Warrant (Oct. 24, 2025), https://perma.cc/G6JY-NPVK; *Nampa man arrested on drug trafficking charges*, KTVB (Mar. 4, 2025, 3:48 PM), https://perma.cc/QS4C-DUQH.

example, executed a search warrant in 2023 during an investigation into drug trafficking and seized approximately 19,900 fentanyl pills, 13.5 pounds of methamphetamine, and three firearms, leading to federal drug charges.[18] Similarly, the Idaho Falls Police Department coordinated the execution of a series of search warrants while investigating drug distribution over several days that resulted in the seizure of, *inter alia*, 73,000 counterfeit fentanyl pills worth approximately $900,000 and five firearms, and the raid led to charges related to drug trafficking days later.[19] And when raids become public, law enforcement usually describe the contraband seized, as in these examples.

122.    It is atypical, and, upon information and belief, without precedent in recent Idaho history, to detain hundreds of individuals at a public, open-air event when executing a criminal search warrant, let alone when executing a criminal search warrant that concerns low-level, non-violent charges. It is further atypical to conduct a raid so disproportionate to the suspected crime, with such a massive law enforcement presence detaining a massive number of individuals while returning no additional federal charges and apparently little, if any, contraband.

## *The Raid was An Immigration Fishing Expedition Motivated by Ethnicity*

123.    The Raid did not look like a typical search warrant execution because it was not a typical search warrant execution. Rather, it was a fishing expedition for immigration violations targeted at the mostly Latino crowd at La Catedral, in furtherance of shared deportation goals and following DHS Secretary Kristi Noem's immigration directives.

124.    In about the spring of 2025, the Trump Administration established a quota of 3,000 immigration arrests per day. Secretary Noem and White House Chief of Staff Stephen Miller

---

[18] *See* Press Release, U.S. Att'y's Off., Dist. of Idaho: Boise, Caldwell Man is Sentenced to 20 years for Fentanyl and Methamphetamine Trafficking (Jan. 31, 2024), https://perma.cc/6D4C-3SLF.
[19] *See* Idaho Falls Police, *Investigators Seize $900,000 worth of Fentanyl Pills*, Idaho Falls (June 30, 2023), https://perma.cc/LMC5-BD5C.

pressured ICE leaders to reach that quota during a meeting in May of 2025. In a statement about that meeting, the DHS spokesperson announced that "[u]nder Secretary Noem, we are delivering on President Trump's and the American people's mandate to arrest and deport criminal illegal aliens and make American safe."[20] The DHS spokesperson "oversees the Department of Homeland Security's public outreach, including its media, digital, strategic and crisis communications efforts, and serves as the principal adviser to Secretary Noem on all external and internal communications."[21]

125.    In support of the Trump Administration quota directive, Mr. Miller said that "we can't take the risk of letting these Biden illegals roam around freely so the next American daughter can get raped, the next American kid can get murdered, the next American family can get splintered and torn apart by people that came into this country unchecked, uncontrolled, unvetted, uninvited by the American people."[22]

126.    The Trump Administration has conscripted FBI officers into immigration enforcement operations to satisfy this directive, including through an Executive Order directing the FBI and other agencies to assist ICE;[23] a Memorandum from former Acting Attorney General Emil Bove instructing the FBI to engage in immigration enforcement activities;[24] and a reported FBI Memorandum stating that the FBI has "been actively engaged in immigration enforcement

---

[20] *See* José Olivares, *Trump administration sets quota to arrest 3,000 people a day in anti-immigration agenda*, The Guardian (May 29, 2025, 6:14 PM), https://perma.cc/W2TV-CF9Z.

[21] *Tricia McLaughlin*, Homeland Security (last visited Feb. 3, 2025), https://perma.cc/J5X7-3AAH.

[22] Fox News, *Stephen Miller reveals Trump admin's 'daily goal' for illegal migrant arrests*, YouTube, at 00:41 (May 29, 2025), https://www.youtube.com/watch?v=MJNXsOqFSZs.

[23] *See Protecting the American People Against Invasion*, The White House (Jan. 20, 2025), https://perma.cc/4VYV-6BPS.

[24] *See* Memorandum from the Acting Att'y Gen. on Interim Pol'y Changes Regarding Charging, Sent'g, and Immigr. Enf't to all Dep't of Just. Emps. (Jan. 21, 2025) (on file with the Washington Post), https://perma.cc/NF7Y-5CE8.

efforts in coordination with our . . . DHS partners" and that, in the coming weeks, there will be "a significant increase in the number of agents participating in immigration enforcement operations."[25]

127.    That shift in priorities coincided with a purge in FBI leadership, including the forced resignation of the agent in charge of the Salt Lake City field office, who was pushed out six months after appointment and only two months before the La Catedral Raid.

128.    Further, to meet their deportation quotas, under Secretary Noem's leadership, ICE has shifted its focus from targeted enforcement against people believed to have violated immigration laws to mass enforcement actions, in which ICE targets locations that it deems likely to have a large number of people without lawful status. Absent individualized indicators of immigration status, these mass enforcement operations require ICE to rely on ethnicity in deciding who to stop or question.

129.    The State Defendants have coordinated with the Federal Defendants to implement their shared deportation goals.

130.    For example, Defendant Donahue is President of the National Sheriff's Association, and has said that his priorities in that role are "border security [and] national security."[26] Through this role, Defendant Donahue has stated that he communicates and coordinates with the Trump Administration in efforts to stop the "cartels infiltrating this country" through partnerships on immigration enforcement.[27]

---

[25] Ken Dilanian & Ryan J. Reilly, *FBI field offices ordered to shift agents to immigration crackdown*, NBC News (May 14, 2025, 11:53 PM), https://perma.cc/UQ45-687Y.
[26] FSACast, *Episode 125: Canyon County Sheriff Kieran Donahue (NSA President)*, Florida Sheriff's Ass'n, at 12:10 (Feb. 18, 2025), https://flsheriffs.org/podcast/entry/episode-125-canyon-county-sheriff-kieran-donahue-nsa-president/.
[27] *Id.* at 16:02.

131.    The Raid was an outgrowth of this coordination. Defendants were motivated to conduct the Raid at La Catedral because it was a Latino community event where Defendants knew they would encounter a large number of Latino individuals, and, based on ethnicity, assumed that they would therefore encounter a large number of individuals without lawful immigration status. Defendants' words and conduct before, during, and after the Raid showed deliberate targeting and mistreatment of Latino individuals and those gathered with them.

### (1) Conflation of Latino Ethnicity with Illegality and Danger

132.    Defendants conflate Latino ethnicity with illegality and criminality.

133.    In support of their deportation goals, Defendants have treated Latino ethnicity and Mexican ancestry synonymously with "enemies," "monsters," and "aliens."

