BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

REGINALD M. SKINNER
Senior Trial Counsel, Torts Branch

*/s/ Juliana M. Barrett*
JULIANA M. BARRETT
CONNOR HACKERT
PAUL C. QUAST
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
TORTS BRANCH, CIVIL DIVISION
P.O. BOX 7146, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044-7146
Tel: (202) 616-4326
Email: Juliana.M.Barrett@usdoj.gov

*Attorneys for Federal Defendants Kenneth Porter,
Robert Bohls, Chris Sheehan, and Jake Sheridan*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

JUANA RODRIGUEZ, *on behalf of herself and her minor child* Y.R.; X.Z., *on behalf of himself and his minor child* Y.Z.; IVAN POPOCA, *on behalf of himself and his minor children* E.I.P. *and* A.S.P.; *and on behalf of all others similarly situated*,

Plaintiffs,

v.

KENNETH PORTER, Acting Director of the Boise U.S. Immigration and Customs Enforcement Field Sub-Office, *in his individual capacity*; ROBERT BOHLS, Special Agent in Charge of the Salt Lake City Office of the Federal Bureau of Investigation, *in his individual capacity*, CHRIS SHEEHAN Supervisory Special Agent of the Federal Bureau of Investigation's Boise Resident Agency, *in his individual capacity*; JAKE SHERIDAN, Special Agent of the Federal Bureau of Investigation, *in his individual capacity*; KIERAN DONAHUE, Canyon County Sheriff, *in his individual capacity*; REX INGRAM, Chief of the Caldwell Police Department, *in his individual capacity*; JOE HUFF, Chief of the Nampa Police Department, *in his individual capacity*; BILL GARDINER, Director of the Idaho State Police, *in his individual capacity*; CANYON COUNTY; CITY OF CALDWELL; CITY OF NAMPA; and JOHN DOES 1-20, *in their individual capacities*,

Defendants.

Case No. 1:26-CV-00075-AKB

**MEMORANDUM OF LAW IN SUPPORT OF FEDERAL DEFENDANTS KENNETH PORTER, ROBERT BOHLS, CHRIS SHEEHAN, AND JAKE SHERIDAN'S CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................ 3

    A.   The Task Force ............................................................................................................ 4

    B.   The FBI Investigation, Search and Arrest Warrants ............................................. 5

    C.   Planning Related to Executing the Search and Arrest Warrants ......................... 6

    D.   Execution of the Warrants ......................................................................................... 6

    E.   Aftermath ..................................................................................................................... 9

LEGAL STANDARD.................................................................................................................... 10

ARGUMENT ................................................................................................................................. 11

I.    The Federal Defendants Are Not Subject to Suit Under Section 1983. ............................... 11

    A.   The Federal Defendants Acted Under Color of Federal, Not State, Law. ......................... 12

    B.   "Joint Action" Does Not Transform Federal Officers Into State Actors. ......................... 13

II.   The Federal Defendants Are Entitled to Qualified Immunity for All Claims....................... 18

    A.   Plaintiffs Fail to Allege the Violation of Any Constitutional or Statutory Right. ............ 19

        1.   Plaintiffs Fail to Plausibly Allege the Federal Defendants Personally Participated in the Violation of Any Constitutional or Statutory Right............................... 19

        2.   Plaintiffs Fail to Plausibly Allege Facts Establishing a Conspiracy.............................. 24

        3.   Plaintiffs Fail to Plausibly Allege a Fourth Amendment Violation by the Federal Defendants. ..................................................................................................... 28

            i.   Supreme Court Precedent Permitted Detaining and Questioning Plaintiffs. ............ 28

            ii.   The Purpose of the Operation was Permissible. ....................................................... 34

        4.   Plaintiffs Have Not Plausibly Alleged Facts Establishing a Fourteenth Amendment Violation. ...................................................................................................... 39

    B.   The Federal Defendants Did Not Violate Clearly Established Law. ............................... 43

CONCLUSION.............................................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Johnson*,
  555 U.S. 323 (2009) ........................................................................................... 31, 33, 37

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................................ 13, 17

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ........................................................................................... 19, 35, 43

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... passim

*Bailey v. United States*,
  568 U.S. 186 (2013) ................................................................................................ 30, 31

*Ballentine v. Tucker*,
  28 F.4th 54 (9th Cir. 2022) .............................................................................................. 43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 10, 40

*Big Cats of Serenity Springs, Inc. v. Rhodes*,
  843 F.3d 853 (10th Cir. 2016) ............................................................................. 14, 16, 18

*Billings v. United States*,
  57 F.3d 797 (9th Cir. 1995) ................................................................................. 12, 16, 18

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ................................................................................................... 1, 11

*Black Lives Matter Los Angeles v. City of Los Angeles*,
  113 F.4th 1249 (9th Cir. 2024) ........................................................................................ 33

*Blantz v. California Dep't of Corr. & Rehab.*,
  727 F.3d 917 (9th Cir. 2013) ..................................................................................... 22, 23

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ......................................................................................................... 18

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ................................................................................................ 25, 45

*Brunette v. Humane Soc'y of Ventura Cnty.*,
  294 F.3d 1205 (9th Cir. 2002) ........................................................................................ 18

*Burns v. County of King*,
  883 F.2d 819 (9th Cir. 1989) ..................................................................................... 24, 25

*Cabrera v. Martin*,
  973 F.2d 735 (9th Cir. 1992) ........................................................................................... 17

*Chavez v. United States*,
  683 F.3d 1102 (9th Cir. 2012) ........................................................................................ 23

*Chavez v. Wynar*,
  No. 21-16094, 2023 WL 2535266 (9th Cir. Mar. 16, 2023) ........................................ 45

*Chuman v. Wright*,
  76 F.3d 292 (9th Cir. 1996) ............................................................................................ 20

*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000) ........................................................................................................... 35

*Crawford-El v. Britton*,
  523 U.S. 574 (1998) ................................................................................................ 38
*Crist v. Miller*,
  No. 1:25-cv-495-AKB, 2026 WL 36105 (D. Idaho Jan. 6, 2026) ........................... 20
*Crowe v. County of San Diego*,
  608 F.3d 406 (9th Cir. 2010) ........................................................................... 25, 26
*Cunningham v. Gates*,
  229 F.3d 1271 (9th Cir. 2000) ............................................................................... 20
*D.C. v. Carter*,
  409 U.S. 418 (1973) ................................................................................... 12, 39, 45
*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010) ................................................................................. 11
*Davis v. City of New York*,
  296 F.R.D. 127 (E.D.N.Y. 2013) ........................................................................... 17
*Davis v. Scherer*,
  468 U.S. 183 (1984) ............................................................................................... 43
*Dawson v. City of Seattle*,
  435 F.3d 1054 (9th Cir. 2006) ........................................................... 30, 31, 32, 33
*De Canas v. Bica*,
  424 U.S. 351 (1976) ............................................................................................... 13
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................................... 41
*District of Columbia v. Wesby*,
  583 U.S. 62– (2018) ......................................................................................... 19, 43
*Dunaway v. New York*,
  442 U.S. 200 (1979) ............................................................................................... 30
*Egbert v. Boule*,
  596 U.S. 482 (2022) ........................................................................................... 1, 12
*F.D.I.C. v. Meyer*,
  510 U.S. 471 (1994) ............................................................................................... 24
*Fazaga v. Fed. Bureau of Investigation*,
  965 F.3d 1015 (9th Cir. 2020) ............................................................................... 27
*Franklin v. Fox*,
  312 F.3d 423 (9th Cir. 2002) ................................................................................. 14
*Gamez-Lopez v. Barr*,
  821 F. App'x 912 (9th Cir. 2020) .......................................................................... 33
*Ganwich v. Knapp*,
  319 F.3d 1115 (9th Cir. 2003) ............................................................................... 32
*Graham v. Connor*,
  490 U.S. 386 (1989) ............................................................................................... 33
*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ............................................................................................... 19
*Harte v. Bd. of Commissioners of Cnty. of Johnson, Kansas*,
  864 F.3d 1154 (10th Cir. 2017) ............................................................................. 32
*Henry v. Essex County*,
  113 F.4th 355 (3d Cir. 2024) ................................................................................. 16

*Hernandez v. Causey*,
 124 F.4th 325 (5th Cir. 2024) ................................................................ 14, 16, 27
*Hernandez v. Causey*,
 No. 2:17-cv-123, 2024 WL 5200178 (S.D. Miss. Feb. 14, 2024) ...................................... 14, 15
*Hopson v. Alexander*,
 71 F.4th 692 (9th Cir. 2023) ................................................................................ 43
*Hydrick v. Hunter*,
 669 F.3d 937 (9th Cir. 2012) .......................................................................... 22, 23
*Ibrahim v. Dep't of Homeland Sec.*,
 538 F.3d 1250 (9th Cir. 2008) ............................................................................... 18
*Idaho Org. of Res. Councils v. Labrador*,
 780 F. Supp. 3d 1013 (D. Idaho 2025) ..................................................................... 13
*In re Gilead Scis. Sec. Litig.*,
 536 F.3d 1049 (9th Cir. 2008) ......................................................................... 10, 11
*Jakuttis v. Town of Dracut*,
 95 F.4th 22 (1st Cir. 2024) ............................................................................... 13, 16
*Jutrowski v. Twp. of Riverdale*,
 904 F.3d 280 (3d Cir. 2018) ................................................................................. 33
*K.O. v. Sessions*,
 No. 20-5255, 2022 WL 3023645 (D.C. Cir. July 29, 2022) ...................................... 27
*Karim-Panahi v. Los Angeles Police Dep't*,
 839 F.2d 621 (9th Cir. 1988) ................................................................................ 28
*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ................................................................................ 10
*King v. United States*,
 917 F.3d 409 (6th Cir. 2019) ................................................................................ 16
*Kisela v. Hughes*,
 584 U.S. 100 (2018) .......................................................................................... 44
*Lacey v. Maricopa County*,
 693 F.3d 896 (9th Cir. 2012) .......................................................................... 36, 40
*Lindke v. Freed*,
 601 U.S. 187 (2024) ..................................................................................... passim
*Los Angeles County. v. Rettele*,
 550 U.S. 609 (2007) ..................................................................................... 30, 32
*Lovelien v. United States*,
 853 F. App'x 676 (D.C. Cir. 2021) ........................................................................ 16
*Lugar v. Edmondson Oil Co.*,
 457 U.S. 922 (1982) ..................................................................................... 12, 15
*Malley v. Briggs*,
 475 U.S. 335 (1986) ........................................................................................... 19
*Michigan v. Summers*,
 452 U.S. 692 (1981) ..................................................................................... passim
*Mitchell v. Forsyth*,
 472 U.S. 511 (1985) ........................................................................................... 19
*Muehler v. Mena*,
 544 U.S. 93 (2005) ....................................................................................... passim

v

*Mullenix v. Luna*,
  577 U.S. 7 (2015)..................................................................................................... 44
*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) ........................................................................... 25, 26
*Okorie v. Crawford*,
  921 F.3d 430 (5th Cir. 2019) ................................................................................. 45
*Olson v. County of Grant*,
  127 F.4th 1193 (9th Cir. 2025) .............................................................................. 23
*Pearson v. Callahan*,
  555 U.S. 223 (2009)................................................................................................ 19
*Peck v. Montoya*,
  51 F.4th 877 (9th Cir. 2022) ............................................................................. 20, 23
*Perez Cruz v. Barr*,
  926 F.3d 1128 (9th Cir. 2019) ........................................................... 34, 35, 36, 39
*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979)........................................................................................... 40, 42
*Pettibone v. Russell*,
  59 F.4th 449 (9th Cir. 2023) ................................................................................. 12
*Plumhoff v. Rickard*,
  572 U.S. 765 (2014)................................................................................................ 28
*Reichle v. Howards*,
  566 U.S. 658 (2012)................................................................................................ 19
*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006) ................................................................................. 11
*Rivas-Villegas v. Cortesluna*,
  595 U.S. 1 (2021).................................................................................................... 44
*Rivera-Quinones v. Commonwealth of Puerto Rico*,
  No. 15-cv-2382, 2026 WL 1459792 (D.P.R. Feb. 25, 2026)................................. 18
*Robbins v. Oklahoma*,
  519 F.3d 1242 (10th Cir. 2008) ......................................................................... 20, 21
*Rodriguez v. United States*,
  575 U.S. 348 (2015)................................................................................................ 33
*Rogers v. Vicuna*,
  264 F.3d 1 (1st Cir. 2001)....................................................................................... 16
*Rosenbaum v. City & County of San Francisco*,
  484 F.3d 1142 (9th Cir. 2007) ............................................................................... 39
*Saucier v. Katz*,
  533 U.S. 194 (2001)................................................................................................ 19
*Schweiker v. Wilson*,
  450 U.S. 221 (1981)................................................................................................ 39
*Shafer v. County of Santa Barbara*,
  868 F.3d 1110 (9th Cir. 2017) ............................................................................... 43
*Sharp v. County of Orange*,
  871 F.3d 901 (9th Cir. 2017) ............................................................................. 39, 44
*Sheikh v. U.S. Dep't of Homeland Sec.*,
  106 F.4th 918 (9th Cir. 2024) ............................................................................... 12