134.    In testimony before Congress, for example, Secretary Noem said that the Trump Administration's aggressive immigration enforcement continued to focus on what she described as threats from Mexican drug cartels seeking to "flood our communities" and "smuggle" humans and arms across our borders. Secretary Noem concluded her testimony by asserting that DHS "is united in our enduring commitment to protect" against these alleged threats "across all domains" in the United States.[28] In her confirmation hearing for Secretary of DHS, Secretary Noem said that, "my hope is that, if given the opportunity to serve as Secretary, that federal government would no longer. . . facilitate an illegal alien invasion[.]"[29]

135.    DHS has publicly used messages associated with white supremacy in recruiting for ICE, including, *inter alia*, a social media advertisement that says, "we'll have our home again,"

---

[28] *Annual Worldwide Threats to the Homeland*: *Hearing Before Comm. on Homeland Sec.*, 119th Cong. 3-4, 6 (2025) (testimony of Kristi Noem, Sec'y, U.S. Dep't of Homeland Sec.), https://perma.cc/V5BB-663U.
[29] PBS NewsHour, *WATCH: Sen. Gallego questions Noem in confirmation hearing*, YouTube, at 2:09 (Jan. 17, 2025), https://www.youtube.com/watch?v=henG0OWUkis.

which is a message affiliated with white-supremacist groups; the advertisement included a song considered a white nationalist anthem.[30]

136.    Defendant Donahue has similarly described "gangs and Mexican Cartels who are destroying our communities" and stated of them, "[t]his is the monster we're fighting – this is the enemy."[31] He warned of "ongoing efforts by Mexican drug cartels to infiltrate communities across the United States and poison our citizens with illicit drugs[.]"[32]

137.    During a 2025 interview, Defendant Donahue spoke to what he called "a very active Hispanic gang population" including "the Mexican cartels" and referred to them as "[t]he enemy [ ] behind the gates." He continued:

> The enemy is among us and they're complex, they're brutal they are violent. And that criminality isn't gonna stop just because we're looking at the criminal illegal alien aspect of deportation. There's a whole other enemy complex that's been here for decades and decades and we have to address that to protect all of our communities.  And the sheriff, as we all know, is that constitutional officer that stands to watch[.][33]

138.    During that interview, Defendant Donahue further warned that "we have to protect our communities and this criminal element is out there. But I see an opportunity to start surgically removing that criminal element from our society, from our citizens."[34]

139.    Defendants likewise conflated Latino ethnicity with undocumented status and criminality at La Catedral.

---

[30] *See* Evan Gorelick, *Administration Social Media Posts Echo White Supremacist Messaging*, The N.Y. Times (Jan. 27, 2026), https://perma.cc/V8R5-67PW.
[31] *Metro Task Force announces a large drug seizure*, Canyon County, Idaho (2023), https://perma.cc/Y86X-P56Z.
[32] Press Release, U.S. Atty's Off., Dist. of Idaho, Three Drug Traffickers Each Sentenced to Ten or More Years in Federal Prison (Nov. 13, 2024), https://perma.cc/3NVB-NR6Q.
[33] FSACast, *supra* note 26, at 04:26, 17:17.
[34] *Id*. at 26:29.

140.    During their pre-Raid investigation, Defendants made assumptions about the immigration status of attendees at La Catedral events based on apparent ethnicity. Undercover agents "determined that there were aliens unlawfully present" at prior La Catedral events, "ascertain[ed] that on average 250 to 500 people" attended the events, and on this basis, "anticipated encountering aliens unlawfully present" during the Raid.[35] Upon information and belief, the only way agents could have determined immigration status while remaining undercover is if attendees disclosed their status in conversation. Upon information and belief, their conclusions about immigration status were based on perceived Latino ethnicity.

141.    When Defendants descended on La Catedral, they came prepared to detain and interrogate hundreds of individuals regarding their immigration status, before they would have had any opportunity to formulate individual grounds for suspicion of immigration violations.

142.    During the Raid, as previously alleged, officers from Defendants' agencies treated Latino individuals as though they were a danger even when they were compliant; used racial epithets for Latinos; deliberately denied some Latino detainees water; sorted detainees into groups based, in part, on assumed immigration status based on perceived ethnicity; and sought to provoke and instill fear among the gathered Latino families.

143.    Defendants did, indeed, engender lasting fear among the Latino attendees. *See supra* ¶ 85.

144.    After the Raid, Defendants also made statements suggesting the events at La Catedral were entirely a criminal enterprise, despite that they are highly popular events for local

---

[35] U.S. Mem. Supp. Det., *United States v. Colin, supra* note 15, at 4.

families. For example, Governor Little referred to events at La Catedral as "illegal gambling events" in a statement announcing the Raid.[36]

### (2) Immigration Focus of the Raid

145.    Defendant Sheehan of the FBI described the Raid as a "nearly impossible task" and a "massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states"[37] yet, for the FBI, executing warrants for five people accused of non-violent unlicensed gambling is not a "massive undertaking" that necessitates hundreds of law enforcement officers.

146.    A large-scale immigration dragnet, on the other hand, is a massive undertaking.

147.    Indeed, prior to and during the Raid, Defendants were focused not on investigating unlicensed gambling, but on rounding up Latino community members for an immigration shakedown that would advance Defendants' shared deportation goals and the Trump Administration's immigration quotas.

148.    As alleged above, Defendants had "anticipated encountering aliens unlawfully present" during the Raid—a determination that was, upon information and belief, based on perceived ethnicity of event attendees.[38]

149.    Further, Defendant Sheridan's affidavits in support of the arrest warrants for Colin, Estrada, and Fajardo underscored that they are Mexican citizens and undocumented.

---

[36] Press Release, Brad Little, *supra* note 9.

[37] Email from Defendant Sheehan to *inter alia* Defendants Porter, Donahue, Ingram, Huff, and Gardiner (Oct. 20, 2025, 6:32 PM) *in* Caldwell Police Department response to American Civil Liberties Union of Idaho Public Record Request dated January 26, 2026 (on file with American Civil Liberties Union) ("Sheehan Email").

[38] U.S. Mem. Supp. Det., *United States v. Colin*, *supra* note 15, at 4.

150.    In pre-Raid planning meetings described more fully below, *see infra* ¶¶ 169-181, the State and Federal Defendants crafted a plan to detain event attendees and bring them through the ICE Tent for immigration processing.

151.    On the day of the Raid, ICE set up a tent for immigration processing. As planned, officers from agencies including the County Sheriff's Office, Caldwell PD, Nampa PD, and ISP detained event attendees and brought them to the ICE Tent for immigration interrogation.

152.    Each detainee was forced through immigration interrogation in the ICE Tent. Inside the ICE Tent, the only questions other than basic identifying information concerned immigration status.

153.    Those detainees with lawful status were released only after verifying immigration status to ICE, and they were released immediately after such verification. Detainees allegedly without lawful status were taken into custody by ICE.