*Snitko v. United States*,
   90 F.4th 1250 (9th Cir. 2024) ........................................................................... 39
*Solomon v. Las Vegas Metro. Police Dep't*,
   441 F. Supp. 3d 1090 (D. Nev. 2020) ................................................................ 26
*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ........................................................................... 22
*Strickland v. Shalala*,
   123 F.3d 863 (6th Cir. 1997) ............................................................................. 15
*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 3, 10
*Thai v. County of Los Angeles*,
   127 F.4th 1254 (9th Cir. 2025) ..................................................................... 15, 16
*Trerice v. Pedersen*,
   769 F.2d 1398 (9th Cir. 1985) ........................................................................... 27
*Tsao v. Desert Palace, Inc.*,
   698 F.3d 1128 (9th Cir. 2012) ...................................................................... 14, 18
*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*,
   463 U.S. 825 (1983) .................................................................................... 24, 27
*United States v. Classic*,
   313 U.S. 299 (1941) .......................................................................................... 12
*United States v. Grey*,
   959 F.3d 1166 (9th Cir. 2020) ...................................................................... 36, 39
*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ....................................................................... 10, 11
*United Steelworkers of Am. v. Phelps Dodge Corp.*,
   865 F.2d 1539 (9th Cir. 1989) ........................................................................... 25
*Van Loo v. United States*,
   No. 3:23-CV-05618, 2025 WL 692484 (W.D. Wash. Mar. 4, 2025) ..................... 15
*Ward v. City of Barstow*,
   749 F. App'x 529 (9th Cir. 2018) ....................................................................... 11
*West v. Atkins*,
   487 U.S. 42 (1988) ...................................................................................... 12, 16
*Wilson v. Layne*,
   526 U.S. 603 (1999) .......................................................................................... 43
*Wood v. Moss*,
   572 U.S. 744 (2014) .......................................................................................... 24
*Yassin v. Weyker*,
   39 F.4th 1086 (8th Cir. 2022) ................................................................. 15, 16, 18
*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ............................................................................................ 32
*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ................................................................................... passim

**Statutes & Rules**

8 U.S.C. 1357 .................................................................................................. 13
18 U.S.C. § 1955(a) ............................................................................................ 5

18 U.S.C. § 3052.................................................................................................................... 13

34 U.S.C. § 41503................................................................................................................... 17

42 U.S.C. § 1983................................................................................................................ passim

42 U.S.C. § 1985(3) ............................................................................................................ 4, 19

42 U.S.C. § 1986....................................................................................................................... 4

Fed. R. Evid. 201(b).............................................................................................................. 10

## INTRODUCTION

Plaintiffs chose to bring this novel lawsuit against the Federal Defendants primarily under 42 U.S.C. § 1983 because settled Supreme Court precedent bars them from suing under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs could not pursue their claims against the Federal Defendants under *Bivens* because this case would extend the *Bivens* remedy to a new context, and the Supreme Court has repeatedly stressed that the creation of new federal remedies is "a job for Congress, not the courts." *Egbert v. Boule*, 596 U.S. 482, 486 (2022). Further, Plaintiffs knew they could not sue under *Bivens* because "a *Bivens* action is not a proper vehicle for altering an entity's policy." *Ziglar v. Abbasi*, 582 U.S. 120, 140 (2017). And that is unmistakably what this putative class action is—a challenge to the Administration's alleged large-scale immigration enforcement operations. Because they cannot sue under *Bivens*, Plaintiffs try to shoehorn their claims against the Federal Defendants into this novel "conspiracy" lawsuit under 42 U.S.C §§ 1983, 1985(3), and 1986. But their claims suffer from several fundamental defects requiring dismissal.

First, the Federal Defendants are not subject to suit under 42 U.S.C. § 1983 because that statute limits liability to individuals acting under color of *state* law. By contrast, the Federal Defendants acted under color of federal law when executing federal warrants for federal crimes. The Federal Defendants only had one source of authority—their federal employment—and federal agents do not act under color of state law by merely working alongside state officers. Plaintiffs say that the criminal search warrant federal agents obtained to uncover evidence of an illegal gambling ring was just a "cover to go fishing for immigration arrests." Compl. ¶ 6. But even if that were true, Plaintiffs fail to explain how federal officers act under state law in a policy arena (immigration enforcement) that is exclusively reserved to the federal government.

1

The Federal Defendants are also entitled to qualified immunity. Settled precedent holds that to survive a motion to dismiss, Plaintiffs must plausibly allege facts showing that each Government-official defendant, through his own individual actions, violated the Constitution. But here, Plaintiffs improperly try to hold defendants *collectively* liable as a group, and they fail to plausibly allege facts showing that any Federal Defendant was directly involved in Plaintiffs' detention or mistreatment.

Plaintiffs seemingly think that their allegation of a vast law enforcement "conspiracy" displaces Supreme Court precedent and relieves them of their burden to allege specific facts demonstrating what each Federal Defendant did to violate Plaintiffs' rights. But a broad conspiracy allegation (indeed, an alleged wide-ranging conspiracy involving some 200 federal and state officers and multiple federal and state agencies) is not a substitute for pleading personal participation as required by the Supreme Court. Plaintiffs must still plausibly allege facts showing how each Federal Defendant, through his own individual actions, agreed with others to prosecute an unlawful plan. They have not. Moreover, even if properly pled, Plaintiffs' conspiracy theory cannot subject the Federal Defendants to suit under Section 1983. That is because the conspiracy itself must be under color of *state* law for federal officers to be even theoretically liable under Section 1983. Here, any putative conspiracy, even based on the Complaint's allegations, would be under color of federal law.

The Federal Defendants are also entitled to qualified immunity because Plaintiffs fail to allege facts showing that the Federal Defendants violated a clearly established right. Under established precedent, the operational plan here was reasonable and lawful. The logical time to investigate a large-scale gambling event is while the event is taking place, which is exactly what the warrants authorized here. The Supreme Court has specifically held that officers can detain

2

individuals on the premises of a warrant execution and question them about immigration status. Thus, even if there was a "meeting of the minds" among the hundreds of federal and state law enforcement officers that executed the warrants at La Catedral, no allegations support the inference that the common objective of the plan was to violate Plaintiffs' constitutional rights, rather than to engage in permissible law enforcement activities. And there are no plausible allegations demonstrating that any of the Federal Defendants harbored any racial or other unlawful animus. Plaintiffs' claims against the Federal Defendants must be dismissed.

## BACKGROUND[1]

Plaintiffs are three adults and four minors who are U.S. citizens or lawful permanent residents. Compl. ¶ 8, 12–18. On October 19, 2025, federal and state officers detained Plaintiffs incident to the execution of federal warrants at the La Catedral racetrack, the hub of an illegal gambling operation investigated by the FBI. *Id*. ¶ 5. The FBI enlisted multiple law enforcement agencies to assist in executing the warrants, which authorized the search of over 24 acres of land, including several buildings and a spectator area, and the arrest of five individuals. *Id.* ¶¶ 49–51; *see also* Ex. A, Search Warrant. Plaintiffs were among about 400 attendees at La Catedral that day, and about 200 officers from various federal, state, and local law enforcement agencies executed the warrants. *Id.* ¶¶ 2, 49. Plaintiffs challenge the legality of their detention and treatment during the execution of the warrants, and seek to certify a class of individuals detained during the law enforcement operation. *Id.* ¶¶ 3–4, 235. They name as Defendants state officials and entities, and four federal officers in their individual capacities: FBI Special Agent in Charge

---

[1] As discussed *infra* Legal Standard, for purposes of this motion, the Federal Defendants accept as true the Complaint's well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and ask the Court to consider judicially noticeable matters and "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

(SAC) Robert Bohls, Supervisory Special Agent (SSA) Chris Sheehan, and Special Agent Jake

Sheridan, and Immigration and Customs Enforcement (ICE) Assistant Field Office Director

Kenneth Porter (the "Federal Defendants"). *Id.* ¶¶ 19–22. Plaintiffs bring four claims against

these Federal Defendants, alleging they conspired with state officials to violate the Fourth and

Fourteenth Amendments under 42 U.S.C. § 1983, to deny them equal protection of the laws

under 42 U.S.C. § 1985(3), and that they failed to prevent an equal protection deprivation under

42 U.S.C. § 1986. *Id.* ¶¶ 243–69.

### A. The Task Force

The Task Force that led the La Catedral operation was the Treasure Valley Metro Violent

Crimes Task Force. Compl. ¶ 50. As Plaintiffs recognize, task forces are a common vehicle by

which federal, state, and local law enforcement collaboratively address crime. *Id.*; Compl. ¶¶

119, 170–71, 231. The FBI administers 178 such task forces nationwide. *Violent Gang Task

Forces*, FBI, www.fbi.gov/investigate/violent-crime/gangs/violent-gang-task-forces. There is no

dispute that this Task Force was led by the FBI. *Id.* In addition to FBI's Boise Resident Agency,

which is part of the Salt Lake City Field Office, the Task Force here consisted of "several"

Department of Homeland Security (DHS) components; Idaho State Police (ISP); the Caldwell

Police Department (PD); the Nampa PD; and Canyon County Sheriff's Office. Compl. ¶¶ 49, 51.

Plaintiffs allege that each law enforcement entity was responsible for directing and

implementing its own participation in the Task Force and the La Catedral operation. *See id.* ¶ 51.

SAC Bohls and SSA Sheehan allegedly oversaw or directed FBI's participation in the La

Catedral operation, while Director Porter oversaw ICE's participation. *Id.* ¶¶ 19–21, 49–51. The

state and local law enforcement agencies' participation was overseen by their own supervisory

personnel, including Defendants Kieran Donahue, Canyon County Sheriff; Rex Ingram,

4

Caldwell PD Chief; Joe Huff, Nampa PD Chief; and Bill Gardiner, ISP Director (collectively, the "State Defendants"). *Id.* ¶¶ 23–26, 166. Although task force operations "lead to both federal and state prosecutions," *id.* ¶ 229, this Task Force operation culminated in federal charges over which this federal Court is presiding. *Id.* ¶¶ 50, 89 n.13; *United States v. Colin*, 25-cr-291-AKB (D. Idaho).