154.    Upon information and belief, no one detained during the Raid was released until they verified their immigration status to ICE, and they were released on a rolling basis: As soon as they verified lawful immigration status to ICE, they were released.

155.    The named plaintiffs did not observe any law enforcement activity during the Raid that appeared related to a criminal investigation. The law enforcement activity they observed all seemed tailored to facilitating the processing of detainees through the ICE Tent, including separating detainees into groups based in part on immigration status.

156.    Following the Raid, Defendants assessed the operation as a successful immigration operation. Defendant Porter wrote in an email that included Defendants Sheehan, Donahue, Ingram, Huff, and Gardiner: "On behalf of ICE/ERO, I [ ] wanted to thank everyone for their

support during this operation. We ended up with 105 arrests, which wouldn't have been possible without everybody here. Thank you for putting the Boise ICE office on the map!"[39]

### (3) The Raid is Consistent with DHS Immigration Raids using Criminal Warrants

157.    While the La Catedral Raid is not consistent with typical search warrant execution in Idaho, it is consistent with joint federal and state law enforcement raids during the second Trump Administration that have similarly abused criminal search warrants to detain large groups of Latino individuals and then fish for immigration violations. These similar raids have occurred across the country, with examples at least including raids in 2025 in Austin, Texas; Colorado Springs, Colorado; Cato, New York; and Chicago, Illinois.

158.    First, as at La Catedral, these abusive criminal warrant raids involved an excessive and militarized law enforcement presence, and these raids targeted locations known to have a large presence of Latino individuals. In Colorado Springs, for example, 300 law enforcement officers from numerous agencies including the FBI and DHS raided a Latino nightclub.[40] In Chicago, 300 law enforcement officers from numerous agencies including the FBI and DHS raided an apartment building where dozens of Latino individuals lived.[41] In both those and other similar raids, law enforcement descended in militarized fashion, such as using a helicopter and flashbang grenades.

---

[39] Email from Defendant Porter to *inter alia* Defendants Sheehan, Donahue, Ingram, Huff, and Gardiner (Oct. 20, 2025, 10:03 PM) *in* Caldwell Police Department response to American Civil Liberties Union of Idaho Public Record Request dated January 26, 2026 (on file with American Civil Liberties Union) ("Porter Email").

[40] *See generally* Eduardo Medina, *D.E.A. Says More Than 100 Undocumented Immigrants Were Detained in a Colorado Raid*, N.Y. Times (Apr. 27, 2025), https://perma.cc/K43G-V3R7; Chris Boyette, *More than 100 migrants were detained during a raid on a Colorado nightclub. Here's what we know*, CNN (Apr. 28, 2025, 6:55 PM), https://perma.cc/PF9G-W46E; 9News, *More than 100 detained in DEA raid on illegal underground nightclub, agency says*, YouTube (Apr. 27, 2025), https://www.youtube.com/watch?v=4gOFR3-4bzE.

[41] *See generally* Melissa Sanchez et al., *"I Lost Everything": Venezuelans Were Rounded Up in a Dramatic Midnight Raid but Never Charged With a Crime*, ProPublica (Nov. 13, 2025, 5:00 AM), https://perma.cc/Z2SM-HDLJ.

159. Second, as at La Catedral, in these raids, law enforcement used criminal warrants that contained specious or low-level allegations as an excuse, and large groups of Latino individuals, including U.S. citizens and others with lawful status, were detained in a manner that ran far afoul of search warrant execution needs. In the Austin raid, for example, law enforcement was surveilling a gathering of multiple Latino families at a vacation rental home during a five-year-old's birthday party.[42] Law enforcement pretextually stopped two drivers who left the home, one of whom was working for a food delivery service. After finding individual amounts of drugs on the drivers, law enforcement obtained a search warrant for the home. They then detained everyone there, including children as young as three years old. Similarly, in Colorado Springs, law enforcement detained everyone in the nightclub, detaining over one hundred individuals, and zip-tying people , including at least one U.S. citizen. And in Cato, they seized about 160 employees in a snack bar factory while executing a warrant for employment violations against the employer, and these seizures, once again, included U.S. citizens.[43]

160. Third, as at La Catedral, those detained were subject to immigration interrogation and the raids resulted in far more arrests for immigration violations than for criminal violations. In Austin, nearly fifty individuals were arrested for alleged immigration violations while, on information and belief, none of those detained during the raid faced criminal charges. In other instances, following the raid, there were zero or very few individuals arrested at the raid on

---

[42] *See generally* Francesca D'Annunzio, *Officials Say They Busted a Tren De Aragua Party. Attendees Beg to Differ*, Texas Observer (Sept. 22, 2025, 7:00 AM), https://perma.cc/GS59-MN8E; Alejandro Serrano, *Months after detaining 47 people accused of being Tren de Aragua in Austin, authorities offer no evidence of gang ties*, Texas Tribune (June 4, 2025, 5:00 AM), https://perma.cc/T8BX-9B7V.

[43] *See generally United States v. Juarez-Lopez*, No. 5:25-CR-00424, 2025 WL 3787214, at *2-6 (N.D.N.Y. Dec. 18, 2025); Finn Lincoln, *Federal agents, deputies raid Central New York nutrition bar manufacturing plant*, Central NY News (Sep. 4, 2025, 3:20 PM), https://perma.cc/Q97Y-KQBZ.

criminal charges, but dozens or hundreds who were arrested on immigration violations. And, in Cato, as at La Catedral, detainees were sorted based on actual or assumed immigration status.

161.    Finally, and just as with the La Catedral Raid, law enforcement who conducted these abusive raids conflated Latino ethnicity with illegality and danger, including the DHS spokesperson. The DHS spokesperson characterized the raid of the Chicago apartment building as "a location known to be frequented by Tren de Aragua members and their associates."[44] Despite these claims, the federal government provided no evidence that a single individual detained was a member of Tren de Aragua.

162.    Similarly, referencing the Colorado Springs raid, President Trump wrote on Truth Social: "A big Raid last night on some of the worst people illegally in our Country — Drug Dealers, Murderers, and other Violent Criminals, of all shapes and sizes, and Judges don't want to send them back to where they came from. If we don't win this battle at the Supreme Court, our Country, as we know it, is FINISHED! It will be a Crime ridden MESS. MAKE AMERICA GREAT AGAIN!"[45] Upon information and belief, no criminal charges were filed following the raid other than against two individuals for whom law enforcement had arrest warrants prior to the raid.

163.    The State Defendants were aware the Federal Defendants have been conducting these comparable immigration dragnets. News of these comparable raids is widespread, and, as previously alleged, Defendant Donahue regularly communicates with the Trump Administration about immigration enforcement.