### B.  The FBI Investigation, Search and Arrest Warrants

The Task Force's execution of the warrants at La Catedral was precipitated by an FBI investigation into, among other things, an unlicensed gambling operation. Compl. ¶ 88. The federal investigation began in February 2025, when the FBI received reports of unlawful activity at La Catedral. *Id.* ¶ 89. Plaintiffs say undercover agents "ascertain[ed] that on average 250 to 500 people" attended and "that there were aliens unlawfully present" at La Catedral events, and so the FBI "anticipated encountering aliens unlawfully present" when executing the warrants here. *Id.* ¶ 140. That proved true: Despite Wilder being a community of only about 1,700 people, most of whom are U.S. citizens, Plaintiffs allege that over 100 of roughly 400 individuals present lacked lawful immigration status and were later brought into custody when the warrants here were executed. *Id.* ¶¶ 35–36, 83–84, 131.

Ultimately, the investigation found that at least five individuals were operating an illegal gambling operation at La Catedral. *See* 18 U.S.C. § 1955(a). The federal government filed felony criminal complaints against those individuals on October 15, 2025. Compl. ¶ 90.

A federal magistrate judge then issued five arrest warrants. *Id.* ; *see also* Ex. B, Arrest Warrants. The magistrate judge also issued a search warrant for the La Catedral grounds. Compl. ¶¶ 90, 166. While Plaintiffs allege on "information and belief" that the search warrant covered only buildings on the premises, and that they were not detained "in the immediate vicinity of

those buildings," *id.* ¶¶ 5, 76, 90, 104, 242, the search warrant was recently unsealed, *see* Ex. A. It authorized a search of the entire La Catedral premises, encompassing over 24 acres of land that included not only several buildings, but also the racetrack and spectator arena where Plaintiffs were detained. *Id.* at Attach. A.

### C.  Planning Related to Executing the Search and Arrest Warrants

"It is not uncommon for federal and local law enforcement to coordinate the execution of a criminal search warrant." Compl. ¶ 119. That is especially so when it covers a vast area where hundreds of individuals may be present. *Id.* ¶ 98. So, the FBI did that. It enlisted the Task Force and other agencies, like ATF and DEA, to assist. *Id.* ¶¶ 109 n.16, 169, 206 n.58. On October 14, 2025, the FBI met telephonically with several State agencies, including the ISP SWAT team commander and team leaders from Caldwell PD, Nampa PD, and the Canyon County Sherriff's Office. *Id.* ¶ 175. On October 18, 2025, the day before the warrants were executed, another planning meeting was held among these same agencies. *Id.* ¶ 176. At that meeting, the agencies developed an operational plan where officers would surround La Catedral, create a perimeter to prevent exit, detain individuals, and move them through a "processing area." *Id.* ¶ 177. Plaintiffs state that "part" of the plan included "coordinating with DHS to bring" a tent to conduct immigration screenings. *Id.* ¶ 181.

### D.  Execution of the Warrants

The Task Force and other agencies executed the warrants at around 1:00 p.m. on October 19, 2025. *Id.* ¶ 2. About 200 federal, state, and local officers arrived at La Catedral. *Id.* ¶¶ 46–47. Most officers were armed and wore identifiable insignia or tactical gear, but some did not or wore masks. *Id.* ¶¶ 47–54. Unspecified officers pointed guns at attendees or pushed them. *Id.* ¶¶ 55–56. According to the Complaint, Caucasian-appearing attendees "generally did not have guns

6

pointed directly at them and were not treated as roughly" as Latino-appearing ones. *Id.* ¶ 56. Some unnamed officers allegedly used racial epithets. *Id.* ¶ 57. Officers gathered attendees, zip-tied most adults and some teens, and held them at the racetrack, where some were detained for around four hours and not initially permitted to use the restroom. *Id.* ¶¶ 58–60, 64–65.

Many of Plaintiffs' allegations collectivize the conduct of unspecified "law enforcement" or "officers" as to unidentified "attendees" or "detainees." *See, e.g., id.* ¶¶ 47–48, 54, 57–79, 100–102. For example, the Complaint alleges that officers yelled at attendees and ordered them to the ground, pointed guns or shot rubber bullets at some, broke car windows, removed people from their vehicles, threw flashbangs, and/or did not consistently provide attendees with water, food, or medical attention. *Id.* ¶¶ 48, 55, 57, 61, 68–69. Officers allegedly searched some attendees and their vehicles incident to detention. *Id.* ¶¶ 72–73, 106–07. Attendees allegedly were not asked questions about gambling and were sorted "into groups" based on "perceived immigration status." *Id.* ¶¶ 74, 188. Yet "several attendees" had "large amounts of cash" on them, *id.* ¶ 109, likely indicating their involvement in illegal betting at the horse races. Detainees were processed "through a tent that law enforcement had erected on the La Catedral grounds." *Id.* ¶¶ 75, 184. Federal and state officers "worked together to process each detainee" by bringing them in the tent, removing their zip-ties, and escorting them "off the property or to waiting vans," depending on if the person lacked lawful immigration status or was the subject of an arrest warrant. *Id.* ¶¶ 78, 81–82. If, after supplying identification, an attendee was not wanted for a crime and had lawful status, he or she was "immediately released." *Id.* ¶ 83. If not, as was the case for about 105 people who lacked lawful status that day, the attendee was taken into custody. *Id.* ¶¶ 84, 190–91.

Simultaneously, law enforcement searched the property and buildings on it. *Id.* ¶ 76.

Plaintiffs allege they were not detained in the immediate vicinity of the buildings the officers searched. *Id.* On "information and belief," Plaintiffs allege that officers began processing detainees through the ICE tent after completing their searches of the buildings on the La Catedral property and arresting four individuals on suspicion of illegal gambling. *Id.* ¶ 76, 105.

The Complaint's allegations regarding injuries to the named Plaintiffs are sparse. Plaintiff Juana Rodriguez and her three-year-old son, Plaintiff Y.R., were near her truck when officers arrived at La Catedral. *Id*. ¶¶ 44–46. She was zip-tied by unidentified officers. *Id.* ¶ 62. She was then untied to use the restroom, but her requests to remain untied to console or provide snacks to Y.R. were denied. *Id.* ¶¶ 62, 68–69, 81.

Plaintiff X.Z. ("Mr. Z") was allegedly thrown to the ground when officers arrived. *Id.* ¶ 55. He asked unidentified officers to allow him to walk around to "find his sons" and later use the restroom, but his requests were allegedly ignored or denied. *Id.* ¶¶ 59, 67. He eventually used the restroom after he was released from his detention. *Id.* ¶ 67. Separately, Mr. Z's fifteen-year-old son, Plaintiff Y.Z., was zip-tied by unidentified officers and his request to be untied was initially denied. *Id.* ¶¶ 60, 63. After thirty minutes, a different officer cut his zip-ties, after Y.Z. continued to complain of pain. *Id.* ¶ 63.

Finally, unidentified officers with guns drawn pushed Plaintiff Ivan Popoca to the ground. *Id.* ¶ 55. They grabbed his ten-year-old daughter Plaintiff A.S.P. by the neck. *Id.* Mr. Popoca and A.S.P. were taken to the racetrack, where Mr. Popoca was zip-tied. *Id.* ¶ 59. Separately, unidentified officers detained Popoca's sixteen-year-old son, Plaintiff E.I.P. and his friends at gunpoint and ordered them to throw away their food and show their hands. *Id.* ¶¶ 61, 69. Officers zip-tied the group, and while escorting them to the racetrack, the group was ordered to their knees, at which point a bullet ricocheted off a nearby SUV and went over their heads. *Id.*

8

¶¶ 2, 61. E.I.P.'s complaints that his zip-ties "were too tight" were allegedly ignored. *Id.* ¶ 63. Eventually, Mr. Popoca entered the "ICE Tent" and officers bent his driver's license and asked if it was "good." *Id.* ¶ 82.[2]

Notably, Plaintiffs do not claim that any named Federal Defendant was among the officers who directly mistreated them.

### E. Aftermath

On October 20, 2025, SSA Sheehan emailed ICE Director Porter and some of the individual State Defendants, thanking them for their agencies' efforts in "assist[ing]" with the "massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states." Compl. ¶¶ 145, 165, 213. Director Porter responded, also thanking "everyone for their support." *Id.* ¶¶ 156, 215. Some State Defendants also responded. *Id.* ¶ 214.

FBI SAC Bohls was later quoted in an FBI press release, stating that "illegal gambling isn't a victimless crime" and "can create an increase in violent crime, drug activity, and violence." *Id.* ¶¶ 109 n.16, 206. A DHS spokesperson also issued a public statement, saying that ICE "arrested 105 illegal aliens" as part of the operation. *Id.* ¶ 204; *see also* Dep't of Homeland Sec. (@DHSgov), X, (Oct. 22, 2025, at 02:02 PM ET), https://perma.cc/7A2D-VUZK. Plaintiffs allege the FBI and various State agencies disputed and tried to clarify a public misconception that the operation had an "immigration purpose." Compl. ¶¶ 205–10. Plaintiffs cite an article noting that statements "by the FBI, local and state law enforcement, and an affidavit . . . all point to" the operation being "FBI-led" and that "ICE was invited to assist . . . to process anyone who may be in the country illegally." *Id.* ¶ 204 n.55.

---

[2] The Complaint also makes a number of allegations as to other racetrack attendees, like Willis Parrill, Kenzie Davis, and John Carter, but none are named Plaintiffs and they do not assert any claims here. *See, e.g.*, Compl. ¶ 63, 68, 70–71, 74, 81, 85.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts may not accept as true legal conclusions, *see id.*, or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). A complaint must assert "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

In addition, without converting a motion to dismiss into one for summary judgment, a court may also consider documents incorporated by reference in the complaint and matters of judicial notice. *See Tellabs, Inc.*, 551 U.S. at 322. Both doctrines "permit district courts to consider materials outside a complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Federal Rule of Evidence 201 allows courts to judicially "notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.* at 999 (quoting Fed. R. Evid. 201(b)). "A fact is not subject to reasonable dispute if it is generally known or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* (cleaned up). By contrast, "incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at 1002. A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to [it] or [it] forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Under the doctrine, courts may assume the document's contents "are true for purposes of a motion to dismiss." *Id.* If a matter is "subject to judicial notice or by exhibit," a court need not "accept as

10

true allegations that contradict" it. *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.

Here, these doctrines permit this Court to judicially notice, or consider incorporated-by-reference in the Complaint, (1) FBI's Violent Gang Task Forces webpage, (2) the arrest and search warrants that form the basis of Plaintiff's claims, and (3) public statements by FBI and DHS to which Plaintiffs extensively refer. Ample authority supports each. *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (judicial notice of government webpage); *Ward v. City of Barstow*, 749 F. App'x 529, 531 (9th Cir. 2018) (search and arrest warrants); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 & n.6 (9th Cir. 2006) ("court filings and other matters of public record").

## ARGUMENT

Plaintiffs' claims against the Federal Defendants must be dismissed. First, their claims under 42 U.S.C. § 1983 fail because the Federal Defendants acted under color of federal, not state, law. Second, the Federal Defendants are entitled to qualified immunity because the Complaint fails to plausibly allege a violation of clearly established law by any defendant.

## I.    The Federal Defendants Are Not Subject to Suit Under Section 1983.

Plaintiffs insist on filing two of their claims under Section 1983. In so doing, they tacitly admit that *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), which provides relief for "plaintiffs whose constitutional rights were violated by agents of the Federal Government," *Abbasi*, 582 U.S. at 130, offers them no recourse here. That is for good reason. Supreme Court and Ninth Circuit precedent squarely foreclose a *Bivens* remedy in a case like this. *See Egbert v. Boule*, 596 U.S. 482 (2023); *Sheikh v. U.S. Dep't of Homeland Sec.*, 106 F.4th 918, 925–30 (9th Cir. 2024); *Pettibone v. Russell*, 59 F.4th 449, 455–57 (9th Cir. 2023). So, Plaintiffs try to jam into Section 1983 a remedy against officers who act under color

11

of federal law that "Congress did not provide." *Abbasi*, 582 U.S. at 130.