---

[44] *See* Statement from Tricia McLaughlin, Assistant Sec'y for Pub. Aff. at the Dep't of Homeland Sec., Dep't of Homeland Sec. (Nov. 6, 2025), https://perma.cc/5W48-FD2B.
[45] @realDonaldTrump, Truth Social (April 27, 2025, 06:59 PM), https://perma.cc/YWY3-BRPQ.

### Conspiracy Among the Defendants

164. In carrying out the Raid, the State and Federal Defendants conspired to abuse criminal warrants to conduct a large-scale immigration dragnet deliberately targeted at a large gathering of Latino individuals because of their ethnicity.

165. Each of the Defendants took an overt act in furtherance of the conspiracy and shared the conspiracy's goal. Defendants held several planning meetings; they coordinated through the Treasure Valley Task Force, in which most Defendants are partners; and during the Raid, they coordinated to detain attendees, hold them at a distance from the search-warrant execution, and interrogate them about immigration status in the ICE Tent. Afterward, they publicly sought to conceal the Raid's immigration focus and minimize the damage caused while lauding the Raid's outcome. Privately, Defendants celebrated their successful dragnet via email, congratulating each other on "a very successful outcome" and confirming that the Raid "wouldn't have been possible without everybody here."[46]

166. Defendants' overarching involvement in the conspiracy was as follows:

    i. Defendants Bohls (FBI), Sheehan (FBI), Porter (ICE), Donahue (County Sheriff's Office), Ingram (Caldwell PD), Huff (Nampa PD), and Gardiner (ISP), are responsible for the direction and supervision of those from their respective agencies who carried out the Raid.

    ii. Defendants Sheehan, Porter, Donahue, Ingram, Huff, and Gardiner were directly involved in planning and/or executing the Raid. At least Defendant Donahue directly participated in the Raid.

---

[46] Sheehan Email, *supra* note 37; Porter Email, *supra* note 39.

    iii.   Defendant Bohls (FBI), upon information and belief, also knew of and was involved in planning and executing the Raid.

    iv.   Defendant Sheridan (FBI) participated in the underlying investigation and secured the warrants that were used to detain the crowd at La Catedral and, upon information and belief, knew of and was involved in planning and executing the Raid.

    v.   Defendants Donahue, Ingram, and Huff acted as the final policymakers for Defendants Canyon County, City of Caldwell, and City of Nampa, respectively, in planning and/or executing the Raid.

    vi.   Defendants Sheehan, Bohls, Porter, Donahue, and Ingram each issued public and/or private statements that ratified the Raid, sought to conceal the Raid's impropriety, and/or celebrated the Raid's outcome.

167.    Upon information and belief, and as alleged above, the Trump Administration and Secretary Noem created pressure and issued directives that prompted the Raid.

168.    Additional specific acts of each Defendant in the conspiracy are set out in further detail in the next sections.

### (1) Planning for the Raid

169.    The Treasure Valley Task Force—in which Defendants Bohls and Sheehan (FBI), Donahue (County Sheriff's Office), Ingram (Caldwell PD), and Huff (Nampa PD), among others, are partners—participated in and coordinated the Raid.

170.    As explained further below, Treasure Valley Task Force members collaborate closely in pursuit of shared law enforcement goals.

171.    Upon information and belief, Defendants who are participants in the Task Force engaged in the same synergistic partnership in executing the Raid as in prior Task Force operations.

172.    Defendant Sheridan (FBI) was involved in the investigation, and signed affidavits in support of arrest warrants for the five individuals accused of unlicensed gambling at La Catedral, which served as the purported basis for the Raid.

173.    Officers from the FBI, ISP, and the County Sheriff's Office participated in several meetings in advance of the Raid to coordinate their plan.

174.    Officers from two additional local agencies that have SWAT teams participated in the pre-Raid meetings. Caldwell PD and Nampa PD participated in the Raid, are members of the Task Force, and have SWAT teams. Further, Caldwell PD confirmed that it sent its SWAT team to the Raid. Accordingly, upon information and belief, Caldwell PD and Nampa PD participated in pre-Raid meetings.

175.    On October 14, 2025, numerous Defendants participated in a telephonic planning meeting, including at least officers from ISP, including the ISP SWAT Team Commander, sent by Defendant Gardiner; the FBI Boise Office, including Defendant Sheehan; and "SWAT team commanders and team leaders" from the County Sheriff's Office, Caldwell PD and Nampa PD.[47]

176.    On October 18, 2025, numerous Defendants participated in another operational planning meeting, this time in person in Canyon County. Officers from the FBI Boise Office, ISP, County Sheriff's Office, Caldwell PD, and Nampa PD participated in this planning meeting.

177.    At the meeting on October 18, an operational plan was established for the ISP SWAT team and SWAT teams from the County Sheriff's Office, Caldwell PD, and Nampa PD. The

---

[47] *See* Idaho State Police, Case Report: Case No. 2025-00121516, at 1 (Nov. 12, 2025, 12:34 PM) *in* Idaho State Police response to American Civil Liberties Union of Idaho Public Record Request dated Oct. 30, 2025 (on file with American Civil Liberties Union) ("ISP Case Report").

operational plan included, among other things, that these SWAT teams would: surround the La Catedral property; create a perimeter that prevented exit; detain attendees; and then move detainees through the "processing area."[48]

178.   As alleged more specifically above, the only processing area during the Raid was the ICE Tent, through which all detainees were processed, and in which detainees were asked only about immigration status.

179.   On October 19, 2025—the day of the Raid—the County Sheriff's Office conducted an operational and tactical planning briefing near its office. Officers from ISP, Caldwell PD and Nampa PD participated in this planning meeting.

180.   The State and Federal Defendants' advance planning included coordinating to bring military-grade weapons and enough zip-ties for hundreds of people.

181.   Part of the plan for the Raid also included coordinating with DHS to bring the ICE Tent and to conduct immigration status screenings before releasing detainees from the Raid.

## (2) Coordination During the Raid

182.   The two hundred officers from local, state, and federal agencies acted in lockstep in descending on La Catedral.

183.   The phalanx of officers arrived heavily armed with flashbang grenades, armored vehicles, snipers, and a helicopter; detained everyone in sight; and fished for immigration violations.

184.   At the Raid, Defendants Bohls (FBI), Sheehan (FBI), Porter (ICE), Donahue (County Sheriff's Office), Ingram (Caldwell PD), Huff (Nampa PD), and Gardiner (ISP)—and/or those acting at their direction and under their control and supervision—were directly involved in

---

[48] *Id.*

detaining attendees, holding them at the racetrack, and then processing them through immigration status screening.

185.    ISP SWAT, along with SWAT teams from the County Sheriff's Office, Caldwell PD, and Nampa PD, surrounded the perimeter of the La Catedral property to prevent exit and then detained attendees.

186.    The State and Federal Defendants coordinated with each other to detain attendees at the Raid with zip-ties, including children.