### A. The Federal Defendants Acted Under Color of Federal, Not State, Law.

Section 1983 "is of only limited scope." *D.C. v. Carter*, 409 U.S. 418, 424 (1973).

Section 1983 "provides no cause of action against federal agents acting under color of federal

law." *Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995). Rather, it provides a remedy

only against those who act "under color of" state law. 42 U.S.C. § 1983. The Federal Defendants

did not act under color of Idaho law.

An individual acts under color of state law "only if" he has "actual authority" derived

from the state *and* purports to use that authority. *Lindke v. Freed*, 601 U.S. 187, 198 (2024).

"The traditional definition of acting under color of state law requires that the defendant in a

§ 1983 action have exercised power 'possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42,

49 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)). For an action to be under

color of state law, it must be "'fairly attributable to the State'" such that it is tantamount to "state

action." *Lindke*, 601 U.S. at 198 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937

(1982)). "An act is not attributable to a State unless it is traceable to the State's power or

authority." *Id.*

Defendants Porter, Bohls, Sheehan, and Sheridan are federal officials who at all relevant

times acted under color of federal—not state—law. Federal law "granted [them] the type of

authority" they used in the underlying investigation and ensuing operation at La Catedral.

*Lindke*, 601 U.S. at 200; *see* 18 U.S.C. § 3052 (powers of FBI), 8 U.S.C. 1357 (powers of

immigration officers). They are not alleged to have possessed any Idaho state authority or to

have held themselves out to be anything but federal officials. To the contrary, Plaintiffs' claims

12

against the Federal Defendants stem from their roles in executing *federal* warrants as part of a *federal* Task Force for a *federal* investigation that led to prosecutions for *federal* crimes. Compl. ¶¶ 88–90, 105, 109 n.15, 166(iv), 172. To the extent any Federal Defendant conducted immigration enforcement while the search warrant was being executed, that work is quintessentially federal. *See Arizona v. United States*, 567 U.S. 387, 408 (2012) ("Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."); *De Canas v. Bica,* 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably . . . a federal power."); *accord Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1041 (D. Idaho 2025). Plaintiffs point to no Idaho law pursuant to which the Federal Defendants acted.

In short, the federal nature of the Federal Defendants' actions is apparent on the face of the Complaint, and there is no "plausible basis for attributing [their] conduct to anything other than [their] federal role[s]." *Jakuttis v. Town of Dracut*, 95 F.4th 22, 30 (1st Cir. 2024). Because there are no grounds to believe the Federal Defendants possessed or purported to exercise Idaho state authority, the Section 1983 claims against them must be dismissed.

### B.  "Joint Action" Does Not Transform Federal Officers Into State Actors.

Plaintiffs appear to rest their Section 1983 claims against the Federal Defendants on a theory that they engaged in "joint action" with state and local officials. Compl. ¶¶ 216-232. The Complaint describes the contributions of state and local agencies to the Task Force operation in terms of manpower and financial support. *Id.* ¶¶ 218–224, 226. It alleges that various federal and state law enforcement entities coordinated efforts. *See, e.g.*, *id.* ¶¶ 165, 174–77. There are also a number of general allegations about the joint nature and structure of the Task Force. *See id.* ¶¶ 51, 225, 227–230. These allegations are insufficient to allow a Section 1983 claim against the

13

Federal Defendants on a "joint action" theory.

"Joint action" is one of several tests "for determining whether a *private* [party's] actions amount to state action." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (quoting *Franklin v. Fox*, 312 F.3d 423, 444–45 (9th Cir. 2002)) (emphasis added). Joint action applies if "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Id.* (quoting *Franklin*, 312 F.3d at 445). It requires "proving the existence of a conspiracy or . . . showing that the private party was a willful participant in joint action with the State or its agents." *Id.*

The joint action test "is applicable to private actors not federal actors." *Hernandez v. Causey*, 124 F.4th 325, 336 (5th Cir. 2024). It is not enough that federal actors are "willful participant[s]" in a joint federal-state operation. *Tsao*, 698 F.3d at 1140. "[F]urther allegations" are required to apply "§ 1983 liability to a *federal* actor." *Hernandez*, 124 F.4th at 337; *see Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 870 n.8 (10th Cir. 2016) (noting "higher" standard to show federal officers "acted under color of state law").

There are good reasons for this. Unlike federal officials, private actors generally "have no inherent authority to act under color of law." *Hernandez v. Causey*, No. 2:17-cv-123, 2024 WL 5200178, at *10 (S.D. Miss. Feb. 14, 2024). This is particularly true in the law enforcement context. An average citizen does not conduct criminal investigations, execute search warrants, or make arrests. If a private person performs these kinds of actions, it implies he is backed by government authority such that his conduct is "fairly attributable to the State." *Lindke*, 601 U.S. at 198 (quoting *Lugar*, 457 U.S. at 937).

The situation is altogether different in the context of federal officers empowered with their own independent authority. When federal officers perform law enforcement functions, it by

14

no means suggests they are backed by *state* authority. By default, federal officers "act under color of *federal* law." *Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997). Like their state counterparts, they perform uniquely governmental functions. The inquiry then, is not *whether* federal officers are performing governmental functions, but the *source of authority* of those functions. *See, e.g.*, *Yassin v. Weyker*, 39 F.4th 1086, 1088–89 (8th Cir. 2022) ("There is no dispute that Weyker was clothed with governmental authority . . . . The question is what type."); *accord Van Loo v. United States*, No. 3:23-CV-05618, 2025 WL 692484, at *11 (W.D. Wash. Mar. 4, 2025); *Hernandez*, 2024 WL 5200178, at *10.

The Ninth Circuit's decision in *Thai v. County of Los Angeles* follows this reasoning. 127 F.4th 1254 (9th Cir. 2025). There, the court held that state officers assigned to a joint federal-state task force investigating Social Security fraud acted "under color of federal, rather than state, law" since their "source of authority" was federal and their "day-to-day work was supervised by a federal officer." *Id.* at 1256; *see id.* at 1260 (noting federal "impetus" for the officers' actions). Although the defendants in *Thai* were state employees, they had been granted federal authority. The question before the court was "not whether [the officers] acted under color of law," but rather "whether [they] acted under color of *state* law." *Hernandez*, 2024 WL 5200178, at *10; *see Thai*, 127 F.4th at 1259–60. Notably, *Thai* did not apply the joint action test.

Under *Thai*, the Federal Defendants were acting under color of federal law because the source of their authority was exclusively federal, and they operated under federal supervision. Plaintiffs allege no facts to suggest the Federal Defendants abdicated their federal authority or were "clothed" in any Idaho state authority. *West*, 487 U.S. at 49 (1988). Nor do they suggest that any of the Federal Defendants were subject to state supervision. As in *Thai*, the Federal Defendants' actions could have only "derive[d] from federal law." 127 F.4th at 1260. In fact,

15

*Thai* applies even more forcefully here because the Federal Defendants are federal employees and "presume[ed]" to have acted under color of federal law. *Big Cats*, 843 F.3d at 870 n.8. Other circuits have likewise held that officers who possess and exercise federal law enforcement powers act under color of federal law. *See Yassin*, 39 F.4th at 1088–91; *Jakuttis*, 95 F.4th at 29; *Henry v. Essex Cnty.*, 113 F.4th 355, 360 (3d Cir. 2024); *King v. United States*, 917 F.3d 409, 433 (6th Cir. 2019), *rev'd on other grounds sub nom. Brownback v. King*, 592 U.S. 209 (2021).

Moreover, the courts of appeals have repeatedly held that federal officers performing their duties act under color of federal law even when collaborating with state officers. *See, e.g.*, *Hernandez*, 124 F.4th at 335–38 (ICE agent called to assist state officer did not act under color of state law); *Lovelien v. United States*, 853 F. App'x 676, 678 (D.C. Cir. 2021) (federal defendants did not act under color of state law despite allegedly directing state law enforcement officials); *Big Cats*, 843 F.3d at 856 (USDA inspectors working alongside sheriff's deputies acted under color of federal law); *Rogers v. Vicuna*, 264 F.3d 1, 4 (1st Cir. 2001) (state officer was at the scene at IRS agents' request); *Billings*, 57 F.3d at 801 (Secret Service Agents who arrested plaintiff and turned her over to sheriff's officers acted under color of federal law).

A unifying theme across these cases is that "[c]olor of law is rooted in authority." *Yassin*, 39 F.4th at 1090. Cross-jurisdictional coordination will not render a federal officer's conduct state action where the officer lacks any "actual authority" granted by the state. *Lindke*, 601 U.S. at 201; *see also id.* at 199 ("the presence of state authority must be real").

Plaintiffs offer no support for the notion that when separate sovereigns work together, it alters their independent federal and state authorities. Indeed, "[c]lose collaboration between state and federal authorities" is "commonplace and, generally speaking, laudable." *Davis v. City of New York*, 296 F.R.D. 127, 129 (E.D.N.Y. 2013). Multi-jurisdictional coordination enables law

16

enforcement to share intelligence, avoid duplication of efforts, and use their resources effectively. As noted above, the FBI operates 178 task forces across the nation. *See supra* Background.A. Many other federal agencies with enforcement powers do the same. *See, e.g.*, 34 U.S.C. § 41503 (establishing USMS fugitive apprehension task forces). If merely being a "willful participant" in joint law enforcement operations transformed the conduct of federal officers into state action, it would expose countless federal officers to Section 1983 liability. Congress certainly never intended such a result. And even as to Plaintiffs' false and conclusory allegation that all Defendants here acted in pursuit of "shared deportation goals" or as part of an immigration dragnet, Compl. ¶¶ 146–47, the authority for "state officers to 'cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States,'" is derived from federal law. *Arizona*, 567 U.S. at 410 (quoting 8 U.S.C. § 1357(g)(10)(B)). Plaintiffs thus fail to explain why the "joint action" theory would support holding that the Federal Defendants operated under color of state law instead of holding that state officials operated under color of federal law.

Indeed, the Ninth Circuit has thrice rejected Plaintiffs' joint action theory. In *Cabrera v. Martin*, it held that meeting and "cooperat[ing]" with state officials did not "transform[]" federal employees into state actors. 973 F.2d 735, 742–43 (9th Cir. 1992). Likewise, in *Billings*, it held that Secret Service agents who acted "pursuant to the procedures and protocols of their agency" acted under color of federal law despite coordinating with sheriff's officers to turn the plaintiff over after her arrest. 57 F.3d at 801; *see also Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257 (9th Cir. 2008) (federal officers did not act under color of state law when coordinating with local police to detain individual on No-Fly list). Likewise here, Plaintiffs' allegations that the Federal Defendants communicated and collaborated with state officials in no way suggest that

17

the State of Idaho was "*responsible* for [their] conduct." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see Rivera-Quinones v. Commonwealth of Puerto Rico*, No. 15-cv-2382, 2026 WL 1459792, at *4 (D.P.R. Feb. 25, 2026) ("[P]laintiffs provide no support for the proposition that if a federal officer communicates with state officers, he is from that point on acting under color of state law.").

Finally, no law supports the notion that the Federal Defendants acted under color of *both* Idaho and federal law simultaneously. *See Yassin*, 39 F.4th at 1091 n.3 ("Federal and state officers work together all the time without clouding their distinct sources of authority . . . ."). Rather, there is a "presumption that when state and federal officers come together, they are acting pursuant to supreme [i.e., federal] law." *Big Cats*, 843 F.3d at 870 n.8.