187.    ISP SWAT then moved detained individuals to another location near the racetrack where "[t]he detainees were put into groups[.]"[49] SWAT teams from the County Sheriff's Office, Caldwell PD, and Nampa PD assisted and did the same.

188.    The State and Federal Defendants sorted individuals into groups based in part on perceived immigration status, including assumptions based on perceived ethnicity.

189.    ISP SWAT then "moved" detained people to the "processing tent."[50] SWAT teams from the County Sheriff's Office, Caldwell PD, and Nampa PD assisted and did the same.

190.    ICE was on the scene of the Raid at the outset. ICE set up the aforementioned tent and it was used exclusively for immigration screening. ICE questioned attendees about immigration status and released them only upon verifying their immigration status. There was no other "processing" area.

191.    During the Raid, State Defendants coordinated with ICE officials at the ICE Tent, bringing detainees into and out of the tent, and communicating with federal immigration officers to facilitate this processing.

---

[49] *Id.* at 2.
[50] *Id.*

192.     Additionally, ISP SWAT "remained on scene and provided security" for the federal officers "who were processing detainees" in the ICE Tent.[51] After ICE processed all detained individuals and the ICE Tent was taken down, "ISP SWAT clear [sic] the scene."[52]

193.     As a result of State and Federal Defendants' actions, hundreds of people were detained in burdensome and harmful conditions and forced to verify immigration status before being released from the La Catedral grounds.

### (3) Failure to Intervene

194.     Named plaintiffs and putative-class member witnesses did not observe any of the law enforcement actors intervening to stop the Raid's execution.

195.     Members of law enforcement did not intervene to stop the improper mass detention of event attendees.

196.     They did not intervene to release those detained for hours—including children—in degrading and harmful conditions.

197.     They did not intervene to stop searches absent individualized suspicion.

198.     They did not intervene to stop the systematic funneling of event attendees to the ICE tent for immigration interrogation absent individualized suspicion.

199.     Nor did they stop ICE from conducting suspicionless interrogations as to immigration status.

200.     If the operation was not going according to plan, each and any of Defendants could have intervened. They did not.

---

[51] *Id.*
[52] *Id.*

## (4) Concealing the Raid's Brutality and Immigration Purpose

201.    After the Raid, Defendants sought to cover up their roles and conduct, and the roles and conduct of their co-conspirators, in at least three ways.

202.    First, Defendants publicly sought to minimize their misconduct toward children. While children were zip-tied as described above, and though Caldwell PD admitted to zip-tying children, the FBI called reports of zip-tying children "completely false."[53] The FBI later backpedaled and said that such reports were false as to "young children."[54]

203.    Second, Defendants publicly misrepresented and sensationalized the allegations, castigating La Catedral as a site of violence and animal abuse—absent any evidence of such conduct.

204.    For example, the DHS spokesperson released a written statement soon after the Raid that characterized what was, in fact, alleged unlicensed gambling as "an illegal horse-racing, animal fighting, and a gambling enterprise operation,"[55] despite that the horse-racing was licensed and legal, and there were no allegations of animal fighting. The DHS spokesperson further celebrated the Raid, stating that "[a]s part of the operation, ICE law enforcement officers arrested 105 illegal aliens. Under President Trump and Secretary Noem, we are dismantling criminal networks in the United States."[56]

205.    During an interview following the Raid, State Defendant Ingram described the investigation into non-violent unlicensed gambling as "a criminal investigation into, really, a

---

[53] Kyle Pfannenstiel, *FBI backtracks on denying children were zip-tied in Idaho raid, saying instead no 'young' kids were*, Idaho Capital Sun (Oct. 22, 2025, 5:41 PM), https://perma.cc/SEK7-YLJR.
[54] *Id.*
[55] *Canyon County Sheriff calls DHS statement on ICE-led raid 'completely false'*, Idaho News (Oct. 22, 2025, 11:02 AM), https://perma.cc/7XV5-FB6D.
[56] *Id.*

cartel" and stated that Caldwell PD agreed to partner in the Raid because "I don't want cartels in Idaho."[57]

206.    Likewise, while the criminal complaints and the indictment secured days later contain no charges of drugs or violence, FBI Defendant Bohls said in a press statement following the Raid that "[i]llegal gambling isn't a victimless crime" and "[t]hese operations can create an increase in violent crime, drug activity, and violence, putting communities at risk."[58]

207.    Governor Little similarly misstated the underlying criminal investigation and overstated the criminal allegations, stating after the Raid that "[i]llegal gambling operations involving animals often accompany drug trafficking, animal abuse, illegal weapons trafficking, and large sums of money that end up in the hands of cartel bosses."[59]

208.    Third, Defendants sought to conceal the Raid's immigration purpose.

209.    For example, while DHS publicly announced that ICE led the Raid, Governor Little tried to minimize both the immigration purpose of the Raid and the improper manner of search warrant execution, stating that, "The State of Idaho provided support in the service of a warrant issued by a federal judge in connection with the illegal activities taking place in Wilder" and described that "[w]hen serving a search warrant, it is common practice for law enforcement to detain others present while processing the scene to ensure the safety of both the civilians and officers present and to preserve evidence."[60]

---

[57] *Caldwell Police chief discusses Wilder operation, calls DHS' comment 'misleading'*, KTVB, at 1:14, 2:08 (Oct. 23, 2025), https://www.ktvb.com/video/news/local/idaho/caldwell-police-chief-discusses-wilder-operation-calls-dhs-comment-misleading/277-0b6ac5de-f0cc-4b07-9d74-0fb466cb8c31.
[58] Press Release, FBI Salt Lake City, *supra* note 16.
[59] Press Release, Brad Little, *supra* note 9.
[60] *Id.*

210.    Others, including State Defendants Donahue and Ingram, similarly tried to conceal the Raid's immigration purpose, stating that the Raid "was not an ICE-led enforcement action" and was instead led by the Task Force "with support from multiple federal, state, and local partners."[61]

211.    DHS has maintained that ICE led the Raid.

212.    While publicly distancing themselves from immigration enforcement, privately, Defendants were celebrating their immigration dragnet.