And so, even if this Court applied the joint action test, it is not met here. The Federal Defendants' actions are neither "inextricably intertwined with those of the [state] government," *Brunette v. Humane Soc'y of Ventura Cnty.*, 294 F.3d 1205, 1211 (9th Cir. 2002), nor are they alleged to have received a formal "delegation of authority" to enforce state law, *Tsao*, 698 F.3d at 1140. Because the Federal Defendants' actions are not "traceable to the State's power or authority," they are not subject to suit under Section 1983. *Lindke*, 601 U.S. at 198.

## II.      The Federal Defendants Are Entitled to Qualified Immunity for All Claims.

Regardless of how the color-of-law question is answered, the Complaint must still be dismissed because the Federal Defendants are entitled to qualified immunity. Qualified immunity is "an *immunity from suit* rather than a mere defense to liability . . . ." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

18

known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Its protection is "ample," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and gives officials "breathing room to make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). It shields "all but the plainly incompetent or those who knowingly violate the law," *id.* (quoting *Malley*, 475 U.S. at 341), and it applies "regardless of whether the government official's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231. Where a plaintiff fails to state a claim sufficient to overcome this immunity, it is subject to dismissal without discovery. *Mitchell*, 472 U.S. at 526; *Iqbal*, 556 U.S. at 672, 686; *Pearson*, 555 U.S. at 231–32 (2009). Government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Plaintiffs do not establish either here.

### A.  Plaintiffs Fail to Allege the Violation of Any Constitutional or Statutory Right.

The Federal Defendants are first entitled to qualified immunity for all Plaintiffs' claims because they fail to establish a constitutional or statutory violation. Specifically, Plaintiffs fail to plausibly allege that the Federal Defendants (1) personally participated in violating their rights, (2) engaged in an unlawful conspiracy, (3) violated the Fourth Amendment, (4) violated Plaintiffs' equal protection rights, or (5) violated Sections 1985(3) or 1986. *See* Compl. at 55–62.

### 1.  Plaintiffs Fail to Plausibly Allege the Federal Defendants Personally Participated in the Violation of Any Constitutional or Statutory Right.

The Federal Defendants are entitled to qualified immunity because the Complaint fails to plausibly allege that they personally participated in any constitutional or statutory violation. To overcome a motion to dismiss raising qualified immunity, Plaintiffs must allege specific facts

19

demonstrating that each Federal Defendant, through his "own individual actions," violated Plaintiffs' rights. *Iqbal*, 556 U.S. at 676. Individual "liability may not be imposed based on a 'team effort' theory that would 'allow[ ] the jury to lump all the defendants together.'" *Peck v. Montoya*, 51 F.4th 877, 890 (9th Cir. 2022) (quoting *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996)). "[A] court must carefully examine the specific factual allegations against each individual defendant." *Cunningham v. Gates*, 229 F.3d 1271, 1287 (9th Cir. 2000). In a case like this, where Plaintiffs sue several government agencies "and a number of government actors sued in their individual capacities," it is "particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008). This requirement ensures that "each individual [has] fair notice as to the basis of the claims against him or her, as distinguished from collective allegations" against a government agency. *Id.* at 1250. As this Court has summarized, a plaintiff "must provide specific facts supporting the elements of each claim and must allege facts showing a causal link between each defendant and [Plaintiffs'] injury or damage." *Crist v. Miller*, No. 1:25-cv-495-AKB, 2026 WL 36105, at *3 (D. Idaho Jan. 6, 2026).

Plaintiffs do not plausibly allege that Defendants Porter, Bohls, Sheehan, or Sheridan personally participated in any constitutional or statutory violation. The Complaint often collectively refers to as "Defendants" the eight individuals and three entities Plaintiffs sue, without specifying which individual or agency took an alleged action. *See, e.g.*, Compl. ¶ 90, 95, 98, 110–18, 131–48. It also, at times, inappropriately synonymizes the "Federal Defendants" with all the federal agencies present at the operation or the federal government *writ large*. *See, e.g., id.* ¶¶ 33, 129, 150, 163–64, 186–88, 193. Where the Complaint does name the Federal Defendants, its allegations lack substance. Defendants Porter, Bohls, and Sheridan are each

20

named fewer than ten times, and Sheehan is mentioned just 13 times in its factual allegations. Even in these allegations, the details of their conduct are largely absent. *See id.* ¶¶ 51, 90, 99, 109, 145, 149, 156, 166(i)-(vi), 169, 172, 175, 184, 206, 213–17. In only conclusory fashion, Plaintiffs allege that the Federal Defendants participated in planning or executing the warrants, without specifying any particular misconduct by any defendant. *Compare* Compl. ¶¶ 75, 88, 150, 166i.–vi., 180, *with id.* ¶¶ 90, 149, 172 (simply alleging Agent Sheridan signed warrant affidavits). Otherwise, they lump the Federal Defendants with the State Defendants to broadly allege that they "and/or those acting at their direction and under their control and supervision [] were directly involved in detaining attendees, holding them at the racetrack, and then processing them." *Id.* ¶ 184; *see id.* ¶ 31 (alleging "Defendants" are liable for Plaintiffs' injuries by "acting jointly with others who did so; by authorizing, acquiescing or setting in motion policies, plans, or actions that led to" their injuries "and/or" by "failing to prevent" or "ratifying the unlawful conduct taken by employees under their direction"). That is all improper.

Plaintiffs must allege "*who*" did "*what* to *whom*." *Robbins*, 519 F.3d at 1250. And here, the Complaint does not allege that any of the Federal Defendants took any action against any named Plaintiff. Importantly, Plaintiffs' civil rights claims in this action arise from their alleged unlawful detention and mistreatment during the warrant operation. Defendants Porter, Bohls, Sheehan, or Sheridan cannot be individually liable to the named Plaintiffs when none of the four are alleged to have directly detained or mistreated them during the warrant operation.

The Complaint vicariously targets supervisory officials, including Federal Defendants Porter, Bohls, and Sheehan, who Plaintiffs allege were "responsible for overseeing and/or directing operations." *See, e.g.,* Compl. ¶ 19. But even under a theory of "supervisory liability," Plaintiffs fail to plausibly allege facts showing the Federal Defendants' personal involvement in

21

unlawful conduct. As an initial matter, the term "supervisory liability" is a misnomer: "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Iqbal*, 556 U.S. at 676. A plaintiff seeking to impose liability on a supervisory official must make "specific factual allegations regarding [the official's] involvement in the actions giving rise to this lawsuit." *Blantz v. California Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013); *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012). "A defendant may be held liable as a supervisor" only based on "(1) his or her personal involvement in the constitutional deprivation," or where there is "(2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011) (citation omitted). A causal connection may be established if the defendant "set[s] in motion a series of acts by others" or "knowingly refus[es] to terminate a series of acts by others, which the supervisor *knew or reasonably should have known would cause others to inflict a constitutional injury*." *Id.* at 1207–08 (emphasis added) (citation omitted).

The Complaint fails to allege supervisory liability against the Federal Defendants under Supreme Court and Ninth Circuit precedent because it contains no allegations of their "specific wrong-doing." *Hydrick*, 669 F.3d at 942. In *Hydrick*, the Ninth Circuit reversed a district court's order denying qualified immunity for supervisory officials, relying on *Iqbal* and *Starr*. *Id.* at 940. The panel explained that unlike "detailed factual allegations [against the supervisor] in *Starr*," the allegations against the officials there were "conclusory allegations and generalities" that did not describe any "*specific* event or events instigated by [them]." *Hydrick*, 669 F.3d at 941–92. So too here. The allegations against Porter, Bohls, Sheehan, and Sheridan are "devoid of specifics."

22

*Id.* at 942.[3] To the extent the Complaint alleges they were "responsible for the direction and implementation of their agency's participation" in the La Catedral operation or were "involved in planning and/or executing" the operation, *see* Compl. ¶¶ 51, 99, 166(i)–(iii), 172, 175, 184, those allegations of personal involvement in the alleged misconduct are conclusory and not presumed true. *See Blantz*, 727 F.3d at 927 (allegations that supervisor "directed . . . other defendants to take [the challenged] actions" are "conclusory" and do not "defeat a motion to dismiss"); *Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) ("discount[ing]" similar "conclusory allegation[s]").

Moreover, there is no basis to conclude that any of the Federal Defendants actually had supervisory authority over the unnamed officers who allegedly conducted unlawful searches, used excessive force, or detained Plaintiffs in an unreasonable manner; the Complaint does not identify these officers or allege that they worked for the Federal Defendants' agencies. *See supra* Background.D. That the Federal Defendants coordinated with other law enforcement agencies certainly does not render them liable for the actions of *those* agencies' officers. Nor may the Federal Defendants "be held liable because they were merely present" on scene or "working in the same or coordinating departments" as an official who violated the law. *Olson v. County of Grant*, 127 F.4th 1193, 1197 (9th Cir. 2025); *accord Peck*, 51 F.4th at 889 ("[S]imply being present at the scene does not demonstrate that an officer has acted as part of a common plan."). Ultimately, the Complaint alleges "instances of misconduct on the part of particular [officers]" and seeks to "attribute" that conduct to Defendants Porter, Bohls, Sheehan, and Sheridan. *Wood v. Moss*, 572 U.S. 744, 763–64 (2014). The Federal Defendants "cannot be held [individually]

---

[3] The only specific allegations are against Defendant Sheridan, who applied for arrest warrants for the criminal defendants in *United States v. Colin*, 25-cr-291-AKB (D. Idaho). *See* Compl. ¶¶ 90, 149, 172. Those actions are not being challenged in this case.

liable" on that basis. *Id.* at 763 (quoting *Iqbal,* 556 U.S. at 683).

In many respects, the Complaint targets the federal government as a whole, rather than the Federal Defendants individually. For instance, it repeatedly references statements by high-level federal officials, *see* Compl. ¶¶ 123-28; alludes to prior federal operations in which the Federal Defendants had no role, *see id.* ¶¶ 157-62; and at times conflates the Federal Defendants with other government actors, *see id.* ¶¶ 133-134, 144. It is well established, however, that a constitutional tort claim is not available against the federal government. *F.D.I.C. v. Meyer*, 510 U.S. 471, 484–85 (1994). And Plaintiffs' allegations against the federal government writ large further underscore that the objective of this class suit is to alter federal government policy, not deter alleged misconduct by individual federal employees. *Abbasi*, 582 U.S. at 140.

### 2. Plaintiffs Fail to Plausibly Allege Facts Establishing a Conspiracy.

At the heart of this lawsuit is Plaintiffs' allegation that the Federal Defendants "conspired" with nearly 200 other state and local officers to violate Plaintiffs' constitutional rights. None of Plaintiffs' claims against the Federal Defendants can survive a motion to dismiss without specific facts supporting the existence of a conspiracy, and conclusory or bare allegations of a "meeting of the minds" will not suffice. *See Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989). Conspiracy is an essential element of Plaintiffs' Section 1985(3) and Section 1986 claims. *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29 (1983). Plaintiffs also allege the Federal Defendants unlawfully conspired in violation of Section 1983. As explained *supra* Part I, Plaintiffs' Section 1983 claims must be dismissed because the Federal Defendants did not act under color of state law. But even assuming the existence of a purported conspiracy with state officials could subject *federal* actors acting pursuant to their *federal* authority to suit under Section 1983 (it cannot), Plaintiffs do not

plausibly allege such a conspiracy here.

To state a conspiracy under Section 1983, 1985(3), or 1986, "a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Conclusory allegations of collusion will not suffice: "the plaintiff must state specific facts to support the existence of the claimed conspiracy." *Burns*, 883 F.2d at 821. It is not enough that the purported conspirators merely agreed to act in concert—they "must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989). To state a conspiracy claim, "[t]he right must be '*aimed at*'; its impairment must be a conscious objective of the enterprise." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (citation omitted).