213.    The day after the Raid, Defendant Sheehan sent an email that included Defendants Porter, Donahue, Ingram, Huff, and Gardiner, stating, in full:

> All,
> I wanted to take a minute to thank each and every one of you, your agencies, and your personnel who assisted in the operation yesterday. We absolutely could not have done this without you. You made a nearly impossible task have a very successful outcome. This was a massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states. Thank you again for your continued partnership, trust, and shared commitment to enforcing the laws of this state and country. It's an honor to stand alongside of you. Thank you again and stay safe.[62]

214.    Defendant Donahue responded to the aforementioned email thread stating, in full, "Thank you, Chris [Defendant Sheehan], As always, it is an honor to work with you and to be a part of operations like this as we pursue public safety and enforce the rule of law."[63]

215.    Defendant Porter then replied to the aforementioned email thread, in full, "On behalf of ICE/ERO, I also wanted to thank everyone for their support during this operation. We

---

[61] *Canyon County Sheriff calls DHS statement on ICE-led raid 'completely false'*, *supra* note 55.
[62] Sheehan Email, *supra* note 37.
[63] Email from Defendant Donahue to *inter alia* Defendants Sheehan, Porter, Ingram, Huff, and Gardiner (Oct. 20, 2025, 6:59 PM) *in* Caldwell Police Department response to American Civil Liberties Union of Idaho Public Record Request dated January 26, 2026 (on file with American Civil Liberties Union).

ended up with 105 arrests, which wouldn't have been possible without everybody here. Thank you for putting the Boise ICE office on the map!"[64]

### (5) Significant State Action

216.    State actors played significant roles in the Raid.

217.    As Federal Defendants Sheehan and Porter put it, the federal officers "absolutely could not have done [the Raid] without" the State Defendants.[65]

218.    Officers from State Defendants' agencies comprised more than a quarter of the total law enforcement presence.

219.    Specifically, the County Sheriff's Office sent its SWAT Team to the Raid.

220.    Caldwell PD sent 16 officers to the Raid.[66]

221.    As part of, or in addition to, these aforementioned officers, Caldwell PD sent its SWAT team to the Raid.

222.    Nampa PD sent 26 officers to the Raid.[67]

223.    As part of, or in addition to, these aforementioned officers, Nampa PD sent its SWAT team, also known as a Tactical Response Team, which has 14 officers.[68]

224.    ISP sent its SWAT Team to the Raid. ISP SWAT "is made up of 16 troopers" including "2 snipers, 2 kinetic breachers, 1 tactical medic, and a majority of the team trained in advanced tracking."[69]

---

[64] Porter Email, *supra* note 39.
[65] Sheehan Email, *supra* note 37. *See also* Porter Email, *supra* note 39 (Raid "wouldn't have been possible without everybody here.").
[66] Carolyn Komatsoulis, *How much did ICE raid near Boise, Idaho cost taxpayers?*, Idaho Statesman (Dec. 11, 2025, 4:00 AM), https://perma.cc/7RPZ-VXFF.
[67] *Id.*
[68] *Specialty Units*, City of Nampa, https://perma.cc/YFZ4-D2CS.
[69] Idaho State Police, *ISP SWAT Team*, Facebook (Sept. 24, 2025), https://perma.cc/M85Y-H5VH.

225.    Moreover, the state participants in the Task Force provide funding for Task Force operations. As one example, Idaho state/local agencies, including Task Force members, fully fund a special prosecutor—a federally deputized Canyon County Deputy Prosecuting Attorney–who prosecutes all referrals from the Task Force.

226.    Further, State Defendants paid their officers' wages during the Raid out of their own budgets. For example, Nampa PD spent $24,000 on officers' wages during the Raid; Caldwell PD spent $11,300.[70]

227.    Further, the Task Force advances local law enforcement goals.

228.    This includes supporting local police departments. As one example, in 2023, the Task Force helped Caldwell PD arrest a person accused of a local shooting.[71]

229.    Task Force operations lead to both federal and state prosecutions. As of 2023, the Task Force had "submitted cases federally resulting in the indictment of over 530 individuals" and "[m]ore than 100 additional individuals ha[d] been indicted in State court on various criminal charges."[72]

230.    State Defendants have lauded the Task Force as integral to their local law enforcement goals. For example, State Defendant Donahue praised "the importance of multi-jurisdictional task forces in our efforts to" prevent drug overdoses in the Treasure Valley.[73] The County Sheriff's Office was a "founding member" of the Task Force.[74]

---

[70] *See* Carolyn Komatsoulis, *supra* note 66. In response to a public record request, the County Sheriff's Office and ISP did not provide information on wages that day.

[71] *See Person suspected in downtown Boise shooting arrested*, Idaho Press (Sept. 8, 2023), https://perma.cc/KC7T-JATS.

[72] *Metro Task Force announces a large drug seizure*, *supra* note 31.

[73] *Id*.

[74] *Sheriff Donahue joins U.S. Attorney Hurwit and Nampa and Caldwell Police Chiefs in PSA highlighting renewed focus on violent crime in Canyon County*, Canyon County, Idaho (2023), https://perma.cc/6WWE-PT8M.

231.    Likewise, State Defendant Ingram announced that the Task Force "continues to prove its worth" in advancing local law enforcement goals.[75]

232.    At the same time, state action was not limited to action through Task Force participation. ISP—one of the primary state actors in the Raid—is not currently on the Task Force.

## CITY AND COUNTY LIABILITY

233.    Defendants Donahue, Ingram, and Huff are final decisionmakers and final policymakers for the County and City defendants, and their intentional acts were the moving force behind the deprivation of rights of the plaintiffs, as alleged more specifically herein. Defendants Donahue, Ingram, and Huff directly caused and/or directed their subordinates to cause the deprivations of the rights of the plaintiffs, and/or ratified said deprivation.

234.    The acts of Defendants Donahue, Ingram, and Huff include but are not limited to: planning the Raid and/or directing those under their supervision to plan the Raid; directing those under their supervision to participate in the Raid, which included detentions, facilitation of detentions, searches, and moving people through immigration processing; ratifying the Raid after the fact; covering up the Raid's immigration function; and, in the case of at least Defendant Donahue, directly participating in the Raid.

## CLASS ACTION ALLEGATIONS

235.    The named plaintiffs seek to represent a class of all those individuals who were temporarily seized at La Catedral on October 19, 2025, who were not arrested for criminal violations.

---

[75] *Metro Task Force announces a large drug seizure*, *supra* note 31.

236.    The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is sufficiently numerous as to make joinder impracticable. The proposed class is approximately 400 individuals.

237.    The proposed class meets the commonality requirement of Federal Rule of Civil Procedure 23(a)(2) because all members of the class were subject to automatic detention during the Raid; they were all detained in the same manner; and they were all detained on the same basis. The questions of law and fact common to the class include but are not limited to:

    a.   Whether Defendants' detention of attendees incident to the warrant execution at the La Catedral Raid was in violation of the Fourth Amendment;

    b.   Whether Defendants' detention of attendees incident to the warrant execution at the La Catedral Raid was done in an unreasonable manner in violation of the Fourth Amendment;

    c.   Whether Defendants were engaged in a conspiracy to detain those at La Catedral for an improper immigration purpose and/or in an unreasonable manner;

    d.   Whether Defendants were motivated by ethnicity in detaining the attendees at La Catedral;

    e.   Whether Defendants were engaged in a conspiracy to deprive those detained at La Catedral of equal protection of the law; and

    f.   Whether Canyon County, City of Caldwell, and City of Nampa had a policy to execute the search and arrest warrants in an unreasonable manner or otherwise in violation of the Fourth Amendment.