Plaintiffs have not plausibly alleged any such facts here. Rather, they allege the Federal Defendants participated in the planning and the execution of a search warrant on an illegal gambling operation with plans to "conduct immigration status screenings before releasing detainees." Compl. ¶ 181. This particular conduct did not violate Plaintiffs' constitutional rights, *see infra* Part II.A.3–4, so there is no basis to say that the Federal Defendants shared an *unlawful* common objective with anyone. *See O'Handley v. Weber*, 62 F.4th 1145, 1162–63 (9th Cir. 2023) ("There is no unconstitutional conspiracy without this shared specific intent.").

Rather, these allegations support an inference that the federal law enforcement officers came together to enforce federal law—a permissible motive. *See id.* at 1159 ("[Plaintiff's] allegations establish, at most, a meeting of the minds to promptly address election misinformation, not a meeting of the minds to violate constitutional rights. There is nothing wrongful about Twitter's desire to uphold the integrity of civic discourse on its platform."). No

25

allegations demonstrate a desire by the Federal Defendants to commit unlawful acts. *See Crowe*, 608 F.3d at 440–41 ("A 'common objective' to merely prosecute the boys is insufficient; fair prosecution would not violate the boys' constitutional rights. It is too great a leap to conclude that help in obtaining a confession—even a coerced confession—suggests that McDonough shared the common objective of falsely prosecuting the boys."); *Solomon v. Las Vegas Metro. Police Dep't*, 441 F. Supp. 3d 1090, 1100 (D. Nev. 2020) (requiring plaintiff to plead "specific facts to show that such an agreement existed, what it entailed, what was each defendant's objective in the alleged conspiracy, or that they communicated before the arrest").

Even assuming federal actors here formed an agreement among themselves with an impermissible common objective (they did not), it would not qualify as a conspiracy under Section 1983 or 1985(3). The intra-corporate conspiracy doctrine bars this. Under the doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Abbasi*, 582 U.S. at 153. This doctrine is "derived from the nature of the conspiracy prohibition," which requires an agreement between "two or more *separate* persons." *Id.* (emphasis added). "When two agents of the same legal entity make an agreement in the course of their official duties . . . as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people." *Id.* Thus, under the intra-corporate conspiracy doctrine, an alleged agreement between federal defendants does not qualify as a conspiracy. *See K.O. v. Sessions*, No. 20-5255, 2022 WL 3023645, at *6 (D.C. Cir. July 29, 2022) ("Appellants failed to demonstrate it is clearly established in the law that officials in the Executive Branch, each answering to the same principal, can engage in a conspiracy among themselves and with their subordinates when communicating with each other about immigration policies."). Here, the

26

Federal Defendants are all agents of the same legal entity, the Executive Branch, and thus could not establish a "conspiracy" between two or more separate legal entities. *Id.*; *accord Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1060 (9th Cir. 2020), *rev'd on other grounds*, 595 U.S. 344 (2022). Absent nonconclusory allegations that the Federal Defendants reached an agreement with *state* actors with the specific purpose and objective of violating Plaintiffs' rights, there is no conspiracy. Plaintiffs have not done this, nor have they alleged that any purported conspiracy arose under color of state, as opposed to federal, law. *See Hernandez*, 124 F.4th at 337 ("Applying § 1983 liability to a federal actor requires further allegations that place the constitutional deprivation under state rather than federal law."); *see also supra* Part I.

With respect to their Section 1985(3) claim in particular, Plaintiffs must allege a conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *United Bhd. of Carpenters*, 463 U.S. at 828–29. Importantly, allegations that "conduct was motivated by a racial or perhaps otherwise class-based, invidiously discriminatory animus . . . constitutes an essential element of a cause of action under section 1985(3)." *Trerice v. Pedersen*, 769 F.2d 1398, 1402 (9th Cir. 1985). Here, Plaintiffs fail to allege facts demonstrating the existence of a conspiracy or that the Federal Defendants were motivated by class-based, invidiously discriminatory animus.

Plaintiffs' claim under Section 1986 also fails because it requires a Section 1985 violation. *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) (§ 1986 claim fails if underlying § 1985 claim is insufficient). Even if a conspiracy existed between persons other than the Federal Defendants (which Plaintiffs have also not alleged), there are no non-conclusory allegations that the Federal Defendants were either aware of that conspiracy or in

27

a position to prevent it. *Id.* Plaintiffs' Section 1986 claim must therefore be dismissed. For all these reasons, the "conspiracy" claim at the heart of Plaintiffs' lawsuit fails as a matter of law.

### 3. Plaintiffs Fail to Plausibly Allege a Fourth Amendment Violation by the Federal Defendants.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. It confers "personal rights [that] may not be vicariously asserted." *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). So, each named Plaintiff must show that his or her specific detention and treatment was unreasonable under the circumstances alleged. They have not. Even if they had adequately alleged that any Federal Defendant took specific action against them that resulted in their seizure, Plaintiffs' detentions and questioning were reasonable under *Michigan v. Summers*, 452 U.S. 692 (1981), and *Muehler v. Mena*, 544 U.S. 93 (2005).

#### i.   Supreme Court Precedent Permitted Detaining and Questioning Plaintiffs.

In *Summers*, the Court held that where officers execute a search warrant for a premises, that warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705. This was so even where officers encountered an individual leaving a home, did not yet know he owned the home, and made him re-enter and "remain in the house until evidence establishing probable cause to arrest him was found." *Id.* at 693, 705. In *Mena*—a Section 1983 case—the Court broadened *Summers*' holding, declaring that "[a]n officer's authority to detain incident to a search is *categorical*; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19) (emphasis added).

*Mena* controls here. There, local police believed a gang member lived in, and obtained a warrant to search, a home for deadly weapons and evidence of gang membership. *Id.* at 95–96. "Aware" that the gang was composed primarily of illegal immigrants, officers notified

28

Immigration and Naturalization Services (INS), and an INS officer accompanied them as they executed the warrant. *Id.* at 96. While executing the warrant, police found and handcuffed four people on the property and brought them to an adjoining garage, where they were asked questions about identity and immigration status. *Id.* The INS "officer later asked the detainees for their immigration documentation." *Id.* One individual later sued, claiming that her two- to three-hour detention in handcuffs and questioning violated the Fourth Amendment. *Id.*

The Court rejected her contentions. First, it found the "detention was, under *Summers*, plainly permissible" because a warrant existed and she was on the premises "at the time of the search." *Id.* at 98. Next, the Court held that using correctly applied handcuffs to effectuate the detention was reasonable because "[i]nherent in *Summers*' authorization to detain . . . is the authority to use reasonable force to effectuate the detention." *Id.* at 98–99. It did not matter that the warrant "did not include [plaintiff] as a suspect," and the fact that there was a "need to detain multiple occupants made the use of handcuffs all the more reasonable." *Id.* at 99–100 & n.2. Lastly, the Court held that officers' questioning about identity and immigration status was not a "discrete Fourth Amendment event," as "mere police questioning does not constitute a seizure" and there was no suggestion that plaintiff's detention was prolonged by the questioning. *Id.* at 100–01. The Court rejected a "requirement of particularized reasonable suspicion for purposes of inquiry into citizenship status," created by the Ninth Circuit below. *Id.* at 101 n.3.

The Court later upheld *Summers-Mena* detentions, even where officers searched a home and detained innocent, unclothed residents who bore no resemblance to the suspects sought. *See Los Angeles County v. Rettele*, 550 U.S. 609, 610 (2007) (per curiam). "The rule announced in *Summers* allows detention incident to the execution of a search warrant," and "does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or

29

poses a specific danger." *Bailey v. United States*, 568 U.S. 186, 193 (2013); *id.* at 203 (Scalia, J., concurring) ("*Summers* establishes a categorical, bright-line rule"). The rule is predicated on allowing law enforcement to engage in a "safe and efficient search," *Bailey*, 568 U.S. at 200, and creates a workable principle that avoids officers engaging in interest-balancing in "an ad-hoc, case-by-case fashion," *Summers*, 452 U.S. at 705 n.19 (quoting *Dunaway v. New York*, 442 U.S. 200, 219 (1979)). The Supreme Court has never said that *Summers* permits a court to inquire into or second-guess officers' motives before executing a warrant. The only "constraint" it has imposed is "spatial": "Once an individual has left the immediate vicinity of a premises to be searched, . . . detentions must be justified by some other rationale." *Bailey*, 568 U.S. at 201–02.

*Mena* is on all fours here. To start, the warrants were not materially different from *Mena*. The warrants here—criminal arrest and search warrants predicated on evidence that La Catedral was the hub of an illegal gambling operation, and several patrons there were facilitating it— permitted a search of the entire 24-acre La Catedral property for evidence relating to federal gambling crimes. *See* Ex. A, Attach. A-B. *Summers* and *Mena*, the Ninth Circuit has held, apply "to all searches upon probable cause, not just to searches for contraband." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006). At the very least, the warrants here were not less serious than a search of boardinghouses for misdemeanor code violations for a "rodent infestation," as in *Dawson. Id.*

The scope of the warrants and the length of Plaintiffs' detentions also were not different from *Mena*. Plaintiffs were on the premises as the warrants were executed, zip-tied, and brought to the racetrack, where some may have been detained for roughly four hours. Plaintiffs do not contend that execution of the search warrant was fully completed before they were released. *See Dawson*, 435 F.3d at 1066 ("[T]he duration of a detention may be coextensive with the period of

30

a search, and require no further justification."). Instead, they complain that buildings that were searched were not "in the immediate vicinity" of the racetrack, and, on "information and belief," allege officers finished searching those buildings before they were processed. Compl. ¶¶ 76, 104, 245. They also claim that four of the five individuals who were subjects of arrest warrants "were taken into custody soon after law enforcement arrived." *Id.* ¶ 105.

But the search warrant here was not limited to discrete buildings, and the legality of Plaintiffs' detentions does not hinge on when the officers completed the execution of the arrest warrants. The search warrant covered the racetrack and spectator arena, where Plaintiffs were held. Plaintiffs do not say that officers had "no further need to control the scene" while executing the warrant. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Moreover, if a two- to three-hour detention related to the search of a single-family home in *Mena* was reasonable, it is hard to fathom how the detentions here related to the search of the 24-acre racetrack premises are not— even assuming all Plaintiffs were detained for four hours. *See* Compl. ¶ 67 (specifying only that Mr. Z was detained for that duration). Officers needed to "secure the scene by detaining those present," including over 400 people, to ensure a "safe and efficient search" was conducted. *Bailey*, 568 U.S. at 198, 200. They could not let 400 individuals roam free while searching for evidence and trying to locate criminal suspects. *Dawson*, 435 F.3d at 1067 ("Allowing an unknown number of unidentified people to move about . . . would dramatically increase the likelihood that an occupant could injure or kill an officer . . . ."). And no authority supports Plaintiffs' suggestion that officers should have simply "dispersed the crowd." Compl. ¶ 110. After gaining control of the premises, officers also needed to arrest wanted individuals and

31

search them[4] and over 24 acres of land and several buildings. Under these circumstances, a four-hour detention during the search of the La Catedral premises was reasonable. *See Rettele*, 550 U.S. at 614 ("In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search.").[5]

Questioning Plaintiffs about their identities and immigration status also did not run afoul of *Mena*. As in *Mena*, the FBI here was "aware" that three arrestees lacked lawful status. 544 U.S. at 96. Through undercover operations, it "anticipated encountering aliens unlawfully present" when executing the warrant. Compl. ¶ 140. So, as in *Mena*, the FBI brought along immigration officers to assist in processing "anyone who may be in the country illegally." *Id.* ¶ 204 n.55. Questioning Plaintiffs was not a "discrete Fourth Amendment event" requiring "particularized reasonable suspicion for purposes of inquiry into citizenship status." *Mena*, 544 U.S. at 101 & n.3. Plaintiffs do not claim their detentions were "prolonged beyond the time reasonably required to complete" the search of the property. *Id.*; *see also Dawson*, 435 F.3d at 1069; *Ganwich v. Knapp*, 319 F.3d 1115, 1121 (9th Cir. 2003). In fact, Mr. Popoca is the only Plaintiff who alleges specifics about his questioning, saying that after he entered the processing tent, his "zip-ties were removed" and he supplied his driver's license and was asked if it was

---

[4] Plaintiffs allege that some attendees and their cars were searched, Compl. ¶¶ 72–73, 106–07, but do not allege this as to themselves, *id.* ¶¶ 43–46, 55–69, 81–82. Nor do they sue the Federal Defendants for an unreasonable search. *Compare id.* ¶¶ 244–45 *with* ¶ 279. The Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85, 90–93 (1979), therefore, is not implicated. *See Summers*, 452 U.S. at 695 n.4.