238.    The proposed class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3) because the named plaintiffs' legal claims are typical to all members of the proposed class. The named plaintiffs have no interests separate from those of the class they seek to represent and seek no relief in conflict with or inconsistent with the relief sought on behalf of the class. Defendants have acted in a manner adverse to the rights of the members of the class as a whole, making relief appropriate regarding the class as a whole.

239.    The proposed class meets the adequacy requirement of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the class.

240.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise to adequately prosecute this case on behalf of the named plaintiffs and the proposed class. Plaintiffs' counsel will fairly and adequately represent the interests of each class member.

241.    The proposed class can be maintained under Federal Rule of Civil Procedure 23(b)(1) because adjudications as to the legality of detention or the conspiracy at issue with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

242.    The proposed class can also be maintained under Federal Rule of Civil Procedure 23(b)(3). The proposed class satisfies Rule 23(b)(3)'s predominance requirement because questions of law or fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. With respect to predominance, specifically, questions such as whether the detention

of attendees at La Catedral at a location not in the immediate vicinity of the search warrant execution violated the Fourth Amendment; whether Defendants chose to effect the Raid at La Catedral in part because it was a gathering of Latino community members; and whether Defendants engaged in a conspiracy under Sections 1983 and 1985(3) will drive resolution of class members' claims. None of these questions turn on an individual class member's fact-specific circumstances; rather, they are capable of resolution as to all class members with one stroke. Further, adjudicating those questions at once is far more efficient and fair to the parties than four hundred separate adjudications on the same subject.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
Section 1983 Conspiracy to Conduct Unreasonable Seizure
In Violation of the Fourth Amendment
*On Behalf of all Plaintiffs Against all Defendants*

243.    The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

244.    The Federal and State Defendants conspired with each other by entering into a mutual agreement to abuse criminal warrants to detain the plaintiffs in a mass seizure and immigration dragnet without lawful authority, in violation of the Fourth Amendment. This includes, but is not limited to, planning to use the Fourth Amendment exception permitting seizure incident to warrant execution when that exception did not apply.

245.    In furtherance of this conspiracy, Defendants committed overt acts including but not limited to: preparing a plan to conduct a large-scale automatic seizure of the attendees at La Catedral and subject them to immigration interrogation; and, at the Raid, descending on La Catedral with military-grade weapons and enough zip-ties for hundreds of people, despite the absence of any specific safety threat; detaining the plaintiffs automatically as incident to warrant

execution when automatic detention was not permitted, and further without reasonable suspicion, probable cause, or other lawful authority; detaining the plaintiffs when they were not in the immediate vicinity of the search warrant execution; continuing to detain the plaintiffs for four hours without food and in burdensome conditions; engaging in burdensome, violent, and abusive behavior toward the plaintiffs; moving the plaintiffs through the ICE Tent for interrogations about their immigration status; interrogating the plaintiffs about their immigration status; only releasing the plaintiffs after forcing them to verify lawful status; and facilitating the unlawful seizure and interrogation of the plaintiffs.

246.    As a result of the conspiracy, Defendants violated the plaintiffs' Fourth Amendment rights to be free from unlawful seizures.

247.    The conspiracy was committed under color of state law because the State Defendants played a significant role in the conspiracy, including but not limited to: meeting with the Federal Defendants to plan the Raid in advance and, during the Raid, detaining the plaintiffs, facilitating the detention of the plaintiffs, and moving the plaintiffs to the ICE Tent for immigration processing. Further, the unlawful seizures would not have been possible without the State Defendants, the State Defendants had a significant presence at the Raid, and the State Defendants were advancing State goals.

248.    Plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

249.    Defendants are jointly and severally liable for the harm caused.

**SECOND CLAIM FOR RELIEF**
Section 1983 Conspiracy to Deny Equal Protection
In Violation of the Fourteenth Amendment
*On Behalf of all Plaintiffs Against all Defendants*

250.    The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

251.    The Federal and State Defendants conspired with each other by entering into a mutual agreement to abuse criminal warrants to conduct a mass seizure and immigration dragnet targeted at a large gathering of Latino community members based in part on their actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity, in violation of the plaintiffs' Fourteenth Amendment rights.

252.    In furtherance of this conspiracy, Defendants committed overt acts including but not limited to: preparing a plan to conduct a large-scale automatic seizure of attendees at La Catedral and subject them to immigration interrogation based in part on the fact that it was a large gathering of Latino people; and, at the Raid, descending on La Catedral with military-grade weapons and enough zip-ties for hundreds of people, despite the absence of any specific safety threat; detaining the plaintiffs automatically as incident to warrant execution when automatic detention was not permitted, and further without reasonable suspicion, probable cause, or other lawful authority; continuing to detain the plaintiffs for four hours without food and in burdensome conditions; engaging in burdensome, violent, and abusive behavior toward the plaintiffs; separating the plaintiffs into groups based in part on ethnicity; moving the plaintiffs through the ICE Tent for interrogations about their immigration status; interrogating the plaintiffs about their immigration status; only releasing the plaintiffs after forcing them to verify lawful status; and facilitating the unlawful seizure and interrogation of the plaintiffs, all based, at least in part, on the

plaintiffs' actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity.

253.    As a result of the conspiracy, Defendants violated the plaintiffs' Fourteenth Amendment rights to equal protection under the law.

254.    The conspiracy was committed under color of state law because the State Defendants played a significant role in the conspiracy, including but not limited to: meeting with the Federal Defendants to plan the Raid in advance and, during the Raid, detaining the plaintiffs, facilitating the detention of the plaintiffs, separating the plaintiffs into groups, and moving the plaintiffs to the ICE tent for immigration processing, all based, at least in part, on the plaintiffs' actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity. Further, the unlawful acts would not have been possible without the State Defendants, the State Defendants had a significant presence at the Raid, and the State Defendants were advancing State goals.

255.    Plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

256.    Defendants are jointly and severally liable for the harm caused.

### THIRD CLAIM FOR RELIEF
Section 1985(3) Conspiracy to Deprive Individuals of Equal Protection
*On Behalf of all Plaintiffs Against all Defendants*

257.    The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

258.    The Federal and State Defendants conspired with each other by entering into a mutual agreement to abuse criminal warrants to conduct a mass seizure and immigration dragnet

targeted at a large gathering of Latino community members based in part on their actual or perceived Latino ethnicity or association with people of actual or perceived Latino ethnicity, in violation of the plaintiffs' rights to equal protection under the law.

259.    Defendants' agreement, and overt acts in furtherance of the conspiracy, were motivated by animus against the plaintiffs due to their actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity.