[5] And it was reasonable for law enforcement to detain children while their parents were being detained. *See Harte v. Bd. of Commissioners of Cnty. of Johnson, Kansas*, 864 F.3d 1154, 1190 (10th Cir. 2017) ("Practical concerns dictate that law-enforcement officers must be allowed to detain children with their parents to monitor the children and ensure that no one interferes with the search."). It would have been impractical, not to mention irresponsible, for law enforcement to remove the children from the property while detaining the parents. But, in any event, the Fourth Amendment does not require that.

32

"good." Compl. ¶¶ 81–82. That was permissible. The Supreme Court has "tolerated certain unrelated investigations that d[o] not lengthen" an otherwise permissible detention. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "[I]nquiries into matters unrelated to the justification for the [detention], th[e] Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the [detention]." *Johnson*, 555 U.S. at 333. Such inquires include checking an individual's "license," determining if "there are outstanding warrants against" him or her, *Rodriguez*, 575 U.S. at 354, and asking about immigration status. *See Mena*, 544 U.S. at 101.

Plaintiffs' treatment during the search was also reasonable.[6] Even assuming any Federal Defendant directly engaged with them, which is not alleged, *see supra*, Part II.A.1., the use of zip-ties and drawn firearms is "[i]nherent in *Summers*' authorization to detain." *Mena*, 544 U.S. at 93; *Dawson*, 435 F.3d at 1068 (holding "it was reasonable for the police to enter the boardinghouses aggressively and drawing their sidearms"); *Gamez-Lopez v. Barr*, 821 F. App'x 912 (9th Cir. 2020) (holding "agents used reasonable force" in executing a search warrant that "did not seek evidence of crimes involving violence" where they broke through apartment door with guns drawn); *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1261 (9th Cir. 2024) ("placing someone in tight handcuffs is not inherently unconstitutional").

Nothing about the type of warrants, their scope, the length of detention, Plaintiffs' treatment, or the questions they were asked, materially differ from *Mena*. In fact, Plaintiffs admit that "automatic detentions" incident to "a search warrant execution" are "permissible," and that

---

[6] Only two Plaintiffs, Mr. Popoca and A.S.P., appear to allege the force used against them went beyond being zip-tied, and extended to being "pushed" or "grabbed" by unnamed officers. Compl. ¶ 55. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018). Regardless, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

such warrant executions often occur at a "business where crime is suspected"—like the illegal gambling business that operated at La Catedral. Compl. ¶¶ 87, 120. Yet, Plaintiffs complain of law enforcement's conduct in detaining them incident to lawfully obtained warrants founded on probable cause. Execution of those warrants did not violate the Fourth Amendment.

### ii. The Purpose of the Operation was Permissible.

The only difference between this case and *Mena* is that, according to Plaintiffs, the warrant execution had a primary "immigration purpose." Compl. ¶¶ 208–10. They appear to invoke the Ninth Circuit's decision in *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019). But *Perez Cruz* does not control here, and Plaintiffs do not plausibly allege that the "primary" or "central" purpose of any Federal Defendant (or even the FBI-led operation generally) was unlawful. *Id.* at 1142–43. No amount of conclusory allegations about "shared deportation goals" or the operation allegedly being an "immigration dragnet," *see, e.g.*, Compl. ¶¶ 86–87, 128–29, changes the fact that, even under Plaintiffs' allegations, the operation was motivated by permissible law enforcement purposes.

*Perez Cruz* arose in the context of a removal proceeding and involved extraordinary facts not present here. There, ICE acted alone in obtaining and executing a search warrant for employment-related documents at a factory employing between 200-300 "undocumented immigrants." 926 F.3d at 1133. Criminal complaints and arrest warrants were also issued for eight employees. *Id.* Planning documents, however, "revealed that ICE intended from the outset to turn the execution of these warrants into quite a different operation than a search for employment records." *Id.* In those documents, ICE stated it was "executing a federal criminal search warrant . . . *in order to* . . . arrest as many as 100 unauthorized workers." *Id.* at 1134. The operation was solely carried out by ICE officers, who entered the factory, did not permit workers

34

to leave, and eventually frisked, handcuffed, and questioned Gregorio Perez Cruz, who was arrested for immigration violations and became subject to removal proceedings. *Id*. Perez Cruz moved to suppress incriminating statements he made to ICE agents, arguing that his detention violated the Fourth Amendment and an ICE regulation. *Id.* at 1135.

The Ninth Circuit held that Perez Cruz's detention was not justified under *Summers*. *Id.* at 1138. "Critical" to that finding was the government's so-called "purpose" in executing the warrants. *Id.* at 1139. Drawing on Supreme Court decisions in special-needs and administrative search cases, the court said that, although "subjective intent" is ordinarily irrelevant under the Fourth Amendment, it "*is* often relevant when suspicion-less intrusions pursuant to a general scheme are at issue." *Id.* (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). Despite the Supreme Court stating that it has "uniformly rejected invitations to probe subjective intent" outside special-needs and administrative-inspection cases, *al-Kidd*, 563 U.S. at 737, the Ninth Circuit formulated a new "limit on the permissible purposes" for which *Summers* detentions may occur. *Perez Cruz*, 926 F.3d at 1140. Applying that limit, the court held that Perez Cruz provided "substantial, uncontroverted evidence that" ICE's "principal goal was to detain, interrogate, and arrest a large number of" factory workers, in the hope "to initiate removal proceedings against them," *id.* at 1141, and so he met his "burden" of showing that his detention "would not have occurred in the absence of an impermissible reason," *id.* at 1143. Stated differently, the court held that "a safe and efficient search" was "not the primary purpose of the officers' actions," so the reasons supporting a *Summers* detention "disappears." *Id.* at 1141.

*Perez Cruz* does not apply here. For it to, Plaintiffs must rebut *Summers*' presumption that their detentions were reasonable by showing they "would not have occurred in the absence of an impermissible reason." *Id.* at 1143. But unlike *Perez Cruz*, where documents unmistakably

35

revealed a "preplanned" purpose to execute the warrant "in order to administratively arrest as many as 100 unauthorized workers," *id.* at 1133–34, no comparable allegations exist here.

To start, *Perez Cruz* did not involve a multi-agency operation or an attempt to hold individual officers liable, and there are sound reasons it should not apply to probe the motives of "separate and independent governmental entities," let alone the "primary purpose" of each one of the alleged 200 officers participating in the La Catedral operation. *United States v. Grey*, 959 F.3d 1166, 1183 (9th Cir. 2020). The federal, state, and local law enforcement agencies each had different roles and different motivations for participating in the operation. Compl. ¶¶ 209–10. This Court may not impute motives from one agency to another, or from one officer to another. *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012). Doing so would potentially render 200 officers liable not for their own acts, but for the supposed "primary purpose" of others. That cannot be so. *Cf. Grey*, 959 F.3d at 1184 (discussing *Perez Cruz* and noting "nothing we say here should be construed as questioning the City's entitlement to the assistance of . . . another law enforcement agency . . . in executing the administrative warrant").

Even if *Perez Cruz* does apply, Plaintiffs have failed to plausibly allege that any of the Federal Defendants' actions were motivated primarily by an unlawful purpose. *Perez Cruz* concerned what was essentially a preplanned ruse to secure and execute a warrant "in order to" conduct mass immigration arrests. 926 F.3d at 1133. The Complaint lacks any allegations plausibly establishing that Defendants Bohls, Sheehan, or Sheridan—all FBI officials investigating an illegal gambling operation—were each *personally* and *primarily* motivated by a desire to unlawfully detain Plaintiffs without reasonable suspicion "in order to" conduct immigration enforcement. The "obvious alternative explanation," *see Iqbal*, 556 U.S. at 682, is that their motivation during the operation was to search for and secure evidence of illegal

36

gambling, and to detain individuals on the property pursuant to established Supreme Court precedent.

Nor have Plaintiffs plausibly alleged that Defendant Porter was motivated primarily by a desire to pervert the search warrant in order to conduct an unlawful mass detention absent reasonable suspicion. To start, Plaintiffs have not alleged that Defendant Porter was involved in procuring the search warrant, and thus he could not have held *any* motive in securing it for an improper purpose. Even assuming that Defendant Porter, as an ICE official, was motivated by an immigration enforcement purpose, that alone is not unlawful. *Mena* makes clear that it is acceptable to have immigration enforcement officials present during the execution of a search warrant. There, an immigration officer was invited to accompany law enforcement officers executing a warrant and was permitted to ask plaintiff about her "immigration status" while she was detained. *Mena*, 544 U.S. at 96. The Supreme Court has never endorsed a "requirement of particularized reasonable suspicion for purposes of inquiry into citizenship status." *Id.* at 101 & n.3. In fact, such questioning incident to a *Summers* detention is not "a discrete Fourth Amendment event." *Id.* at 101. Plaintiffs have not plausibly alleged that Defendant Porter was motivated by a purpose to do anything other than to question individuals lawfully detained under *Summers* about their immigration status, in accordance with *Mena*. It is too great a leap to infer that Defendant Porter acted from improper motives given that the Supreme Court has repeatedly affirmed that officers may inquire "into matters unrelated to the justification for" a detention. *Johnson*, 555 U.S. at 333.

To the extent Plaintiffs ask the court to cast an up or down vote on the "primary purpose" of the operation as a whole, that is not a proper inquiry in an individual-capacity case where each government official can only be held liable for his own individual conduct. *See Iqbal*, 556 U.S. at

37

676. If the Court were to base personal liability on the purpose of "the operation," that would effectively hold all 200 law enforcement officers individually liable regardless of what each officer's personal motives were. Moreover, it would fly in the face of established Supreme Court precedent that "subjective intent is simply irrelevant to [the qualified immunity] defense." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

In essence, Plaintiffs ask this Court to infer from the fact that ICE took "105 illegal aliens" into custody that day, Compl. ¶ 204, that the warrant sought by the FBI was simply a ruse to conduct immigration arrests. That conflates the operation's results with its purpose, and it fails to grapple with the individual-capacity nature of Plaintiffs' claims by treating almost 200 officers present on the scene as having a uniform, singular and unlawful purpose.