260.    In furtherance of this conspiracy, Defendants committed overt acts including but not limited to: preparing a plan to conduct a large-scale automatic seizure of attendees at La Catedral and subject them to immigration interrogation based at least in part on the fact that it was a large gathering of Latino people; and, at the Raid, descending on La Catedral with military-grade weapons and enough zip-ties for hundreds of people, despite the absence of any specific safety threat; detaining the plaintiffs automatically as incident to warrant execution when automatic detention was not permitted, and further without reasonable suspicion, probable cause, or lawful authority; continuing to detain the plaintiffs for four hours without food and in burdensome conditions; engaging in burdensome, violent, and abusive behavior toward the plaintiffs; separating the plaintiffs into groups based in part on ethnicity; moving the plaintiffs through the ICE Tent for interrogations about their immigration status; interrogating the plaintiffs about their immigration status; only releasing the plaintiffs after forcing them to verify lawful status; and facilitating the unlawful seizure and interrogation of the plaintiffs, all based in part on the plaintiffs' actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity.

261.    As a result of the conspiracy, Defendants deprived the plaintiffs of rights or privileges.

262.     Plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

263.     Defendants are jointly and severally liable for the harm caused.

**FOURTH CLAIM FOR RELIEF**
Section 1986 Failure to Prevent Deprivation of Equal Protection
*On Behalf of all Plaintiffs Against all Defendants*

264.     The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

265.     Defendants had knowledge of the conspiracy to abuse criminal warrants to conduct a mass seizure and immigration dragnet targeted at a large gathering of Latino community members based in part on their actual or perceived Latino ethnicity or association with people of actual or perceived Latino ethnicity, in violation of Section 1985(3).

266.     This knowledge derived from, among other sources, pre-Raid meetings during which the State and Federal Defendants agreed they would descend on La Catedral heavily armed and with enough zip-ties to detain hundreds of people; ICE would set up a tent for immigration processing; and State and Federal Defendants would detain event attendees and move them to the ICE Tent for interrogations about their immigration status.

267.     Defendants had the power to prevent or aid in preventing the commission of these wrongful acts.

268.     Defendants willfully or negligently failed to prevent or aid in preventing these wrongful acts. For example, Defendants did not intervene to stop the mass detention of the plaintiffs absent reasonable suspicion and not in the immediate vicinity of the search warrant execution; to release those detained for hours without access to food; to stop the systematic

funneling of the plaintiffs to the ICE Tent for immigration interrogations absent individualized suspicion; or to stop ICE from conducting interrogations as to immigration status absent individualized suspicion.

269.    The plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

### FIFTH CLAIM FOR RELIEF
Unreasonable Seizure in Violation of the Fourth Amendment
*On Behalf of all Plaintiffs Against the State Defendants*

270.    The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

271.    The State Defendants unreasonably detained the plaintiffs for a prolonged period in burdensome conditions as incident to execution of a criminal warrant when automatic detention was not permitted, and otherwise without reasonable suspicion, probable cause, or other lawful authority, in violation of the Fourth Amendment.

272.    The detentions were gratuitously burdensome in that, *inter alia*, the State Defendants held the plaintiffs for an extensive period of time; used aggressive and militarized tactics; failed to provide appropriate access to water, food, bathrooms, and medical care; detained the plaintiffs in zip-ties in public view and in front of journalists and the public; and did not release the plaintiffs until they answered questions concerning their immigration status.

273.    The State Defendants moved the plaintiffs to the ICE Tent where the plaintiffs were interrogated about their immigration status, absent any particularized suspicion of immigration violations, and released only upon verifying their immigration status.

274.     The plaintiffs suffered harm as a direct and proximate result of the State Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

## SXITH CLAIM FOR RELIEF
Deprivation of Equal Protection in Violation of the Fourteenth Amendment
*On Behalf of all Plaintiffs Against the State Defendants*

275.     The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

276.     The State Defendants detained, seized, and/or searched the plaintiffs, and engaged in dehumanizing, violent, and abusive behavior toward them, based in part on the plaintiffs' actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity, in violation of the Equal Protection Clause of the Fourteenth Amendment.

277.     The plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

## SEVENTH CLAIM FOR RELIEF
Unreasonable Searches in Violation of the Fourth Amendment
*On Behalf of the Named Plaintiffs Juana Rodriguez, X.Z., Y.Z., Ivan Popoca, and E.I.P. Against the John Doe Defendants*

278.     The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

279.     John Doe Defendants searched named plaintiffs Juana Rodriguez, X.Z., Y.Z., Ivan Popoca, and E.I.P. without the required individualized suspicion or probable cause, in violation of the Fourth Amendment, including by emptying and searching their pockets.

280.    The named plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

### EIGHTH CLAIM FOR RELIEF
Excessive Force in Violation of the Fourth Amendment
*On Behalf of the Named Plaintiffs Against the John Doe Defendants*

281.    The plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1-242 as if fully set forth herein.

282.    John Doe Defendants used excessive force, including but not limited to pointing guns at the named plaintiffs absent any safety threat and when the named plaintiffs were compliant with orders; zip-tying each of the named plaintiffs for an excessive period of time; zip-tying named plaintiffs Y.Z. and E.I.P. even though they are minors; and refusing loosen or remove the named plaintiffs' zip-ties, even when asked due to extreme pain or injury.

283.    Each of the named plaintiffs suffered harm as a direct and proximate result of Defendants' actions including but not limited to the violation of their constitutional rights, emotional distress, bodily injury, and economic loss.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

a.  Assume jurisdiction over this matter;

b.  Certify the class under Federal Rule of Civil Procedure 23(b)(1) and/or (b)(3), and appoint the undersigned as Class Counsel;

c.  Enter a declaratory judgement that the Defendants' seizure and questioning of the plaintiffs violated the Fourth and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, and 1986;

d.  Enter an order awarding damages to the plaintiffs for the violation of their rights under the Fourth and Fourteenth Amendments and 42 U.S.C. §§ 1983, 1985, and 1986;

e.  As to claims One through Six, enter an order awarding the plaintiffs compensatory damages in an amount to be determined at trial;

f.  As to claims Seven and Eight, enter an order awarding the named plaintiffs compensatory damages in an amount to be determined at trial;

g.  Enter an order awarding the plaintiffs costs of suit, and reasonable attorneys' fees and expenses pursuant to any applicable law; and

h.  Order such other and further relief as the Court deems equitable, just, and proper.


Dated: February 10, 2026

Respectfully submitted,

Jenn Rolnick Borchetta*
Allison Frankel*
Jorge Castillo*
Emma Andersson*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

*Pro hac vice motions concurrently filed

/s/ Paul Carlos Southwick
Paul Carlos Southwick
Emily Myrei Croston
ACLU OF IDAHO FOUNDATION

Wendy J. Olson
STOEL RIVES LLP