Finally, even assuming *Perez Cruz* applies and can be properly construed as extending personal capacity liability to individual participants in a law enforcement operation because of the operation's primary purpose, that still would not support liability here. Plaintiffs allege only that "*part* of the plan" included "coordinating with DHS to bring" a tent "to conduct immigration status screenings before releasing detainees." *Id.* ¶ 181 (emphasis added). But they cannot refute that the execution of the warrants here was primarily—or at minimum equally—motivated by an intent to investigate an illegal gambling operation. Indeed, that purpose bore fruit: "[L]arge amounts of cash" were found on several of the individuals detained. *Id.* ¶ 109. Evidence of gambling was also found during the search of Colin's backpack, and indictments were later secured for federal gambling charges. *Id.* ¶¶ 109, 206. Such allegations cannot be explained if officers were motivated only by immigration enforcement. Also, Plaintiffs cannot deny that officers executing warrants are presumptively concerned with conducting a "safe and efficient" search. *Perez Cruz*, 926 F.3d at 1142. That is especially so where a large number of individuals

38

could interfere with the arrests or search. *See Sharp v. County of Orange*, 871 F.3d 901, 915 (9th Cir. 2017) (holding that officers may sometimes detain occupants of a premises "while searching for the subject of an arrest warrant or conducting a lawful protective sweep"). Plaintiffs cannot elide these myriad permissible reasons for their detentions. And, under *Perez Cruz*, even "'dual motives' are permissible." *Snitko v. United States*, 90 F.4th 1250, 1261 (9th Cir. 2024). Plaintiffs have not alleged that their detentions would *never* "have occurred in the absence of an impermissible reason." *Perez Cruz*, 926 F.3d at 1143; *Grey*, 959 F.3d at 1182 ("When the police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out [his] 'true' motivation."). Therefore, they "ha[ve] not shown" that their detentions were unreasonable. *Iqbal*, 556 U.S. at 679 (citation omitted).[7]

### 4. Plaintiffs Have Not Plausibly Alleged Facts Establishing a Fourteenth Amendment Violation.

"[T]he commands of the Fourteenth Amendment are addressed only to the State or to those acting under color of its authority." *Carter*, 409 U.S. at 423. "[A]ctions of the Federal Government and its officers are beyond [its] purview." *Id.* at 424. Thus, the Federal Defendants are not "subject to [the Amendment's] restrictions," *id.*, and Count Two must be dismissed.

But even under an equal protection analysis, the Complaint still fails to state a claim. *See Schweiker v. Wilson*, 450 U.S. 221, 227 n.6 (1981) (explaining that the Fifth and Fourteenth Amendment use "the same standard"). To prevail on an equal protection claim, "a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v. City & County of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007). A plaintiff must allege facts sufficient to demonstrate both a "causal connection

---

[7] As noted, Plaintiffs' theory that the Federal Defendants were guided primarily by immigration purposes also conflicts with their color of law argument. *See supra* Part I.

of the official to the complained-of violation" and intent "to deprive another of that person's rights." *Lacey*, 693 F.3d at 916. "For an official to be liable for another actor's depriving a third party of his constitutional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights." *Id.*

Purposeful discrimination "requires more than 'intent as volition or intent as awareness of consequences.'" *Iqbal*, 556 U.S. at 676 (*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). "It instead involves a decisionmaker's undertaking a course of action 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Id.* at 676–77 (quoting *Feeney*, 442 U.S. at 279). Therefore, a plaintiff "must plead sufficient factual matter to show that" defendants acted "not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 677. The Complaint does not contain facts showing that the Federal Defendants acted with a purposefully discriminatory motive or that their conduct "caused" the violation of Plaintiff's equal protection rights.

As to purpose, the Federal Defendants acted in furtherance of permissible law enforcement goals. They sought warrants, planned an operation, and sent congratulatory emails. These actions were for "neutral, investigative reason[s]," *Iqbal*, 556 U.S. at 677, acceptable under established legal authority. *Mena*, 544 U.S. at 101. True, it is "conceivable" that such permissible law enforcement purposes could coexist with invidious discrimination, but Plaintiffs' allegations fail to "nudge" their claim "of invidious discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

For example, Plaintiffs' allegations that "Defendants conflate Latino ethnicity with illegality and criminality," that "[u]pon information and belief, their conclusions about immigration status were based on perceived Latino ethnicity," and that "Defendants conspired to

40

abuse criminal warrants to conduct a large-scale immigration dragnet deliberately targeted at a large gathering of Latino individuals because of their ethnicity," Compl. ¶¶ 132, 140, 164, are "bare assertions" that are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680–81. It is also impossible to discern any of the four Federal Defendants' specific intent from them as the allegations lump together multiple individual and entity defendants together as one. Those and similar allegations do not further Plaintiffs' claim that the Federal Defendants "were motivated by animus against the plaintiffs due to their actual or perceived Latino ethnicity, or association with people of actual or perceived Latino ethnicity." Compl. ¶ 259.

Nor do the factual allegations demonstrate that any Federal Defendant personally harbored a discriminatory motive or any race-based animus. Plaintiffs broadly allege that "law enforcement" or "officers" used racially charged terms during the operation, but do not identify those individuals or their agencies. Compl. ¶¶ 3, 57, 142. The Complaint also cites statements with purported racial undertones made by high-level federal administration officials. *See, e.g., id.* ¶¶ 134-35. Those statements were not related to this operation, nor were they adopted by any Federal Defendant. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 35 (2020) (holding that statements made by officials which were "remote in time and made in unrelated contexts" "fail to raise a plausible inference that the" particular conduct "was motivated by animus"). Plaintiffs do not allege that any of the Federal Defendants used, knew about, or directed racial epithets. Nor are they alleged to have specifically planned for or directed attendees to be sorted into groups based on perceived race. Allegations about questioning for immigration status are also not discriminatory, particularly where officers are alleged to have questioned *everyone* who was detained about their status and identity. Compl. ¶ 152.

*Iqbal* is particularly instructive. There, the Court accepted as true petitioner's allegation

41

that government officials instituted a "hold until cleared" policy in the wake of September 11. *Iqbal*, 556 U.S. at 681. The Court noted that the factual allegations were "consistent with" purposeful discrimination. *Id*. But "given more likely explanations, they [failed to] plausibly establish this purpose." *Id.* The Court explained that in investigating "an Islamic fundamentalist group . . . composed in large part of [Osama bin Laden's] Arab Muslim disciples" it was not surprising "that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 682. But that impact had a "lawful" and "nondiscriminatory" explanation to "detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts." *Id.* The Court held: "As between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* (citation omitted).

So too, here. Whatever conduct the Federal Defendants engaged in (which again, is not specified) had the obvious alternative explanation of executing a search warrant and, incident to that, processing those detained. Just because the burden of the search warrant execution fell on those present at La Catedral, which consisted predominately of a particular ethnic group, does not demonstrate that the Federal Defendants planned to execute the warrants "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Iqbal*, 556 U.S. at 676–77 (quoting *Feeney*, 442 U.S. at 279). Indeed, as alleged in the Complaint, it would have been impossible to execute a search authorized by a warrant during a horse race (when gambling would be most likely to occur) without disproportionately affecting attendees. *See* Compl. ¶ 40 ("The vast majority of attendees at La Catedral events are Latino."). The law does not require

42

law enforcement officers to forgo otherwise permissible investigatory activities simply because they may have a disparate impact on a specific ethnic group.

Lacking allegations demonstrating any discriminatory purpose or causal connection between the Federal Defendants' conduct and any discriminatory effect, Plaintiffs fail to state a claim for a Fourteenth Amendment violation.

### B.  The Federal Defendants Did Not Violate Clearly Established Law.

Under the second prong of qualified immunity, "the plaintiff . . . bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (quotations omitted). "[A] rule is only clearly established if it has been 'settled' by 'controlling authority' or 'a robust consensus of cases of persuasive authority' that 'clearly prohibit[s] the officer's conduct in the particular circumstances,' with 'a high degree of specificity.'" *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (quoting *Wesby*, 583 U.S. at 63). An official is entitled to qualified immunity unless "the contours of a right are sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (emphasis added) (cleaned up). If judges or officials of reasonable competence could "disagree" about caselaw's application to the facts of a particular case, it is "unfair" to subject officers to damages liability. *Wilson v. Layne*, 526 U.S. 603, 618 (1999); *see Davis v. Scherer*, 468 U.S. 183, 194 (1984).

The Federal Defendants did not engage in a clearly established violation of Plaintiffs' constitutional or statutory rights. To determine whether a right is clearly established, courts "look first" to binding Supreme Court precedent. *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022).

With respect to Plaintiffs' Fourth Amendment claims, *Mena* controls here, and the Supreme Court has never said that the permissibility of a *Summers* detention turns on or even

43

permits inquiry into individual officers' motives. Indeed, *Summers* created a bright-line rule allowing detention that "does not depend on the specific circumstances in a particular case." *Sharp*, 871 F.3d at 913. *Mena* later emphasized that officers' authority to detain incident a search is "categorical." 544 U.S. at 98. Yet *Perez Cruz*'s allowance to probe motives does just that, and is in tension with *Summers*' refusal to require officers to engage in "ad-hoc, case-by-case" interest-balancing. 452 U.S. at 705 n.19. It was plainly lawful for the warrants to be executed here without requiring the Federal Defendants to probe the minds of all officers involved about what their supposed intent was before doing so.

"Even assuming that Circuit precedent can clearly establish law," *Perez Cruz* does not place the constitutionality of the La Catedral operation "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). In the Fourth Amendment context, the Supreme Court has repeatedly said it will be "sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts," and so existing precedent must squarely govern "the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). This case is unlike *Perez Cruz* in that it concerned a multi-agency operation, with each agency or officer having their own reasons for assisting in the warrant execution. *Perez Cruz* also did not involve attempts to hold individual officers personally liable. On that score, Plaintiffs make no non-conclusory allegations that a Federal Defendant (particularly the FBI Defendants) was motivated by a primary and preplanned immigration purpose, as opposed to a purpose to secure the scene while a search for evidence of illegal gambling was conducted. And even if some other on-scene officer was motivated by such a purpose, his or her purpose cannot be used to hold *others* personally liable. At the least, application of *Perez Cruz* to the facts is open to debate such that the Federal Defendants could

44

not have "known for certain" their particular conduct was unlawful. *Abbasi*, 582 U.S. at 152. In fact, the Ninth Circuit recently held that neither *Perez Cruz* nor its decision in *Ganwich* placed "the constitutional question presented here 'beyond debate'" because probing an officer's "intent is in tension with the objective approach" to determining if a "*Summers*-type detention" is conducted "in a reasonable manner." *Chavez v. Wynar*, No. 21-16094, 2023 WL 2535266, at *2 (9th Cir. Mar. 16, 2023). At best, there is confusion in the caselaw and "the limits of *Summers* are not well defined." *Okorie v. Crawford*, 921 F.3d 430, 440 (5th Cir. 2019). That alone entitles the Federal Defendants to qualified immunity.

Nor did the Federal Defendants violate any clearly established equal protection or statutory right. No clearly established law forbade the Federal Defendants from planning or being at the alleged operation here. There was robust legal support for the operation, and no case forbade conducting immigration screening on individuals already detained during the execution of a warrant. Part II.A.3.i. Moreover, no case clearly established that the Federal Defendants participated in an unlawful conspiracy on the facts alleged. *See Abbasi*, 582 U.S. at 155 (defendants entitled to qualified immunity where they "would not have known with any certainty that the alleged agreements were forbidden by law"). Or that federal defendants could be liable for conspiring to violate the Fourteenth Amendment—a provision which only restricts state conduct. *Carter*, 409 U.S. at 423. At the very least, no law demonstrated that the Federal Defendants' conduct—all supported by lawful law enforcement motives—could qualify as "invidiously discriminatory animus." *Bray*, 506 U.S. at 274.

Therefore, the Federal Defendants are entitled to qualified immunity.

## CONCLUSION

This Court should grant the Federal Defendants' motion to dismiss.

45

Dated: June 23, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

REGINALD M. SKINNER
Senior Trial Counsel, Torts Branch

By: */s/ Juliana M. Barrett*
Juliana M. Barrett
Connor J. Hackert
Paul C. Quast
Trial Attorneys
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
Tel: (202) 616-4326
Email: Juliana.M.Barrett@usdoj.gov

*Attorneys for Defendants Kenneth Porter, Robert*
*Bohls, Chris Sheehan & Jake Sheridan*

46