Jenn Rolnick Borchetta*
Allison Frankel*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
Tel: (914) 462-2363
jborchetta@aclu.org
afrankel@aclu.org

Jorge M. Castillo*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel: (212) 549-2500
jorgecastillo@aclu.org
Not admitted in DC.
Practice limited to the federal courts.

Emma Andersson*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (212) 549-2500
eandersson@aclu.org

**Admitted pro hac vice*

*Attorneys for Plaintiffs*

Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
psouthwick@acluidaho.org
ecroston@acluidaho.org

Wendy J. Olson (ISB No. 7634)
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Tel: (208) 387-4291
wendy.olson@stoel.com

Simona Agnolucci*
Eduardo Santacana*
COOLEY LLP
3 Embarcadero Center, 22nd Fl.
San Francisco, CA 94111
Tel: (415) 693-2000
sagnolucci@cooley.com
esantacana@cooley.com

Jade Ford*
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
Tel: (202) 842-7800
jford@cooley.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

JUANA RODRIGUEZ, *on behalf of herself and her minor child* Y.R.; X.Z., *on behalf of himself and his minor child* Y.Z.; IVAN POPOCA, *on behalf of himself and his minor children* E.I.P. *and* A.S.P.; *and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

KENNETH PORTER, Acting Director of the Boise U.S. Immigration and Customs Enforcement Field Sub-Office, *in his individual capacity*; ROBERT BOHLS, Special Agent in Charge of the Salt Lake City Office of the Federal Bureau of Investigation,

Case No. 1:26-cv-00075-AKB

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS–DOCKET NOS. 38, 39, 40, & 41**

*in his individual capacity*; CHRIS SHEEHAN, Supervisory Special Agent of the Federal Bureau of Investigation's Boise Resident Agency*, in his individual capacity*; JAKE SHERIDAN, Special Agent of the Federal Bureau of Investigation*, in his individual capacity*; KIERAN DONAHUE, Canyon County Sheriff*, in his individual capacity;* REX INGRAM, Chief of the Caldwell Police Department*, in his individual capacity*; JOE HUFF, Chief of the Nampa Police Department*, in his individual capacity*; BILL GARDINER, Director of the Idaho State Police*, in his individual capacity*; CANYON COUNTY; CITY OF CALDWELL; CITY OF NAMPA; *and* JOHN DOES 1-20*, in their individual capacities*,

*Defendants*.

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 4

I. The Raid on La Catedral ..... 4

II. Planning a Gratuitous Seizure and Immigration Dragnet ..... 6

III. Publicly Concealing the Raid's Brutality; Privately Celebrating Their Joint Operation ..... 8

LEGAL STANDARD ..... 10

ARGUMENT ..... 10

I. Plaintiffs Adequately Allege That State and Federal Defendants Conspired Under Sections 1983, 1985(3), and 1986 to Violate Their Constitutional Rights. ..... 11

A. Defendants Agreed to Abuse Criminal Warrants in an Unreasonable Mass Seizure Based on Ethnicity. ..... 12

B. Each Defendant Played a Role in Executing the Illegal Plan. ..... 16

C. The Conspiracy Violated Plaintiffs' Constitutional Rights. ..... 16

D. Federal Defendants Are Liable for Conspiring with State Defendants, Who Provided Color of State Law. ..... 17

E. Defendants Failed to Stop the Unlawful Conspiracy. ..... 20

II. Plaintiffs Adequately Allege That Defendants Violated Their Fourth Amendment Rights. ..... 21

A. The Initial Mass Seizure Was Not Justified by the *Summers* Exception. ..... 21

B. Defendants Detained Plaintiffs in an Unlawful Manner. ..... 29

III. Plaintiffs Adequately Allege Defendants Intentionally Targeted Them Based on Their Perceived Latino Ethnicity in Violation of Their Equal Protection Rights. ..... 31

IV. Plaintiffs Adequately Allege That Each Individual Defendant Is Liable for Violating Their Constitutional Rights. ..... 39

A. ICE Director Porter: Putting Boise ICE "On The Map" ..... 41

B. FBI SA Sheridan: Obtained Pretextual Warrants for the Raid ..... 43

C. FBI SSA Sheehan: Led "Nearly Impossible Task" ..... 44

D. FBI SAC Bohls: Appointed Amidst Deportation Pressure ..... 46

**TABLE OF CONTENTS**
(continued)

**Page**


E. Canyon County Sheriff Donahue: Boots on the Ground and Deployed SWAT to Get "The Enemy" ... 47

F. Caldwell PD Chief Ingram: Deployed SWAT to Get the "Cartels" ... 49

G. Nampa PD Chief Huff: Deployed SWAT in Lockstep with Task Force ... 51

H. ISP Colonel Gardiner: Deployed SWAT to Fulfill Idaho Governor's Immigration Directive ... 52

V. Canyon County, Caldwell, and Nampa Bear Municipal Liability. ... 54

VI. Defendants' Qualified Immunity Claims Fail ... 58

A. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Fourth Amendment Claims. ... 60

B. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Claims of Intentional Discrimination. ... 64

C. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Conspiracy Claims. ... 65

CONCLUSION ... 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ....................38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................38, 54

*Aurora Astro Prods. v. Celestron Acquisition*,
691 F. Supp. 3d 1132 (N.D. Cal. 2013) ....................40

*Avalos v. Baca*,
596 F.3d 583 (9th Cir. 2010) ....................11

*Ave. 6E Invs., LLC v. City of Yuma*,
818 F.3d 493 (9th Cir. 2016) ....................36

*Bailey v. United States*,
568 U.S. 186 (2013).................... *passim*

*Ballew v. City of Pasadena*,
642 F. Supp. 3d 1146 (C.D. Cal. 2022) ....................32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................10, 38

*Beltz Travel Serv., Inc., v. Int'l Air Transport Ass'n*,
620 F.2d 1360 (9th Cir. 1980) ....................39

*Big Cats of Serenity Springs, Inc. v. Rhodes*,
843 F.3d 853 (10th Cir. 2016) ....................18

*Billings v. United States*,
57 F.3d 797 (9th Cir. 1995) ....................19

*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993)....................65

*Cabrera v. Martin*,
973 F.2d 735 (9th Cir. 1992) ....................12, 17, 18, 19

*Cahoo v. SAS Inst., Inc.*,
71 F.4th 401 (6th Cir. 2023) ....................60

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) ....................................................................................40

*Chavez v. Wynar*,
No. 21-16094, 2023 WL 2535266 (9th Cir. Mar. 16, 2023)..............................................61

*Christie v. Iopa*,
176 F.3d 1231 (9th Cir. 1999) ..............................................................................55, 56

*City of Indianapolis v. Edmond*,
531 U.S. 32 (2000)...............................................................................................26, 62

*Connick v. Thompson*,
563 U.S. 51 (2011)...................................................................................................55

*Crowe v. Cnty. of San Diego*,
608 F.3d 406 (9th Cir. 2010) ......................................................................................39

*Dawson v. City of Seattle*,
435 F.3d 1054 (9th Cir. 2006) ..............................................................................27, 28

*De Anda v. City of Long Beach*,
7 F.3d 1418 (9th Cir. 1993) .........................................................................................55

*District of Columbia. v. Carter*,
409 U.S. 418 (1973)...................................................................................................32

*Elliot-Park v. Manglona*,
592 F.3d 1003 (9th Cir. 2010) ......................................................................................65

*Flores v. Pierce*,
617 F.2d 1386 (9th Cir. 1980) ..............................................................................64, 65

*Florida v. Royer*,
460 U.S. 491 (1983)...................................................................................................30

*Florida v. Wells*,
495 U.S. 1 (1990).......................................................................................................24

*Foster v. Echols Cnty. Sch. Dist.*,
169 F.4th 1291 (11th Cir. 2026) ..................................................................................66

*Franklin v. Foxworth*,
31 F.3d 873 (9th Cir. 1994) ..................................................................................30, 31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Galbraith v. Cnty. of Santa Clara*,
307 F.3d 1119 (9th Cir. 2002) ....................12

*In re Gamez-Lopez & Esteves Silva*,
2016 WL 1722599 (B.I.A. Mar. 24, 2016) ....................31

*Gamez-Lopez v. Barr*,
821 Fed. App'x 912 (9th Cir. 2020) ....................31

*Ganwich v. Knapp*,
319 F.3d 1115 (9th Cir. 2003) ....................29

*Gibson v. City of Portland*,
165 F. 4th 1265 (9th Cir. 2026) ....................54

*Gibson v City of Portland*,
No. 23-cv-00833-AB (D. Or. Sept. 27, 2023) ....................54

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) ....................12

*Gillette v. Delmore*,
979 F.2d 1342 (9th Cir.1992) ....................55

*Gray v. Baker*,
399 F.3d 1241 (10th Cir. 2005) ....................66

*Hampton v. Hanrahan*,
600 F.2d 600 (7th Cir. 1979) ....................39

*Hardwick v. Cnty. of Orange*,
844 F.3d 1112 (9th Cir. 2017) ....................60, 62

*Hart v. Massanari*,
266 F.3d 1155 (9th Cir. 2001) ....................26

*Harte v. Bd. of Comm'rs of Cnty. Of Johnson, Kansas*,
864 F.3d 1154 (10th Cir. 2017) ....................31

*Hernandez v. Causey*,
124 F.4th 325 (5th Cir. 2024) ....................18

*Hernandez v. City of San Jose*,
241 F. Supp. 3d 959 (N.D. Cal. 2017) ....................56

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hope v. Pelzer*,
536 U.S. 730 (2002)....................62, 63, 64

*Hunt v. Cromartie*,
526 U.S. 541 (1999)....................33

*Ibrahim v. Dep't of Homeland Sec.*,
538 F.3d 1250 (9th Cir. 2008)....................19

*Illinois v. Wardlow*,
528 U.S. 119 (2000)....................22, 62

*J.T. v. City & Cnty. of San Francisco*,
No. 23-cv-06524-LJC, 2024 WL 3012791 (N.D. Cal. June 13, 2024)....................57

*Jackson v. Vartanian*,
No. 20-cv-1148, 2021 WL 4523072 (E.D. Wis. Oct. 4, 2021)....................19

*K.O. v. U.S. Immigr. & Customs Enf't*,
468 F. Supp. 3d 350 (D.D.C. 2020)....................67

*Karim-Panahi v. L.A. Police Dep't*,
839 F.2d 621 (9th Cir. 1988)....................12, 20

*Keates v. Koile*,
883 F.3d 1228 (9th Cir. 2018)....................60

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)....................28

*Lacey v. Maricopa Cnty.*,
693 F.3d 896 (9th Cir. 2012)....................11, 12, 25, 39

*Leatherman v. Tarrant Cnty. Narcotics Intel. &Coordination Unit*,
507 U.S. 163 (1993)....................58

*Liberal v. Estrada*,
632 F.3d 1064 (9th Cir. 2011)....................64

*Lytle v. Carl*,
382 F.3d 978 (9th Cir. 2004)....................55

*Manansingh v. United States*,
No. 21-16192, 2023 WL 7295184 (9th Cir. 2023)....................17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ....................................10

*Martinez v. City of Clovis*,
943 F.3d 1260 (9th Cir. 2019) ....................................58, 59

*Martinez v. City of W. Sacramento*,
No. 2:16-cv-02566-TLN-EFB, 2019 WL 448282 (E.D. Cal. Feb. 5, 2019)....................................32

*Maryland v. Pringle*,
540 U.S. 366 (2003)....................................21

*Melendres v. Arpaio*,
989 F. Supp. 2d 822 (D. Ariz. 2013) ....................................34

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
14 F.3d 457 (9th Cir. 1994) ....................................18

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
192 F.3d 1283 (9th Cir. 1999) ....................................13, 14, 15

*Meredith v. Erath*,
342 F.3d 1057 (9th Cir. 2003) ....................................30, 31, 64

*Michigan v. Clifford*,
464 U.S. 288 (1984)....................................26

*Michigan v. Summers*,
452 U.S. 692 (1981).................................... *passim*

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978)....................................54, 55, 57

*Muehler v. Mena*,
544 U.S. 93 (2005).................................... *passim*

*Mullenix v. Luna*,
577 U.S. 7 (2015)....................................66

*NAACP of San Jose/Silicon Valley v. City of San Jose*,
562 F. Supp. 3d 382 (N.D. Cal. 2021) ....................................40

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....................................10

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*O'Brien v. Welty*,
818 F.3d 920 (9th Cir. 2016) ....................60

*O'Connor v. Eubanks*,
83 F.4th 1018 (6th Cir. 2023) ....................66

*OSU Student All. v. Ray*,
699 F.3d 1053 (9th Cir. 2012) ....................40

*Pac. Shores Props., LLC v. City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) ....................33, 38

*Pearson v. Callahan*,
555 U.S. 223 (2009) ....................59

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ....................55, 56

*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) .................... *passim*

*Quinto-Collins v. City of Antioch*,
No. 21-cv-06094-VC, 2022 WL 18574 (N.D. Cal. Jan. 3, 2022) ....................57

*Reese v. Jefferson Sch. Dist. No. 14J*,
208 F.3d 736 (9th Cir.2000) ....................32

*Reynaga Hernandez v. Skinner*,
969 F.3d 930 (9th Cir. 2020) ....................58, 61

*Risch v. Royal Oak Police Dep't*,
581 F.3d 383 (6th Cir. 2009) ....................36

*Rodriguez v. United States*,
575 U.S. 348 (2015) ....................29, 64

*Sampson v. Cnty. of Los Angeles ex rel. Los Angeles Cnty. Dep't of Child. & Fam. Servs.*,
974 F.3d 1012 (9th Cir. 2020) ....................59

*Scofield v. Guillard*,
No. 3:22-cv-00521-REP, 2023 WL 5045274 (D. Idaho Aug. 8, 2023) ....................10

*Sever v. Alaska Pulp Corp*,
978 F.2d 1529 (9th Cir. 1992) ....................11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sharp v. Cnty. of Orange*,
871 F.3d 901 (9th Cir. 2017) ....................59, 61, 62

*United States ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ....................54

*Simmers v. King Cnty.*,
No. 21-cv-00100, 2022 WL 3585146-BJR-JRC (W.D. Wash. Aug. 22, 2022) ....................54

*Sims v. Brown*,
No. 23-35545, 2024 WL 1854284 (9th Cir. Apr. 29, 2024) ....................38

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ....................12, 13, 15

*St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ....................56

*Starr v. Bacca*,
652 F.3d 1202 (9th Cir. 2011) ....................10, 40

*Taylor v. Barkes*,
575 U.S. 822 (2015) ....................59

*Taylor v. Riojas*,
592 U.S. 7 (2020) ....................59

*Taylor v. Ways*,
999 F.3d 478 (7th Cir. 2021) ....................66

*Tekle v. United States*,
511 F.3d 839 (9th Cir. 2007) ....................29, 31

*Terry v. Ohio*,
392 U.S. 1 (1968) ....................21

*Thai v. County of Los Angeles*,
127 F. 4th 1254 (9th Cir. 2025) ....................20

*Trump v. Illinois*,
146 S. Ct. 432 (2025) ....................65

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012) ....................57

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Anderson*,
101 F.4th 586 (9th Cir. 2024) ........ 26, 62

*United States v. City of Yonkers*,
96 F.3d 600 (2d Cir. 1996) ........ 36

*United States v. Grey*,
959 F.3d 1166 (9th Cir. 2020) ........ 26

*United States v. Lanier*,
520 U.S. 259 (1997) ........ 64

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
865 F.2d 1539 (9th Cir. 1989) ........ 13, 14, 15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........ 32, 38, 66

*Washington v. Davis*,
426 U.S. 229 (1976) ........ 32

*Whren v. United States*,
517 U.S. 806 (1996) ........ 32, 65

*William v. City of Sparks*,
112 F. 4th 635 (9th Cir. 2024) ........ 58

*Zelaya v. Hammer*,
516 F. Supp. 3d 778 (E.D. Tenn. 2021) ........ 14, 17, 37, 38

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ........ 17

**Statutes**

42 U.S.C.
§ 1983 ........ *passim*
§ 1985(3) ........ *passim*
§ 1986 ........ *passim*

**Other Authorities**

U.S. Const. amend. IV ........ *passim*

U.S. Const. amend. XIV ........ *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Fed. R. Civ. P.
8(d) ....................16
12(b)(6) ....................10

Fed. R. Evid. 201(b) ....................28

## INTRODUCTION

This case is about whether law enforcement may target hundreds of attendees at a Latino community event for a mass seizure and immigration dragnet because officers have narrow warrants for a handful of people accused of unrelated non-violent crimes. They may not. Plaintiffs are three parents, their children, and a putative class of people who were seized during the raid at La Catedral Arena and not charged with any crimes (collectively, "Plaintiffs" or "the Plaintiff Class"). This Court should allow Plaintiffs to pursue recovery for the injuries they suffered when Defendants turned their Sunday afternoon of family fun into a militarized assault.

On October 19, 2025, approximately 400 spectators—including children and grandparents, nearly all Latino—gathered at La Catedral to enjoy licensed horse races, traditional Mexican food, and games. Around lunchtime, more than 200 law enforcement officers from federal, state, and local agencies descended on the event with armored trucks, flashbang grenades, and guns drawn ("the Raid"). Officers detained the entire 400-person crowd, zip-tying most; sorted them into groups based in part on perceived ethnicity; and held them for four hours. None were set free unless and until they proved to officers from Immigration and Customs Enforcement ("ICE") that they were U.S. citizens or had lawful status. During the detention, officers did not let mothers feed their crying babies, denied people food and water, and even refused to let detainees use the bathroom—compelling some to urinate in public. One officer put it bluntly: "that's what you get for being here."

Two fundamental rights principally govern this case: the right against unreasonable searches and seizures, including against suspicionless dragnets and excessively burdensome detentions, protected by the Fourth Amendment, and the right to equal treatment under the law regardless of ethnicity, protected by the Fourteenth Amendment and 42 U.S.C. § 1985(3). Federal

statutes make liable both state actors who directly deprive individuals of these rights and all those with whom they conspire, including, as here, federal officers.

Defendants' motions to dismiss misconstrue the law and the Complaint. Defendants claim they were merely executing warrants for five people accused of non-violent unlicensed gambling. But this Raid was far from a run-of-the-mill warrant execution. Plaintiffs allege that Federal and State Defendants[1] conspired to abuse those narrow warrants to advance their shared goal of improperly and unreasonably detaining Plaintiffs for an immigration dragnet—and did so in a manner markedly more gratuitous than typical warrant executions. Meanwhile, Federal Defendants overlook black letter law that federal actors can be liable under Section 1983 where they conspire with state actors to violate civil rights, and that Section 1985(3) conspiracy does not require state action. Defendants also inflate the factual burden needed to plead a conspiracy claim. But Plaintiffs adequately allege that each individual Defendant had a meeting of the minds to pursue the unlawful goal and committed an act in furtherance of it, and that, as a result, Plaintiffs' Fourth Amendment and equal protection rights were violated. That is all that is required.

Defendants' purported bases to dismiss Plaintiffs' underlying constitutional claims likewise fail. Defendants focus on a subset of allegations to argue the Complaint fails to plead any deprivation of rights. Yet the Complaint sufficiently pleads that Defendants violated Plaintiffs' Fourth Amendment and equal protection rights many times over. As to the Fourth Amendment, the Complaint describes how Plaintiffs' seizure was unreasonable at its outset and in its manner of execution. While *Michigan v. Summers*, 452 U.S. 692 (1981), permits a suspicionless detention in

---

[1] "Federal Defendants" collectively refers to Kenneth Porter, Robert Bohls, Chris Sheehan, and Jake Sheridan. "State Defendants" collectively refers to Kieran Donahue, Rex Ingram, Joe Huff, Bill Gardiner, Canyon County, City of Caldwell, and City of Nampa. "Municipal Defendants" collectively refers to Canyon County, City of Caldwell, and City of Nampa.

limited circumstances, and *Muehler v. Mena*, 544 U.S. 93, 98 (2005) allows immigration questioning during such a detention, the *Summers* exception did not apply to Plaintiffs' seizure for two independent reasons. First, *Summers* and *Mena* do not apply where, as alleged here, the primary purpose of the detention was immigration enforcement and the detention would not have happened absent that purpose. The existence of criminal warrants does not defeat this claim. Plaintiffs sufficiently allege that the warrant execution was secondary to immigration enforcement, including because the actual investigation into unlicensed gambling was limited and Defendants continued detaining Plaintiffs well after that investigation was complete. Second, as alleged, Plaintiffs were not within the area in which the *Summers* exception would apply.

Regardless of whether Plaintiffs were lawfully seized in the first place, the Fourth Amendment separately protects them against unduly intrusive detentions. As alleged, Plaintiffs' detention was unreasonable because it was conducted in a dehumanizing and brutal manner. Further, it ended not upon the completion of the warrant execution, but on a rolling basis, after each attendee was interrogated for immigration purposes.

Defendants similarly ignore or distort facts and law in seeking to dismiss the equal protection claims. The Complaint sufficiently pleads that Defendants targeted La Catedral in part because mostly Latinos attend events there, conducted the Raid on the predominantly Latino crowd in an uncharacteristically violent manner, and treated Latino-appearing people especially harshly. Defendants largely disregard Plaintiffs' well-pled allegations of explicit racial epithets, disparate violence toward Latino-appearing individuals, assumptions that Latinos were undocumented, and statements by Defendants and their leadership surrounding the Raid suggesting Latinos were enemies or criminals. The equal protection standard requires consideration of direct and circumstantial allegations in their totality, and reasonable inferences drawn from them. At the

pleading stage, Plaintiffs' allegations, taken as a whole, are sufficient to state that Defendants were motivated in part by ethnicity.

Finally, Defendants cannot fall back on qualified immunity. The unlawful nature of their conduct is clearly established: No reasonable officer in Defendants' position could believe that a narrow search warrant for five people accused of unlicensed gambling authorized 200 officers to detain 400 people, including toddlers, in dehumanizing conditions for hours in order to subject them to immigration interrogations—nor could they believe that equal protection rights permitted them to do so in part because of Plaintiffs' Latino ethnicity.

Defendants' arguments boil down to one extraordinary claim: that simply having a criminal warrant grants law enforcement impunity to deliberately target Latino communities for suspicionless immigration dragnets and gratuitous detentions. Not so. Whatever authority officers are afforded to execute criminal warrants, that authority does not extend to the unequal and unreasonable conduct alleged in this action.

The Court should deny Defendants' motions to dismiss.

## FACTUAL BACKGROUND

The following facts are alleged in the Complaint and, as explained *infra* Legal Standard, must be taken as true for purposes of this motion.

### I. The Raid on La Catedral

On October 19, 2025, Plaintiff Juana Rodriguez and her family drove to a local event in Wilder, Idaho. *See* Complaint, ECF No. 1 ("Compl.") ¶¶ 1, 43. Wilder is a small, majority-Latino town where most Latinos are U.S. citizens. *Id.* ¶ 36. It was race day at La Catedral, a Latino community hub in the area. *Id.* ¶¶ 35–37. The track regularly hosted Latinos of all ages for horse races, traditional Mexican foods, and other family-friendly activities. *Id.* ¶¶ 37–40. That day, approximately 400 people attended, including Ms. Rodriguez; her three-year-old son, Plaintiff

Y.R.; Plaintiff X.Z. and his fifteen-year-old son, Plaintiff Y.Z.; and Plaintiff Ivan Popoca and his children, Plaintiffs sixteen-year-old E.I.P. and ten-year-old A.S.P. *Id.* ¶¶ 12–18, 41, 43.

Around 1 PM, Ms. Rodriguez noticed a military-style helicopter overhead. *Id.* ¶ 46. Suddenly, more than 200 federal, state, and local law enforcement officers swarmed La Catedral with guns drawn, flashbang grenades, and armored trucks. *Id.* ¶ 2. Officers fired rubber bullets at attendees, including teenagers. *Id.* ¶ 48. They threw compliant people to the ground. *Id.* Acting in lockstep, officers from Defendants' agencies detained everyone at La Catedral—including the elderly, toddlers, and babies—and zip-tied most adults and many children. *Id.* ¶¶ 59–63, 102, 112. Officers detained the crowd of approximately 400 people for about four hours. *Id.* ¶ 75. Despite launching the Raid at lunchtime, officers refused access to food, even for mothers trying to feed their hungry toddlers. *Id.* ¶¶ 69, 116. Officers also restricted access to bathrooms and water, and did not provide medical care to those who needed it. *Id.* ¶¶ 65–67, 71. Officers treated Latino-appearing people especially harshly—including using greater force, taunting them, *id.* ¶¶ 55–57, 60, 63, 68, and shouting racist slurs, *id.* ¶ 57 ("wetback" and "spic").

Officers sorted everyone into groups based in part on the color of their skin, *id.* ¶¶ 3, 74, then marched them to a huge tent that ICE brought and erected on the property (the "ICE Tent"). *Id.* ¶¶ 75–84. Inside, ICE officers interrogated each person about their immigration status—releasing them on a rolling basis, and only if they proved U.S. citizenship or lawful status. *Id.* ¶¶ 82–84. At least 70% of attendees did so and were released. *Id.* ¶ 83. The remaining 105 people who could not confirm legal status were whisked away in vans to detention centers. *Id.* ¶ 84.

Defendants publicly claimed they detained the entire crowd to execute warrants for five people accused of unlicensed gambling. *Id.* ¶¶ 5, 145. But Named Plaintiffs did not observe any law enforcement activity related to investigating gambling. *Id.* ¶¶ 73, 155. Further, the targets were

arrested soon after law enforcement arrived; yet Defendants detained the entire crowd for hours. *Id.* ¶ 105. Moreover, during the interrogations that followed, officers only asked attendees about basic identifying information and immigration status. *Id.* ¶ 152. And Plaintiffs' detentions ended not upon any conclusion of warrant execution, but only as each detainee managed to either verify their individual lawful status to ICE or was arrested. *Id.* ¶¶ 105, 153–54.

## II. Planning a Gratuitous Seizure and Immigration Dragnet

The Raid was the result of advance planning by multiple federal, state, and local agencies, coordinated through the Treasure Valley Task Force ("Task Force"). The Task Force is a federal-state partnership made up of officers from the Federal Bureau of Investigation ("FBI"), including Defendants Special Agent in Charge of the Salt Lake City FBI Office ("SAC") Robert Bohls; Supervisory Special Agent of the Boise FBI Office ("SSA") Chris Sheehan, and Special Agent ("SA") Jake Sheridan; Canyon County Sheriff's Office ("County Sheriff's Office"), including Sheriff Kieran Donahue; Caldwell Police Department ("Caldwell PD"), including Chief Rex Ingram; and Nampa Police Department ("Nampa PD"), including Chief Joe Huff (collectively, "Task Force Defendants"). *Id.* ¶¶ 51, 169. Task Force Defendants routinely collaborate on shared federal and state law enforcement goals. *Id.* ¶ 170. In 2025, they—along with ICE Director Kenneth Porter and Idaho State Police ("ISP") Director Colonel Bill Gardiner—collaborated to plan and execute the Raid on La Catedral. *Id.* ¶¶ 164–66.

The Raid occurred amidst pressure from federal and state officials to increase immigration arrests, especially among Latino populations. For instance, Colonel Gardiner was appointed to lead ISP under a mandate to work closely with Governor Brad Little on immigration enforcement. *Id.* ¶ 26. Sheriff Donahue, who is also the President of the National Sheriff's Association, regularly coordinated with the Trump Administration on shared immigration goals. *Id.* ¶ 130. Sheriff Donahue stated publicly that "gangs and Mexican Cartels who are destroying our communities"

are "the monster we're fighting—this is the enemy." *Id.* ¶ 136. In the months leading up to the Raid, Sheriff Donahue saw "an opportunity to start surgically removing that criminal element from our society, from our citizens." *Id.* ¶ 138. Meanwhile, the FBI had recently been conscripted to help ICE meet its quota of 3,000 immigration arrests per day, amid pressure from the Trump Administration. *Id.* ¶¶ 124, 126. Around the country, ICE, FBI, and local law enforcement had made headlines for using criminal warrants to detain large groups of Latino people for immigration sweeps. *Id.* ¶¶ 156–60.

La Catedral provided an opportunity for Defendants to conduct an immigration dragnet in Idaho. Defendants selected La Catedral in part because they knew they would encounter a large number of Latino individuals, and, based on ethnicity, they assumed an operation would corral individuals without lawful immigration status. *Id.* ¶¶ 131, 140. Undercover officers previously attended events at La Catedral in August and September 2025—following an anonymous tip regarding suspected unlicensed betting—and determined that about 250 to 500 people attended events there. *Id.* ¶¶ 89, 140. Officers concluded that this group included "aliens unlawfully present," but that conclusion was based on the perceived Latino ethnicity of La Catedral attendees. *Id.* ¶ 140.

On October 14, 2025, Task Force Defendants or their officers, along with the ISP SWAT Team Commander, sent by Colonel Gardiner, met by phone to plan the Raid. *Id.* ¶ 175. The following day, SA Sheridan obtained arrest warrants for five individuals suspected of unlicensed gambling at La Catedral and a search warrant for the property. *Id.* ¶¶ 88, 90, 96. The sole asserted probable cause in SA Sheridan's arrest-warrant affidavits was gambling without the required state-law license; there were no allegations of drugs or violent crime. *Id.*

Three days later, on October 18, Task Force Defendants and Colonel Gardiner or their subordinate officers met in person to devise an operational plan. *Id.* ¶¶ 173–76. Defendants knew there were no specific safety threats at La Catedral and that attendees were screened for weapons upon entry. *Id.* ¶¶ 42, 95, 140. Nevertheless, they agreed that their officers would descend on La Catedral with military-grade weapons, a helicopter, sniper teams, canine units, and enough zip-ties for hundreds of people. *Id.* ¶¶ 47, 99, 180. Defendants formulated an operational plan to deploy their respective SWAT teams to surround La Catedral, create a perimeter that prevented exit, and detain everyone on site. *Id.* ¶¶ 52, 99, 177–78. The plan included coordinating with Director Porter to bring the ICE Tent to interrogate all detainees about immigration status, and vans to transport people without immigration status to detention centers. *Id.* ¶ 181. Although Defendants went into the Raid prepared to physically bind everyone in the crowd, they did not prepare to provide access to water, food, restrooms, or medical care. *Id.* ¶¶ 114–16.

On October 19, 2025—the day of the Raid—Sheriff Donahue or an officer under his command conducted an operational and tactical briefing near his office, which Colonel Gardiner, Chief Ingram, and Chief Huff or their officers joined. *Id.* ¶ 179. Each Defendant deployed officers under their command to execute the Raid as planned. *Id.* ¶¶ 166, 219–24.

## III. Publicly Concealing the Raid's Brutality; Privately Celebrating Their Joint Operation

In the Raid's aftermath, government leaders, including SSA Sheehan, SAC Bohls, Director Porter, Sheriff Donahue, and Chief Ingram, issued statements that minimized the Raid's brutality or attempted to conceal its immigration purpose. *Id.* ¶¶ 166, 201–15. For example, Chief Ingram described the operation, without evidence, as "a criminal investigation into, really, a cartel." *Id.* ¶ 205. The FBI minimized its misconduct toward children. *Id.* ¶ 202. Governor Little downplayed the State of Idaho—and therefore ISP's—involvement in the Raid as "common practice" to assist

with "serving a search warrant." *Id.* ¶ 209. Further, while DHS announced that ICE led the Raid, Sheriff Donahue and Chief Ingram asserted it "was not an ICE-led enforcement action." *Id.* ¶ 210.

Privately, Defendants celebrated their operation. The day after the Raid, SSA Sheehan emailed Raid organizers, including Defendants Porter, Donahue, Ingram, Huff, and Gardiner, thanking "[e]ach and every one of you, your agencies, and your personnel who assisted in the operation yesterday." *Id.* ¶ 213. He wrote that the FBI "absolutely could not have done this without you" because it was a "nearly impossible task" and "a massive undertaking that took over 200 law enforcement personnel from different jurisdictions." *Id.* Sheriff Donahue responded that it was an "honor . . . to be a part of operations like this." *Id.* ¶ 214. Director Porter replied saying: "On behalf of ICE/ERO, I also wanted to thank everyone for their support during this operation. We ended up with 105 arrests, which wouldn't have been possible without everybody here. Thank you for putting the Boise ICE office on the map!" *Id.* ¶ 215. No Defendant disclaimed participation or contradicted Director Porter, SSA Sheehan, or Sheriff Donahue.

* * *

The plan achieved its intended aim. Everyone at La Catedral was detained and processed for potential immigration violations—causing lasting physical and emotional harm. *Id.* ¶ 85. Ms. Rodriguez experiences emotional distress and is scared to go to Latino cultural events. She also is concerned that her three-year-old son, Y.R., now fears police. Ten-year-old A.S.P. suffers recurring nightmares. Fifteen-year-old Y.Z. also struggles to sleep due to recurring nightmares of being held at gunpoint. His grades have suffered, and he still has scars from the zip-ties, which sliced his wrists. *Id.* ¶¶ 63, 85. These are only examples; the Plaintiff Class and broader Wilder-area Latino community suffer widespread lasting fear, physical damage, and emotional distress.

## LEGAL STANDARD

A motion to dismiss must be denied if the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court must also "draw reasonable inferences in the [Plaintiffs'] favor and consider the allegations as a whole." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024).

The plausibility standard "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Scofield v. Guillard*, No. 3:22-cv-00521-REP, 2023 WL 5045274, at *2 (D. Idaho Aug. 8, 2023) (*quoting Twombly*, 550 U.S. at 556). Even "[i]f there are two alternative explanations [for the challenged conduct], . . . both of which are plausible, plaintiff[s'] complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Bacca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## ARGUMENT

Defendants' motions to dismiss fail across the board. The Complaint adequately alleges that State and Federal Defendants conspired under 42 U.S.C. §§ 1983, 1985(3), and 1986 to abuse narrow criminal warrants as cover for an unlawful mass seizure and immigration dragnet targeting Latino people. The Complaint also adequately alleges that Defendants violated the Fourth Amendment through both an unreasonable initial seizure and a dehumanizing and prolonged manner of detention. And it adequately alleges that Defendants intentionally targeted Plaintiffs based in part on their perceived Latino ethnicity, in violation of equal protection. Plaintiffs

adequately allege that each Individual Defendant is liable for these violations, and that Municipal Defendants bear liability for the deliberate acts of their final policymakers. Finally, qualified immunity does not shield Individual Defendants: The unconstitutionality of their conduct was clearly established. The Court should thus deny Defendants' motions to dismiss in full.[2]

## I. Plaintiffs Adequately Allege That State and Federal Defendants Conspired Under Sections 1983, 1985(3), and 1986 to Violate Their Constitutional Rights.

Plaintiffs allege that State and Federal Defendants did not simply agree to execute warrants—rather, they conspired under Sections 1983, 1985(3), and 1986 to abuse those warrants for an unlawful mass seizure targeting Latino people. County and City Defendants largely ignore Plaintiffs' conspiracy claims,[3] while Federal Defendants sidestep Plaintiffs' actual allegations.[4] Plaintiffs do not contend that every state-federal task force operation is an illicit conspiracy, *contra* Federal Defendants' Motion to Dismiss, ECF No. 38-1, at 17 ("Federal MTD"); as alleged, this Raid was.

A Section 1983 conspiracy claim requires (1) a "meeting of the minds" to violate constitutional rights, (2) "some concerted action intend[ed] to accomplish" that objective, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) (quotation omitted); and (3) "an actual deprivation of [] rights resulting from that agreement," *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010). A Section 1985(3) conspiracy must additionally have "the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws[.]" *Sever v. Alaska Pulp Corp*, 978 F.2d 1529, 1536 (9th Cir. 1992). Individuals are liable under

---

[2] Plaintiffs do not address claims against the John Doe Defendants (Counts 7 and 8) because no Defendant moved for dismissal as to those Defendants or those claims.

[3] Colonel Gardiner contests his involvement, but not that a conspiracy existed. Colonel Gardiner's Motion to Dismiss, ECF No. 40-1, at 9 ("State MTD").

[4] Federal Defendants repeatedly cite *Bivens*, but Plaintiffs bring conspiracy, not *Bivens*, claims.

Section 1986 for knowingly failing to prevent a Section 1985(3) conspiracy. *See Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988). The plausibility pleading standard applies to conspiracy allegations. *See Soo Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017); *Lacey*, 693 F.3d at 935.[5]

While Section 1983 concerns state action, "[i]t is well settled" that "federal officials acting under federal authority" are liable for Section 1983 conspiracy "[i]f they 'conspire with . . . state officials who, under color of state law, act to deprive a person of protected rights.'" *Cabrera v. Martin*, 973 F.2d 735, 741–42 (9th Cir. 1992). Color of state law is not required for Section 1985(3) conspiracy. *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980).

### A. Defendants Agreed to Abuse Criminal Warrants in an Unreasonable Mass Seizure Based on Ethnicity.

The Complaint alleges more than agreement to execute warrants. *Contra* Federal MTD at 25. It alleges that State and Federal Defendants agreed to abuse those warrants as cover for a gratuitous mass seizure and immigration dragnet targeted at a gathering of Latino people in violation of Plaintiffs' Fourth Amendment and equal protection rights. *See* Compl. ¶¶ 123, 164, 244, 251, 258. Additionally, Plaintiffs allege that Defendants were motivated in part by Plaintiffs' ethnicity, as required under Section 1985(3). *See infra* Section III. Notably, Plaintiffs do not allege that all 200 officers at the Raid shared this unlawful goal, and do not seek to hold all 200 officers liable for conspiracy. *Contra* Federal MTD at 2, 24. Rather, Plaintiffs allege that State and Federal Defendants reached the unlawful agreement and are liable for their participation in the conspiracy. *See infra* Section IV.

[5] Colonel Gardiner's erroneous assertion that a heightened pleading standard applies, State MTD at 10, relies on caselaw that has since been overturned. *See Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1123–26 (9th Cir. 2002) (explaining plausibility pleading now applies).

"Direct evidence" of a conspiratorial agreement "will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1302 (9th Cir. 1999) ("*Mendocino II*"). Courts consider "the entire factual context" in this analysis. *Soo Park,* 851 F.3d at 928. "The possibility that other inferences could be drawn that would provide an alternate explanation for the [Defendants'] actions does not entitle them to summary judgment"—let alone to dismissal at the pleading stage. *Mendocino II*, 192 F.3d at 1303. Further, whether a conspiracy existed, *id.*, or a given defendant participated in it, are questions of fact that require trial, *United Steelworkers of Am. v. Phelps Dodge Corp*., 865 F.2d 1539, 1547 (9th Cir. 1989) (en banc).

Here, the Complaint, and reasonable inferences drawn from it, adequately allege a meeting of the minds to violate Plaintiffs' constitutional rights. First, Defendants had "[t]he ability and opportunity to conspire." *See Mendocino II*, 192 F.3d at 1303 n.34 ("fact that [local] police officers held meetings and conducted a joint investigation with the FBI agents" supported inference "of actual participation in the conspiracy"). SAC Bohls, SSA Sheehan, SA Sheridan, Sheriff Donahue, Chief Ingram, and Chief Huff routinely communicated and coordinated through their partnership on the Task Force, Compl. ¶¶ 51, 165–66, 169; these Defendants or their officers, and Colonel Gardiner or his officers, participated in multiple pre-Raid planning meetings, *id.* ¶¶ 165, 169–79; and these Defendants coordinated with Director Porter to bring the ICE Tent, *id.* ¶ 181.

Second, the plan itself shows that Defendants' shared aim was not a mere warrant execution, but rather a wanton mass seizure and immigration dragnet based on ethnicity. As alleged, Defendants planned to execute the warrants during an event that they knew was typically attended by hundreds of mostly Latino community members who posed no specific safety threat.

*Id.* ¶¶ 40, 95, 98. Further, though the warrants concerned five people accused of unlicensed gambling, Defendants chose to deploy 200 officers armed with military-grade weapons, zip-ties for hundreds, an ICE Tent, and transport vans. *Id.* ¶¶ 78, 99, 180–81. They also agreed to have those officers detain everyone and process them for immigration purposes. *Id.* ¶¶ 177–78, 181. Defendants could have executed the warrants at a time or in a manner that did not ensnare hundreds of uninvolved community members; indeed, detaining hundreds of people likely increased security management issues on the scene. *Id.* ¶ 110. Likewise, Defendants could have come prepared to attend to the easily foreseeable needs of those subjected to their show of force, but they did not come prepared to provide water, food, access to restrooms, or medical care. *Id.* ¶¶ 114–16. While federal and state agencies regularly cooperate to execute warrants, this was significantly more intrusive and gratuitous than typical warrant executions. *See infra* Section III.

Third, officers' actions at the Raid were "unlikely to have been undertaken without an agreement"—further supporting the inference of conspiracy. *See Mendocino II*, 192 F.3d at 1301. As alleged, hundreds of officers from State and Federal Defendants' agencies acted in lockstep to execute the Raid. They arrived with military-style gear and an ICE Tent, descended with guns drawn, detained everyone, sorted detainees into groups based in part on perceived ethnicity, and moved them through the ICE Tent. *Id.* ¶¶ 99, 180–93. If that was not the plan, any officer could have intervened; none did. *Id.* ¶¶ 194–200. *See Phelps Dodge*, 865 F.2d at 1541 (allegations "that police failed to exercise independent judgment will support an inference of conspiracy"). "[I]t is far more reasonable to infer from the facts alleged that the raid was planned to be executed in the way described, as opposed to [hundreds] of officers coincidentally executing it in the same manner." *Zelaya v. Hammer*, 516 F. Supp. 3d 778, 806 (E.D. Tenn. 2021) (denying motion to dismiss allegations of conspiracy to abuse narrow warrant to conduct a raid based on ethnicity);

*Soo Park*, 851 F.3d at 928 n.22 ("when the entire sequence of events in the complaint is considered in context, what might otherwise appear to have been coincidental parallel conduct on its own becomes 'suggestive of illegal conduct' and is thus sufficient to survive a motion to dismiss"). That Defendants also engaged in some legitimate law enforcement activity, such as arresting people named in the warrants, does not negate the inference of conspiracy. *See Phelps Dodge*, 865 F.2d at 1547 ("[A]n act done for a legitimate purpose in furtherance of a conspiracy may, together with other evidence, be evidence of a conspiratorial purpose.").

Fourth, "[D]efendants' adoption of [a] modified version of events" supports the inference of conspiracy. *Mendocino II*, 192 F.3d at 1303. After the Raid, Defendants and officials they serve publicly attempted to justify their heavy-handed tactics: Chief Ingram, SAC Bohls, DHS, and Governor Little castigated La Catedral as a site of violence and animal abuse absent any evidence, Compl. ¶¶ 203–07;[6] the FBI minimized its misconduct toward children, *id.* ¶ 202; and Sheriff Donahue, Chief Ingram, and Governor Little concealed the Raid's immigration purpose. *Id.* ¶¶ 208–11.

Finally, Defendants' private communications demonstrate their conspiratorial intent. Following the Raid, SSA Sheehan emailed Raid organizers including Defendants Porter, Donahue, Ingram, Huff, and Gardiner, describing the Raid as a "nearly impossible task" and a "massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states." *Id.* ¶ 213. For the FBI, executing warrants for five people accused of non-violent crimes is not a "nearly impossible" task necessitating hundreds of officers. A wanton mass seizure and

---

[6] Indeed, Defendants' briefs misleadingly refer to La Catedral community events as "illegal gambling events." *See* Federal MTD at 3, 25, 30; County Defendants' Motion to Dismiss, ECF No. 39-1 ("County MTD") at 7–9; City Defendants' Motion to Dismiss, ECF No. 41-1("Cities MTD") at 6.

immigration dragnet is. *Id.* ¶¶ 145–46. Sheriff Donahue responded confirming his involvement: "As always, it is an honor to work with you and to be a part of operations like this[.]" *Id.* ¶ 214. And Director Porter confirmed the operation was a cover for an immigration dragnet targeted at Latinos: "We ended up with 105 arrests, which wouldn't have been possible without everybody here. Thank you for putting the Boise ICE office on the map!" *Id.* ¶ 215.

**B. Each Defendant Played a Role in Executing the Illegal Plan.**

Plaintiffs adequately allege that each Defendant took overt acts in furtherance of this conspiracy. As illustrative examples, ICE Director Porter participated in planning the Raid, including by coordinating with other Defendants to send ICE officers with an ICE Tent and transport vans to the Raid. *Id.* ¶¶ 150, 181. He also directed ICE officers under his supervision to execute the Raid by processing hundreds of attendees through the ICE Tent and releasing each attendee only if and when they proved U.S. citizenship or lawful immigration status. *Id.* ¶¶ 78–84, 166(i)–(ii), 191. Sheriff Donahue planned the Raid through his role as a partner on the Task Force and his participation in multiple pre-Raid meetings, including one led by his office. Further, he directed officers under his command to execute the Raid by detaining everyone and funneling them through the ICE Tent. And he personally participated in the Raid. *Id.* ¶¶ 51, 169, 173–79, 166(ii), 219, 234. Each Defendant's role is explained *infra* Section IV.

**C. The Conspiracy Violated Plaintiffs' Constitutional Rights.**

Plaintiffs sufficiently allege that the conspiracy resulted in violations of their Fourth Amendment and equal protection rights. The Complaint supports several Fourth Amendment violations, as explained *infra* Section II.[7] Detaining hundreds of people for an immigration raid without individualized suspicion and where the exception that attends to executing a search

[7] At the pre-discovery pleading stage, Plaintiffs should not be tied to a specific theory of liability. Fed. R. Civ. P. 8(d).

warrant does not apply was unjustified at the outset. Further, detaining the Plaintiff Class in dehumanizing, publicly humiliating conditions and prolonging that detention beyond the warrant execution was unreasonable in its manner of execution. Additionally, the Complaint adequately alleges that Defendants deliberately targeted La Catedral, and executed the Raid in an uncharacteristically gratuitous manner, at least in part because of the Plaintiff Class's perceived Latino ethnicity, in violation of their equal protection rights. *See infra* Section III.

### D. Federal Defendants Are Liable for Conspiring with State Defendants, Who Provided Color of State Law.

Federal Defendants attempt to evade conspiracy liability in three ways. First, they cite a slew of cases to argue they acted under color of federal law. *See* Federal MTD at 12–13. But Plaintiffs do not dispute that. Instead, Plaintiffs assert that Federal Defendants conspired with State Defendants, and those state officials supplied the color of state law required under Section 1983. *See Cabrera*, 973 F.2d at 741–42. Second, Federal Defendants invoke the intracorporate-conspiracy doctrine, Federal MTD at 26, but that doctrine is irrelevant because Plaintiffs allege that Federal Defendants conspired with State Defendants. *See Zelaya*, 516 F. Supp. 3d at 805 (intracorporate-conspiracy doctrine inapplicable to claim that federal officers conspired with state agency).[8] Third, Federal Defendants assert that mere "joint action" between federal and state officers does not trigger Section 1983 liability, Federal MTD at 13–18, but Plaintiffs allege more—conspiracy between federal and state officers to violate civil rights—which does trigger liability.

The Ninth Circuit has made clear that "federal officials acting under federal authority . . . may be liable under § 1983 if they are found to have conspired with" state officials who "significantly participated in the challenged activity." *Cabrera*, 973 F.2d at 741–43 (quoting

[8] This Court, accordingly, need not determine whether the intracorporate-conspiracy doctrine even applies to civil rights conspiracy claims generally. *See Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017); *Manansingh v. United States*, No. 21-16192, 2023 WL 7295184, at *2 (9th Cir. 2023).

*Gibson v. United States*, 781 F.2d 1334, 1343 (9th Cir. 1986));[9] *contra* Federal MTD at 24. Indeed, Defendants' own cases recognize that where "federal officials conspire . . . with 'state officials to deny constitutional rights, the state officials provide the requisite state action to make the entire conspiracy actionable under section 1983.'" *Hernandez v. Causey*, 124 F.4th 325, 335 (5th Cir. 2024); *see also Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 869 (10th Cir. 2016).

Here, Plaintiffs allege that State Defendants played significant roles in the conspiracy. State Defendants participated in planning the Raid via multiple meetings and coordination through the Task Force. *Id.* ¶¶ 169–81, 219–24. And they directed scores of officers to execute the Raid as planned: State officers comprised more than a quarter of the total law enforcement presence that swarmed La Catedral, surrounded the perimeter to prevent exit, seized attendees, sorted detainees into groups, and moved them to the ICE Tent. *Id.* ¶¶ 166(i)–(ii), 183–89, 218, 247. As SSA Sheehan put it, Federal Defendants "absolutely could not have done [the Raid] without" State Defendants. *Id.* ¶ 213, *see also id.* ¶ 215 (Director Porter stating Raid "wouldn't have been possible without everybody here," including State Defendants).

These allegations suffice at the pleading stage. *See, e.g.*, *Cabrera*, 973 F.2d at 744 (favorably citing *Hampton v. Hanrahan,* 600 F.2d 600, 623 (7th Cir. 1979) as an example where federal officers could be liable for Section 1983 conspiracy to conduct an unlawful raid because state officers played a "significant role"); *Mendocino Env't Ctr. v. Mendocino Cnty.* ("*Mendocino I*"), 14 F.3d 457, 465 (9th Cir. 1994) (holding, under prior heightened conspiracy pleading standard, that plaintiffs sufficiently alleged FBI officers—in their federal capacities—could be liable under Section 1983 for conspiring with local police to violate plaintiffs' civil rights);

[9] *Cabrera* discusses both conspiracy between federal and state officials and when federal officials themselves act under color of state law. Plaintiffs only allege the former.

*Jackson v. Vartanian*, No. 20-cv-1148, 2021 WL 4523072, at *3–4 (E.D. Wis. Oct. 4, 2021) (holding plaintiff sufficiently alleged "a federal agent on a federal task force" could be liable under Section 1983 for "conspir[ing] with state actors to violate [plaintiff's] Fourth Amendment rights").

The joint-action cases cited by Federal Defendants are inapposite because they did not involve an alleged conspiracy to violate civil rights and state actors did not play a significant role in the alleged violations. *See Cabrera*, 973 F.2d at 739–40; *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1254 (9th Cir. 2008); *Billings v. United States*, 57 F.3d 797, 798 (9th Cir. 1995). Moreover, each case opined that federal officials can be liable under Section 1983 if they conspire with state actors to violate people's civil rights, as alleged here. *Cabrera*, 973 F.2d at 741–42; *Ibrahim*, 538 F.3d at 1257–58; *Billings*, 57 F.3d at 801.

Lastly, Federal Defendants make a passing suggestion that State Defendants did not act under color of state law. Federal MTD at 17. State Defendants rightly do not dispute that Plaintiffs have adequately alleged they and their officers acted under color of state law. Indeed, Plaintiffs allege that State Defendants and/or their officers participated in pre-Raid planning meetings in their state-officer capacities, Compl. ¶¶ 169–79, deployed officers to execute the Raid in their state-officer capacities (e.g., as "Caldwell PD SWAT" officers), *id.* ¶¶ 49, 205, 218–24, directly supervised those officers, *id.* ¶¶ 166, 233–34, and paid those officers' wages, *id.* ¶ 226. Further, the Task Force is a state-federal partnership where County and City Defendants participate in their own capacities (not as full-time deputized federal agents) and contribute funding to the Task Force. *Id.* ¶¶ 51, 169, 225. Task Force operations advance both federal and state law enforcement goals and lead to federal and state prosecutions. *Id.* ¶¶ 227–31.[10] *See Thai v. County of Los Angeles*, 127

---

[10] Further, ISP is not currently a member of the Task Force. Thus, Colonel Gardiner and his officers plainly participated in their state capacities. *Id.* ¶ 232.

F. 4th 1254, 1259–63 (9th Cir. 2025) (holding courts must consider "the totality of the circumstances" including these factors to determine, at summary judgment, whether officers on a state-federal task force act under "color of state law"); *cf.* Federal MTD at 15–16 (citing cases where, unlike here, courts found—generally after discovery—that state officers were deputized full-time to federal agencies and did not act under color of state law).

The facts that officers executed federal warrants and had an immigration purpose do not remove the color of state law. The color-of-law analysis "focuses not on whose law is being implemented" (i.e., the type of warrant) or "the particular work that the agency chooses . . . to perform on a given day" (i.e., pursuing federal or state law violations) but "rather on whether the authority of the state was exerted[.]" *Thai*, 127 F. 4th at 1260.[11] The Complaint amply alleges that—no matter the subject of the investigation—state officers exercised their state authority.

### E. Defendants Failed to Stop the Unlawful Conspiracy.

Plaintiffs adequately allege that Defendants failed to intervene to stop this unlawful plan, in violation of Section 1986. *See Karim-Panahi*, 839 F.2d at 626. First, Plaintiffs have sufficiently alleged a Section 1985(3) violation. *See supra* Section I.A–D. Second, the Complaint adequately alleges that each Defendant knew of the impending violation, including through collaboration on the Task Force and multiple pre-Raid meetings. Compl. ¶¶ 169–81, 266. Third, the Complaint and reasonable inferences from it adequately allege that each Defendant had the power to aid in preventing these violations—for instance, by instructing their officers to not participate in the

[11] Notably, even when some amount of federal authority underlies an officer's conduct, they may still act under color of state law under the totality of the circumstances. *See, e.g.*, *Thai*, 127 F.4th at 1259 (favorably citing *Johnson v. Orr*, 780 F.2d 386, 390 (3d Cir. 1986), where the Third Circuit held, at 390–93, that a National Guard technician acted under color of state law even though the Guard is a "hybrid" federal-state agency and the alleged violation occurred "pursuant to federal regulations").

illegal plan or demanding warrant execution at a time and in a manner that did not subject so many people to needless detention and interrogation—but failed to do so. *See id.* ¶ 166.

## II. Plaintiffs Adequately Allege That Defendants Violated Their Fourth Amendment Rights.

The Complaint adequately alleges that Defendants violated Plaintiffs' Fourth Amendment rights several times over. First, the initial mass, suspicionless seizure of the hundreds of individuals in the Plaintiff Class was impermissible. Defendants' reliance on *Summers* and *Mena* to justify the initial detention is squarely foreclosed by binding Ninth Circuit precedent. Regardless, the seizures occurred outside the area authorized by the *Summers* exception. Second, the manner of Plaintiffs' detention was both unreasonably prolonged and gratuitously intrusive. Defendants' arguments to the contrary misconstrue the law and ignore key allegations in the Complaint.

### A. The Initial Mass Seizure Was Not Justified by the *Summers* Exception.

"The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures." *Bailey v. United States*, 568 U.S. 186, 189 (2013). Even if a search is conducted pursuant to a valid warrant, "it does not follow that the seizure was lawful as well." *Id.* As a general matter, the seizure of a person must be predicated on individualized suspicion, and "a person's mere propinquity to others independently suspected of criminal activity" does not constitute the requisite suspicion. *Maryland v. Pringle*, 540 U.S. 366, 372–73 (2003) (citation omitted); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968) (requiring "specific and articulable facts" particular to the person seized). Plaintiffs allege, and Defendants do not meaningfully dispute,[12] that Defendants did not have individualized suspicion to detain all attendees at La Catedral.

[12] County Defendants suggest in passing that they had particularized suspicion to detain all attendees at La Catedral because it was "reasonable to suspect that observers at the racetrack were participating in gambling activities." County MTD at 5-6. Plaintiffs' allegations do not support that argument, and Supreme Court case law forecloses it: "An individual's presence in an area of

The Supreme Court has recognized a narrow exception to the Fourth Amendment's individualized suspicion requirement, providing a "limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. But the Ninth Circuit held in *Perez Cruz*—which controls here—that seizures attendant to the *Summers* exception are not permitted when the central purpose of the seizure is immigration enforcement and the seizure would not have occurred absent that purpose. *Perez Cruz v. Barr*, 926 F.3d 1128, 1143 (9th Cir. 2019). And in any event, individualized suspicion is still required to detain people who are not in the "immediate vicinity" of the search. *Bailey*, 568 U.S. at 199. Because the limited exception in *Summers* did not justify the suspicionless mass seizure of the Plaintiff Class, the detention violated the Fourth Amendment.

The Supreme Court grounded its justification for the *Summers* exception in "law enforcement interests in conducting a safe and efficient search," *Bailey*, 568 U.S. at 200, and the limited nature of the "incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." *Summers*, 452 U.S. at 703. Importantly, while the *Summers* exception is "categorical" where it applies, *Mena*, 544 U.S. at 98, the Supreme Court made clear that its scope must be "confined to its underlying justification." *Bailey*, 568 U.S. at 201.

In *Perez Cruz*, the Ninth Circuit held that this categorical exception is not applicable when officers' primary purpose is to conduct suspicionless immigration seizures and the seizures would not have been made absent that impermissible purpose. *Perez Cruz*, 926 F.3d at 1143. The court reviewed a mass detention carried out by federal officers in a factory that, officers suspected, employed 200–300 undocumented immigrants. *Id.* at 1133, 1140–43. Officers obtained criminal

---

expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

arrest warrants for eight employees and a criminal search warrant for employment-related documents. *Id*. at 1133. Purporting to execute these warrants, "approximately 100 armed and uniformed ICE agents" stormed the factory, blocked all exits, and prohibited everyone from leaving. *Id*. at 1134, 1138. The officers then detained the employees en masse and ordered them into groups based on work authorization. They next handcuffed and questioned those employees without proof of work authorization. *Id.* Officers subsequently arrested 130 workers and forced them onto buses headed for ICE detention facilities. *Id.*

The Ninth Circuit rejected the government's invocation of *Summers* and *Mena* to justify this mass suspicionless seizure. *Id*. at 1138. As the court explained, "'*Summers* recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search.'" *Id*. at 1141 (quoting *Bailey*, 568 U.S. at 200). But "[w]here 'a safe and efficient search' is not the primary purpose of the officers' actions, *Summers*'s justification for bypassing the Fourth Amendment's traditional protections disappears." *Id*. (quoting *Bailey*, 568 U.S. at 200). Thus, "*Summers*' categorical authority to detain incident to the execution of a search warrant does not extend to a preexisting plan whose central purpose is to detain, interrogate, and arrest a large number of individuals without individualized reasonable suspicion." *Id*. at 1143. The court held that, because Perez Cruz's seizure would not have been made "in the absence of the invalid purpose," the *Summers* exception did not apply. *Id.* at 1141, 1143 (citation omitted). This holding was premised on longstanding precedent that suspicionless intrusions permitted under a Fourth Amendment exception "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4

(1990); *see Perez Cruz*, 926 F. 3d at 1139.[13]

The immigration dragnet alleged here is a dead ringer for the raid in *Perez Cruz* in all material respects. In both cases, defendants (1) amassed a disproportionately large force of officers for the execution of a limited search warrant and the arrest of a handful of individuals, (2) executed those warrants at a time and location where defendants believed a large number of undocumented immigrants would be on the premises, (3) detained individuals unrelated to the warrants and sorted them on the basis of immigration status, (4) plainly prepared to seize, question, and transport attendees to enforce immigration laws, and (5) would not have made the mass detentions in the absence of an impermissible reason. *Compare* Compl. ¶¶ 6, 41–47, 74–75, 80–82, 84, 90, 99, 101, 141, 145 *with Perez Cruz*, 926 F.3d at 1133–35, 1141, 1144–45. To be clear, immigration questioning may be permissible during a valid *Summers* seizure, as long as it does not prolong the seizure.[14] But here, as in *Perez Cruz*, Defendants may not shoehorn a massive immigration operation into a limited and unrelated warrant execution in order to seize people who would not have been otherwise detained.

Defendants have no compelling response to *Perez Cruz*. State Defendants fail to even cite it. Federal Defendants contend that Plaintiffs have not adequately pled a "primary and preplanned immigration purpose." Federal MTD at 44. That argument is belied by Plaintiffs' extensive

---

[13] Although Federal Defendants devote significant attention to administrative or special needs cases, Federal MTD at 35–36, *Perez Cruz* was neither; as here, the raid in *Perez Cruz* involved a criminal warrant execution. *Perez Cruz*, 926 F. 3d at 1140–42.

[14] For example, the Supreme Court held immigration questions were reasonable in *Mena*, a case upon which Defendants rely. *See* Federal MTD at 27–28. In *Mena*, the FBI detained four people inside an alleged gang member's garage while executing a search warrant for dangerous weapons. The FBI knew the gang was primarily comprised of people without lawful status and notified immigration authorities of their planned search. A single immigration officer joined the operation. His questions were not burdensome and did not prolong the detentions. *Mena*, 544 U.S. at 96, 100–01. Notably, in *Mena*, the immigration investigation was ancillary, which stands in sharp contrast to this case in which immigration enforcement was the central concern.

allegations on this purpose, as detailed *infra* Section III. While Federal Defendants point to cash being found on "several" of the hundreds of adults and children detained, Federal MTD at 38, they ignore the overwhelming conduct of officers (mass immigration sorting and interrogations), fruits of the operation (105 immigration arrests), and Defendants' admissions that confirm the primary immigration purpose ("Thank you for putting the Boise ICE office on the map!"). *See* Section III. *Perez Cruz* applies where, as adequately alleged here, the "central concern" was immigration enforcement and the warrant was "of secondary concern." *Perez Cruz*, 926 F.3d at 1141, 1144–45.

Federal Defendants also try (and fail) to distinguish *Perez Cruz*. They assert *Perez Cruz* is inapplicable because Plaintiffs did not allege that "documents unmistakably revealed a preplanned purpose to execute the warrant" to conduct immigration arrests. Federal MTD at 35–36 (cleaned up). But *Perez Cruz* did not turn on one type of evidence; rather the Ninth Circuit looked to the comprehensive record to determine the primary purpose—a record that largely overlaps with Plaintiffs' allegations.[15] *See, e.g.*, *Perez Cruz*, 926 F.3d at 1144 (discussing "agents' conduct at the [] factory and afterward"). Federal Defendants also assert *Perez Cruz* "did not involve a multi-agency operation" that requires "prob[ing] the motives of" different officers. Federal MTD at 36. As an initial matter, the cases they cite illustrate how courts regularly determine motives in multi-agency operations. *See Lacey*, 693 F.3d at 934–39 (holding two agencies can share an unlawful objective to form a conspiracy); *United States v. Grey*, 959 F.3d 1166, 1183–84 (9th Cir. 2020) (distinguishing the motives of two agencies). More to the point, Plaintiffs have adequately pled that Defendants shared the same primary purpose to use warrants as a ruse to conduct an

---

[15] In discovery, Plaintiffs might obtain the very documents Federal Defendants insist on. But at the pleading stage, Plaintiffs' allegations and all reasonable inferences are enough to proceed.

immigration dragnet. *See supra* Section I.A; *infra* Section IV; *contra* Federal MTD at 36.

Finally, Federal Defendants also attempt to cast doubt on *Perez Cruz*. *See* Federal MTD at 35, 44. First, this Court is bound to follow Ninth Circuit precedent. *See Hart v. Massanari*, 266 F.3d 1155, 1171 & n.28 (9th Cir. 2001). Second, Defendants' basis for questioning *Perez Cruz* misconstrues the law. They suggest that *Perez Cruz* is in tension with Supreme Court precedent "reject[ing] invitations to probe subjective intent." Federal MTD at 35 (citation omitted). But *Perez Cruz* described—and Federal Defendants acknowledge—that the Supreme Court held "purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue." *Perez Cruz*, 926 F.3d at 1139 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)) (cleaned up); *see* Federal MTD at 35. As *Perez Cruz* explains, in this narrow context, courts do probe whether the intrusion was primarily for an improper investigative purpose, such that suspicion is required where it otherwise would not be to ensure the intrusion is reasonable. *See, e.g.*, *Edmond*, 531 U.S. at 44–48 (holding suspicionless highway checkpoint seizures where the primary purpose was drug enforcement are improper); *Michigan v. Clifford*, 464 U.S. 288, 294 (1984) (plurality opinion) (holding the use of administrative warrants to determine the cause of a fire are improper if the "primary object" is to "gather evidence of criminal activity"); *United States v. Anderson*, 101 F.4th 586, 596–99 (9th Cir. 2024) (holding an inventory search conducted principally for a criminal investigation was improper). *Perez Cruz* plainly governs here.

Even putting *Perez Cruz* aside, the Raid's mass seizure still violated the Fourth Amendment because the *Summers* exception is "limited to the immediate vicinity" of the search, *Bailey*, 568 U.S. at 199, and the Complaint alleges that Plaintiffs were outside that area.

The Supreme Court in *Bailey* confirmed that the "immediate vicinity" of the search is "the area in which an occupant poses a real threat to the safe and efficient execution of a search

warrant." *Id.* at 199, 201. A *Summers* detention must be confined "to those who are present when and where the search is being conducted." *Id.* at 197–98. Further, the search must be "proper"—i.e., authorized by the warrant. *Id.* at 193. To determine if someone was detained within the immediate vicinity of a search, courts consider "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Id.* at 201.

Here, the allegations support an inference that Plaintiffs were detained beyond the "immediate vicinity" of the search because they were not within "the area in which [they could have] pose[d] a real threat to the safe and efficient execution of a search warrant." *Id.* As alleged, officers only searched the small buildings at the southeast edge of the property. Compl. ¶¶ 5, 76–77, 104. Yet officers detained the Plaintiff Class throughout the open fields, racetrack, and ICE Tent—far from the buildings being searched. *Id.* ¶¶ 5, 76–77, 104. Additionally, the individuals named in the criminal warrants were taken into custody soon after law enforcement arrived, *id.* ¶ 105, and the authorized searches had ended by the time the Plaintiff Class was being detained near and in the ICE Tent, *id.* ¶¶ 75–77; *see Bailey*, 568 U.S. at 197–98; *cf. Dawson v. City of Seattle*, 435 F.3d 1054 (9th Cir. 2006) (applying *Summers* exception where the duration of the detention was coextensive with the period of the search); *contra* Federal MTD at 30. And unlike in *Mena*, the intrusion here was far from "slight": Plaintiffs' hours-long detention in publicly humiliating and dehumanizing conditions was exponentially more intrusive than the search of the venue they were visiting. *Mena*, 544 U.S. at 98; *see infra* Section II.B. Thus, the *Summers* exception did not apply to the Plaintiff Class.

Defendants erroneously assume that the "immediate vicinity" of a search is defined only by the full geographic boundary lines identified in the search warrant, which they claim covered

the entire 24-acre La Catedral property. *See* Federal MTD at 30; County MTD at 5–8; Cities MTD at 5–6. As an initial matter, while the Court may recognize that Defendants had a search warrant, it should not consider the contents of that warrant at the pleading stage.[16] What is more, the "immediate vicinity" of a search is defined by reference to "the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant" based on myriad factors—not merely the face of the search warrant. *See Bailey*, 568 U.S. at 194–201. Defendants cite no precedent holding that an entire 24 acres of land could qualify as the "immediate vicinity" of a search. Instead, the *Summers* exception has always applied to far more limited areas: *Summers*, *Bailey*, and *Mena*, each concerned searches of confined spaces (homes). The same is true of Ninth Circuit cases applying the *Summers* exception. *See, e.g.*, *Dawson*, 435 F.3d at 1068 (detention within boarding house).

Consider the implications of Defendants' theory: Officers could lay siege to any large gathering with military-style force to detain and interrogate hundreds or even thousands of attendees, so long as they obtained a search warrant for supposed illegal gambling at that venue. They could deliberately choose to storm the Athletic Club Boise Soccer Stadium (which used to

---

[16] The search warrant is not incorporated by reference in the Complaint because Plaintiffs did not have access to it at the time of filing, as it was under seal. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Further, judicial notice of the search warrant as a definitive source to determine the bounds of the authorized search would be improper because its contents are "subject to reasonable dispute." Fed. R. Evid. 201(b); *Khoja*, 899 F.3d at 999–1000. For example, it is unclear whether the warrant authorized searches for gambling evidence only in parts of the property enumerated in the warrant's Attachment A ("Tellez's residence, a shop housing Catedral Market, stables, a green barn, a spectator area, and a racetrack, named La Catedral Arena") or across the entire property, as Federal Defendants claim. *Compare* ECF No. 38-2 at 1 *to* Federal MTD at 6. Further, language suggests the property to be searched may have been limited to those parts of the property on which three named individuals and their personal property might be found. *See* ECF No. 38-2 at 10–13. Understanding the contents of the warrant requires discovery to obtain its underlying affidavit (which remains under seal) and probe the circumstances surrounding obtaining and executing it.

be a horse-racing track) and detain everyone in the stadium and parking lots. And because Defendants' theory contains no limiting principle, by logical extension they could raid a sold-out football game in Albertsons Stadium at Boise State University and detain all 36,000 attendees simply because they purportedly were in the "immediate vicinity" of the search. *See* Federal MTD at 28–31. That stretches *Summers* beyond recognition. The Court should reject Defendants' radical expansion of *Summers* and *Mena*.

Finally, to the extent Defendants contend that officers conducted searches for gambling evidence beyond the small buildings, that is contrary to Plaintiffs' factual allegations—which must be accepted as true for purposes of this motion—and to the reasonable inferences drawn from them. *See* Compl. ¶¶ 5, 76, 104. Additionally, Plaintiffs have at least sufficiently alleged that not all 400 attendees on the sprawling property were in the immediate vicinity of the search, even if some individual attendees may have been. If nothing else, factual questions concerning the warrant and search prevent resolution of this claim on a motion to dismiss.

**B. Defendants Detained Plaintiffs in an Unlawful Manner.**

Even where *Summers* authorizes detention, the detention must be reasonable. *Tekle v. United States*, 511 F.3d 839, 848 (9th Cir. 2007). Plaintiffs adequately allege the seizures directed and executed by Defendants were unreasonable in duration and intrusiveness. With respect to duration, Plaintiffs' approximately four-hour detention was unreasonably prolonged. A seizure must not last beyond the time needed to diligently handle the underlying matter. *Rodriguez v. United States*, 575 U.S. 348, 350, 352, 357 (2015) (holding a detention prolonged even by seven to eight minutes can be unreasonable); *see also Ganwich v. Knapp*, 319 F.3d 1115, 1120–21 (9th Cir. 2003). And immigration questioning cannot prolong a *Summers* detention beyond the duration of the search. *See Mena*, 544 U.S. at 101–02. The Complaint alleges that attendees were detained well after officers fully executed the warrants. Compl. ¶¶ 5, 76, 105; *contra* Federal MTD at 30–

31, County MTD at 9; Cities MTD at 7. That officers released detainees on a rolling basis once ICE verified immigration status confirms that any justification tied to the warrant execution had already ended. Compl. ¶ 154. Any plausible claim that detention was needed pursuant to the search warrant evaporated when the first person was released after ICE processing.

Additionally, the manner in which Defendants detained Plaintiffs was unreasonably intrusive. A seizure becomes unreasonable when it is "more intrusive than necessary" and its "scope" is not "carefully tailored to its underlying justification," *Florida v. Royer*, 460 U.S. 491, 500, 504 (1983); *see also Meredith v. Erath*, 342 F.3d 1057, 1062–63 (9th Cir. 2003). This includes seizures that are "unnecessarily painful [or] degrading" or that involve "an undue invasion of privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

The Complaint includes ample allegations that Plaintiffs' seizure was unnecessarily intrusive and far broader than its narrow justification. Although the warrants concerned only non-violent charges of unlicensed gambling by five individuals, Compl. ¶¶ 5, 90, 96, more than 200 officers stormed La Catedral with armored vehicles and guns drawn, *id.* ¶¶ 2, 47. They fired shots into the crowd, exploded flashbang grenades, threw compliant people to the ground, and shot rubber bullets over the heads of teenagers on their knees. *Id.* ¶¶ 47–48, 61. They detained everyone present, including the elderly and babies, and zip-tied most adults and many children without assessing whether any individual posed a threat. *Id.* ¶¶ 59–60, 112. Children and adults were forced to urinate in public. *Id.* ¶¶ 66–67. Parents were kept from consoling their distressed kids and from feeding hungry toddlers who had been detained through lunchtime. *Id.* ¶¶ 59, 62, 68–69. Attendees were herded onto the track and put on display before the public and press. *Id.* ¶ 117. Even after hours of detention, attendees were not released until they underwent immigration interrogation in the ICE Tent. *Id.* ¶ 83. Those needlessly "degrading" and painful conditions, *Franklin*, 31 F.3d at

876—and the officers' disproportionate show of force—were unreasonable, especially given the presence of vulnerable populations. S*ee Tekle*, 511 F.3d at 850; *Meredith*, 342 F.3d at 1062–63.

Defendants' counterarguments rely on inapposite decisions. Federal Defendants cite *Harte v. Bd. of Comm'rs of Cnty. Of Johnson, Kansas*, 864 F.3d 1154 (10th Cir. 2017), for the proposition that officers may detain children alongside their parents so they can be monitored. Federal MTD at 32 n.5. But the detention approved in *Harte* was far more limited: It involved a brief search of a single residence, where children were kept with a parent during that short time. *Harte*, 864 F.3d at 1190. Here, by contrast, parents and their children were kept separated, zip-tied, deprived of food, and held at gunpoint for hours. Compl. ¶¶ 55, 59–63.

Similarly, Federal Defendants cite *Gamez-Lopez v. Barr,* 821 Fed. App'x 912 (9th Cir. 2020), for the proposition that a strong showing of force may be used to execute warrants for non-violent offenses. Federal MTD at 33. But Federal Defendants ignore critical distinguishing facts from *Gamez-Lopez*, including that officers used force to enter an apartment only after knocking and announcing their presence several times without a response, and that once detained, petitioners were held for less than an hour in their apartment without restraints or weapons pointed at them. *Gamez-Lopez,* 821 F. App'x at 912–13; *In re Gamez-Lopez & Esteves Silva*, 2016 WL 1722599, at *1 (B.I.A. Mar. 24, 2016). Here, by contrast, officers used an overwhelming show of force and aggressive tactics from the outset and maintained unnecessary restraints throughout the Raid. Compl. ¶¶ 2, 47–48, 61, 158. The Complaint thus sufficiently alleges that Plaintiffs' detention violated the Fourth Amendment.

## III. Plaintiffs Adequately Allege Defendants Intentionally Targeted Them Based on Their Perceived Latino Ethnicity in Violation of Their Equal Protection Rights.

The Complaint states a plausible claim that Defendants violated Plaintiffs' equal protection rights under the Fourteenth Amendment and Section 1985(3) because Defendants "acted in a

discriminatory manner and [] the discrimination was intentional." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (citation omitted). As a threshold matter, and to resolve confusion that Federal Defendants introduce, Federal MTD at 39, Plaintiffs bring equal protection claims against all Defendants under both 42 U.S.C. § 1983—including against Federal Defendants based on their participation in a conspiracy with state actors—and 42 U.S.C. § 1985(3).[17]

The Supreme Court set out a non-exhaustive list of factors for courts to consider whether government action was tainted by discriminatory intent, including: (1) impact and whether it bears more heavily on one race or ethnicity; (2) the historical background; (3) the sequence of events leading to the action; (4) departures from normal procedures; and (5) contemporary statements of the decisionmakers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977). A court considers "the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). While in this case Plaintiffs also allege Fourth Amendment violations, an equal protection violation notably can occur when an otherwise lawful policing tactic is used against individuals because of their ethnicity. *Whren v. United States*, 517 U.S. 806, 813 (1996); *see, e.g.*, *Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1168 (C.D. Cal. 2022) (law enforcement action "motivated, at least in part, by race still constitutes an equal protection violation, even if the officers also had a legitimate basis for the" action).

[17] Federal Defendants cite *District of Columbia. v. Carter*, 409 U.S. 418, 423–24 (1973), to claim they are not proper defendants in Plaintiffs' claim of a Section 1983 conspiracy to deny equal protection, but *Carter* is inapposite. *See* Federal MTD at 39. *Carter* stands for the proposition that the Fourteenth Amendment addresses acts under color of state law and not "merely" private conduct or acts of the federal government. *Carter*, 409 U.S. at 423–24. The case does not foreclose that both groups can be—indeed, have been—found liable under Section 1983 for conspiring with state actors to violate the Fourteenth Amendment. *See, e.g.*, *Martinez v. City of W. Sacramento*, No. 2:16-cv-02566-TLN-EFB, 2019 WL 448282, at *21–22 (E.D. Cal. Feb. 5, 2019).

Because claims of intentional discrimination are fact-intensive, they are rarely decided pre-trial—let alone on the pleadings. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). Even at summary judgment, a plaintiff "need provide very little [] evidence" of discriminatory intent "to raise a genuine issue of fact," and "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (cleaned up). The bar is even lower at the pleading stage, where a plausible inference of such discriminatory intent suffices.

The totality of facts and reasonable inferences in the Complaint sufficiently plead that Defendants brutally detained and interrogated the Plaintiff Class in part because they were, or appeared, Latino. And the Complaint adequately alleges these actions arose from two reinforcing motivations: a presumption that Latino people are undocumented, and a disregard for the rights, safety, and well-being of Latino people.

The allegations begin with what Defendants knew about La Catedral events and what they assumed based on that knowledge. Plaintiffs allege that Defendants selected La Catedral because they knew that Wilder is a majority-Latino community and that hundreds of mostly-Latino residents generally attend the Latino cultural events at La Catedral. Compl. ¶¶ 36–40, 131. Further, the Complaint alleges that SA Sheridan's arrest-warrant affidavits highlighted the Mexican heritage of the arrest targets. *Id.* ¶ 149. And the undercover investigation underlying those warrants "anticipated encountering aliens unlawfully present" during the Raid based on the perceived Latino ethnicity of attendees. *Id.* ¶ 140. These allegations support the inference that Defendants impermissibly relied on Latino ethnicity to make conclusions about attendees' immigration status. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822, 901 (D. Ariz. 2013) *aff'd in relevant part and*

*vacated in part,* 784 F.3d 1254 (9th Cir. 2015) (holding Hispanic ethnicity is not a sufficient basis to conclude a person lacks immigration status).

Moreover, the Complaint alleges that Federal Defendants were under significant pressure to make mass immigration arrests, particularly of Latino people. In spring 2025, the Trump Administration demanded ICE make 3,000 immigration arrests per day, and, to advance that goal, it conscripted FBI officers into immigration enforcement. Compl. ¶¶ 124, 126–27. This coincided with ICE's shift from targeted immigration enforcement against individuals believed to have violated immigration laws to mass immigration operations that rely on ethnicity in deciding who to seize. *Id.* ¶ 128. State Defendants independently sought to support federal immigration initiatives targeted at Latinos. *Id.* ¶¶ 129–30, 147. Sheriff Donahue, for example, regularly partners with the federal government on immigration enforcement, *id.* ¶ 130, and Governor Little appointed Colonel Gardiner in part to focus on immigration enforcement efforts. *Id.* ¶ 26. The Complaint alleges the Raid followed a model from other state-federal raids that, in the prior months, gained public attention for securing high numbers of immigration arrests. Those raids similarly exploited criminal warrants to detain large groups of Latinos with a substantial show of force and to interrogate detainees about their immigration status. *Id.* ¶¶ 157–63 (discussing similar raids in Austin, TX; Colorado Springs, CO; Cato, NY; and Chicago, IL).

During the Raid, the Complaint alleges that immigration enforcement and assumptions about immigration status based on ethnicity were integral to the operation. Officers sorted detainees into groups based in part on perceived immigration status, which turned, at least in part, on whether officers thought the person was white—which officers associated with U.S. citizenship—or Latino—which officers associated with undocumented status. *Id.* ¶ 74. For example, officers sorted Willis Parrill, a white man who officers perceived to be Latino due to his

darker skin tone, into the undocumented group. *Id.* ¶ 74. Further, ICE brought a large tent and several vans for transport to immigration detention. It processed each detainee through the ICE Tent without individualized suspicion of immigration violations, releasing them only upon verification of immigration status. *Id.* ¶¶ 151–54, 190. While processing people through the ICE Tent, ICE officers treated Latino-appearing detainees with more suspicion. *Id.* ¶ 82.

Plaintiffs also allege that Defendants executed the Raid in an uncharacteristically intrusive and gratuitous manner. As detailed above, Defendants detained 400 people for four hours in painful conditions and interrogated each of them about immigration status. *See supra* Section II.B. Yet officers only arrested four people for federal gambling charges, and hundreds of attendees—a significant majority—demonstrated their U.S. citizenship or lawful status. Compl. ¶¶ 83, 94. This stands in sharp contrast to the far more tailored tactics Idaho law enforcement agencies use in typical warrant executions. Such operations more commonly are tailored to suspected criminal charges and not mass immigration enforcement; focus on discrete locations and not outdoor events open to the public; do not entail the automatic detention of hundreds of bystanders; and often return significant contraband—far more than what was secured at the Raid. *Id.* ¶¶ 119–22. A reasonable inference is that Defendants executed the Raid in a wanton manner because they targeted Latinos.

Additionally, Plaintiffs allege that officers singled out Latino-appearing people for harsher treatment during the Raid. Officers pointed guns at Latinos, threw Latinos onto the ground, taunted Latinos—including with racist slurs—zip-tied Latino teens, and denied Latinos' requests for water. *Id.* ¶¶ 3, 55, 57, 60, 68, 70, 142. They hit Mr. Parrill, the darker skinned white man, on the head with the butt of a rifle when he said he did not speak Spanish. *Id.* ¶ 70. In contrast, officers treated white-appearing detainees less roughly, including generally not pointing guns at them, granting them earlier access to water, and releasing white teens from zip-ties. *Id.* ¶¶ 56, 60, 68, 74.

All of this occurred as Federal and State Defendants made comments dehumanizing and criminalizing Latinos. For example, before the Raid, Sheriff Donahue said that "gangs and Mexican Cartels" were "monster[s]," "[t]he enemy [] behind the gates," and "brutal" and "violent" people that were "destroying our communities." *Id.* ¶¶ 136–38. After the Raid, Chief Ingram characterized the Raid—absent any evidence of drugs or violence—as an investigation "into, really, a cartel." *Id.* ¶ 205. SAC Bohls and a DHS spokesperson for ICE also demonized the attendees at La Catedral, with the former claiming La Catedral put "communities at risk" even though it was a cultural hub for Wilder-area Latinos, and the latter asserting officers stopped an illegal animal fighting enterprise even though there were no such allegations. *Id.* ¶¶ 37–38, 204, 206, *see Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 506–07 (9th Cir. 2016) (finding use of code words and references to crime may be interpreted as allusions to race and circumstantial evidence of discriminatory intent).

Similarly, Plaintiffs quote racialized statements about the Raid from non-Defendant federal and state leaders. These statements are not attributed to Defendants. *Contra* Federal MTD at 41. Rather, they provide context for the conditions under which Defendants operated and circumstantial evidence of their motivations. *See United States v. City of Yonkers*, 96 F.3d 600, 616, 618–19 (2d Cir. 1996) (holding "deference to the racially inspired positions" of officials exerting pressure on defendants supported finding an equal protection violation); *cf. Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (in an employment discrimination case, describing "discriminatory atmosphere" as circumstantial evidence that "tend[s] to add color" to the challenged act) (cleaned up). For example, then-DHS Secretary Kristi Noem and White House Deputy Chief of Staff Stephen Miller—while pressing ICE and the FBI to increase immigration arrests—described immigrants as threats and invaders, associated them with murder and rape

absent evidence, and used white supremacist-coded language, including the message "we'll have our home again" accompanied by a white nationalist anthem. Compl. ¶¶ 125, 134–35. Idaho Governor Little—who gave Colonel Gardiner his immigration mandate—echoed this same messaging in his statements about the Raid, calling La Catedral an "illegal gambling event[]" and inaccurately linking the Raid to "drug trafficking, animal abuse, illegal weapons trafficking, and large sums of money that end up in the hands of cartel bosses," none of which are reflected in the charges brought after the Raid. *Id.* ¶¶ 144, 207.

These allegations substantiate Plaintiffs' claims. In fact, many are taken from Defendants' own press statements, official records, and sworn court filings. *See, e.g.*, *id*. ¶¶ 148, 192, 204. They are hardly "bare assertions." *Contra* Federal MTD at 41; Cities MTD at 8–9.[18] In many respects, Plaintiffs' allegations resemble those that were held sufficient to state an equal protection conspiracy claim in *Zelaya v. Hammer*, 516 F. Supp. 3d 778 (E.D. Tenn. 2021). As with the Raid, in *Zelaya*, federal and state officers coordinated to execute a narrow warrant for non-violent offenses. The pre-raid investigations and warrant application emphasized the Latino ethnicity of people on site. *Id.* at 788–89. At the raid, officers descended with military-grade weapons and helicopters, detained all Latino people for hours, interrogated Latinos for immigration purposes, and treated Latinos especially harshly. *Id.* at 789–91. The court held these allegations stated a plausible claim that officers conspired to violate plaintiffs' equal protection rights. *Id.* at 802–06. Such is the case here, too.

Federal Defendants acknowledge that the Raid disproportionately burdened Latinos. Federal MTD at 42; *see Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (finding a

---

[18] Colonel Gardiner does not argue there is no indicia of discrimination and instead attacks only whether he is liable. *See* State MTD at 8. Plaintiffs address his personal liability *infra* Section IV.H.

"disproportionate impact" on Hispanic students supported inference of discriminatory motive). However, they discount it as simply an "incidental impact" of executing the warrants. Federal MTD at 41–43 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)). This is the same argument the court rejected in *Zelaya*. There, defendants argued they had not "planned" to target Latinos, but the court held that was "necessarily an inferential conclusion—and the Court must draw reasonable inferences from the facts alleged in favor of Plaintiffs." *Zelaya*, 516 F. Supp. 3d at 806. Indeed, at the pleading stage, Plaintiffs need only allege sufficient facts to "raise a reasonable expectation that discovery will reveal evidence of" a discriminatory motive. *Iqbal*, 556 U.S. at 556; *see also Twombly*, 550 U.S. at 556 (plausibility is not probability). Here, as in *Zelaya*, the allegations taken together make it plausible to conclude the Raid's impact on Latinos was intentional and not simply incidental.

City and County Defendants assert the Complaint is deficient for not identifying a similarly situated group who were treated more favorably, but this misconstrues both the equal protection standard and the Complaint. Cities MTD at 9; County MTD at 12–13. The use of comparators is one way to show discriminatory intent; it is not the only way. *See Pac. Shores Props., LLC*, 730 F.3d at 1158. Plaintiffs "may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Id.* (cleaned up); *see also Arlington Heights*, 429 U.S. 252 (requiring consideration of all evidence and not requiring a comparator); *see, e.g.*, *Sims v. Brown*, No. 23-35545, 2024 WL 1854284, at *6 (9th Cir. Apr. 29, 2024). Regardless, as discussed above, Plaintiffs *have* included such comparator allegations, including that officers treated white-appearing people better than those who officers perceived to be Latino and that officers used racial epithets about Latinos. Further, the Raid at a Latino community hub impacted

far more bystanders than typical warrant executions by these and similar law enforcement agencies, and in a publicly humiliating and particularly intrusive manner.

## IV. Plaintiffs Adequately Allege That Each Individual Defendant Is Liable for Violating Their Constitutional Rights

Defendants eschew any responsibility for the violations of Plaintiffs' constitutional rights that occurred during the Raid. In their view, nobody is responsible. In seeking to evade accountability, they inflate the standard for pleading individual liability and ignore extensive facts alleged in the Complaint.

"Participation by each conspirator in every[] detail in the execution of the conspiracy is unnecessary to establish"—let alone plead—a conspiracy claim. *Beltz Travel Serv., Inc., v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). So long as each defendant is part of a conspiracy, all are "jointly liable for the acts of their co-conspirators." *Id.*; *see also Lacey*, 693 F.3d at 935. Plaintiffs must allege that each participant "share[d] the common objective of the conspiracy" but they "need not know the exact details of the plan." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Phelps Dodge*, 865 F.2d at 1541). Even where some defendants "never spoke to" other defendants, and in the "absence of a sole instigator who personally communicated with all the participants in the conspiracy and orchestrated each of their actions", a fact-finder can still "conclude that a conspiracy existed." *Hampton*, 600 F.2d at 621–24. Further, it is "well-established" that "a conspiracy (is) not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Beltz Travel Serv., Inc.*, 620 F.2d at 1366 (quoting *United States v. Patten*, 226 U.S. 525, 544 (1913)).

With respect to the non-conspiracy Section 1983 claims against the individual State Defendants, supervisory liability requires pleading that the supervisory official (a) shared the "requisite mental state for the violation alleged," *OSU Student All. v. Ray*, 699 F.3d 1053, 1071

(9th Cir. 2012)—*i.e.*, knowledge for Fourth Amendment violations, *Chavez v. United States*, 683 F.3d 1102, 1109 (9th Cir. 2012), and discriminatory purpose for Fourteenth Amendment violations, *Ray*, 699 F.3d at 1070—and (b) were either personally involved in the alleged violations or "there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at 1207 (citation omitted). The Ninth Circuit "ha[s] never required a plaintiff to allege that a supervisor was physically present when the injury occurred." *Id*. Rather, "[t]he requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury[.]" *Id.* at 1207–08 (internal citations omitted) (alterations in original).

Circumstantial facts can provide the necessary detail for stating conspiracy or supervisory liability claims. For example, "when the department is executing an organized, department-wide response, one can presume that the police chief was in control of his department, either directing that response himself or—at the very least—ratifying the actions of his subordinates." *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 397 (N.D. Cal. 2021) (citation omitted). As another example, "passive receipt of an email" about the alleged conspiracy can "support an inference that [the recipient] participated in the conspiracy." *Aurora Astro Prods. v. Celestron Acquisition*, 691 F. Supp. 3d 1132, 1154 (N.D. Cal. 2013).

As detailed next, the direct and circumstantial facts alleged, and the reasonable inferences from them, sufficiently plead that each individual Defendant entered the conspiratorial agreement and committed overt acts in furtherance of it (Counts 1–3); that each Defendant knowingly failed to prevent the conspiracy (Count 4); that each individual State Defendant knew the plan would

violate Plaintiffs' Fourth Amendment rights and was motivated in part by Plaintiffs' ethnicity; and that their actions caused the underlying violations (Counts 5–6).

**A. ICE Director Porter: Putting Boise ICE "On The Map"**

Director Porter is the Acting Director of the Boise ICE Field Sub-Office. Compl. ¶ 19. ICE officers under Director Porter's command were on the scene from the start of the Raid. *Id.* ¶ 53. A massive ICE Tent was erected at La Catedral, *id.* ¶ 75, and numerous vans were on hand to transport people to immigration detention centers, *id.* ¶ 84. Officers present at the Raid from FBI, County Sheriff's Office, Caldwell PD, Nampa PD, and ISP worked hand-in-hand to group detainees in part according to assumed immigration status (which, in turn, was based partly on perceived ethnicity) and to then bring each individual detainee—hundreds in all—one by one into the ICE Tent. In the ICE Tent, ICE officers interrogated each detainee about their immigration status. *Id.* ¶¶ 75–83. Then, based on the ICE officers' interrogation, the coordinating officers either released detainees or loaded them onto the waiting vans. *Id.* ¶¶ 83–84. Officers drove about 100 people in vans to nearby detention centers. *Id.* ¶ 84. The next day, Director Porter celebrated and thanked the other Raid organizers, including Defendants Sheehan, Donahue, Ingram, Huff, and Gardiner, for the successful operation:

> On behalf of ICE/ERO, I also wanted to thank everyone for their support during this operation. We ended up with 105 arrests, which wouldn't have been possible without everybody here.
>
> Thank you for putting the Boise ICE office on the map!
>
> **Ken W. Porter**
> Assistant Field Office Director
> Enforcement and Removal Operations
> U.S. Immigration and Customs Enforcement
> Las Vegas Sub-Office

*Id.* ¶ 215. He also received emails, on the same thread, sent by SSA Sheehan calling the Raid a "nearly impossible task" and by Sheriff Donahue confirming it was an "honor" to participate in it. *Id.* ¶¶ 213–14.

Meanwhile, Director Porter was under the command of Trump Administration officials who were pressuring ICE to dramatically increase daily immigration arrest numbers, including through mass enforcement actions that, absent individualized indicators of immigration status, require ICE to rely on the arbitrary criterion of ethnicity to make stops and arrests. *Id.* ¶¶ 124, 128. This pressure campaign included promising the public that DHS would deliver, *id.* ¶ 124, making Latinos a primary target, *id.* ¶¶ 134–35 and directing FBI officers to help ICE fulfill the mandate, *id.* ¶ 126. In the months leading up to the Raid, ICE, FBI, and local law enforcement offices around the country coordinated to execute raids that involved abusing warrants to detain large groups of Latino people for immigration sweeps. La Catedral races—where hundreds of Latinos would be gathered in an open field—gave Director Porter an opportunity to conduct his own immigration dragnet in Idaho based on the arbitrary and impermissible criterion of ethnicity. *Id.* ¶¶ 157–62.

From these allegations, it is reasonable to infer that: the centrality of immigration enforcement to the Raid was the result of advance planning and coordination between Director Porter and the other Individual Defendants, *id.* ¶¶ 150, 166(ii), 181; ICE officers under Director Porter's command coordinated with officers from FBI and State Defendants' agencies in lockstep to have hundreds of people forcibly processed through immigration interrogation because that is what Director Porter commanded them to do; and ICE officers under Director Porter's supervision would not have executed the operation without his full direction, participation and involvement, and therefore Director Porter directed, supervised, and was responsible for ICE's role in subjecting Plaintiffs to the Raid in deprivation of their constitutional rights. *Id.* ¶ 166(i).

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, and that Director Porter knew of the impending conspiracy yet failed to prevent it.

### B. FBI SA Sheridan: Obtained Pretextual Warrants for the Raid

SA Sheridan is an FBI Special Agent serving under SSA Sheehan and SAC Bohls. *Id.* ¶¶ 20–22. He secured the arrest warrants for five people accused of non-violent unlicensed gambling that served as the purported basis for the Raid. *Id.* ¶¶ 90, 166(iv). SA Sheridan asserted probable cause only for the offense of gambling without the required license. *Id.* ¶ 90. The warrants emphasized that the targets were Mexican and undocumented. *Id.* ¶ 149. SA Sheridan obtained these warrants on October 15—the same week that Defendants were meeting to plan the Raid. *See id.* ¶¶ 90, 175–79.

The investigation that led to the warrants made assumptions about the immigration status of La Catedral attendees based on apparent ethnicity. *Id.* ¶ 140. Specifically, undercover FBI officers "determined that there were aliens unlawfully present" at prior La Catedral events and on this basis "anticipated encountering aliens unlawfully present" during the Raid—conclusions that were based on perceived Latino ethnicity. *Id.* Officers also determined that 250–500 people attend La Catedral events, and that attendees are screened for weapons upon entering the venue. *Id.* ¶¶ 95, 140. During this time, the Trump Administration had conscripted FBI officers to assist ICE with immigration enforcement, including through conducting mass raids without individualized suspicion and focusing on Latino populations. *Id.* ¶¶ 124–26, 134–35, 157–62.

From these allegations, it is reasonable to infer that: SA Sheridan knew of and was involved in the planning and execution of the Raid, given he obtained the warrants that served as the purported basis for the Raid and did so in the midst of pre-Raid planning meetings, *id.* ¶¶ 90, 166(iv), 175–79; SA Sheridan knew that the underlying investigation conflated perceived ethnicity with immigration status and shared that assumption; and, since news was widespread, SA Sheridan was aware of similar immigration dragnets around the country.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, and that SA Sheridan knowingly failed to prevent the conspiracy.

### C. FBI SSA Sheehan: Led "Nearly Impossible Task"

SSA Sheehan is the Supervisory Special Agent of the FBI's Boise office. *Id.* ¶ 21. Officers under his supervision, including SA Sheridan, investigated alleged unlicensed gambling at La Catedral and obtained warrants for five people accused of gambling without the required license. *Id.* ¶¶ 88–90. The officers made assumptions about immigration status of La Catedral attendees based on their apparent ethnicity. *Id.* ¶ 140. That investigation also made clear that 250–500 people attend events at La Catedral, and that attendees are screened for weapons upon entry. *Id.* ¶¶ 95, 98.

The Task Force—in which SSA Sheehan and most Defendants are partners—coordinated the plan to execute the warrants through the Raid. *Id.* ¶¶ 51, 169. SSA Sheehan routinely communicated and coordinated with other Task Force Defendants to pursue shared law enforcement goals. *Id.* ¶ 170. SSA Sheehan also planned the Raid through meetings with the other Defendants. He participated in a pre-Raid planning meeting on October 14, 2025 ("October 14 meeting"), and either participated or sent officers to participate in an in-person meeting on October 18, 2025 ("October 18 meeting"). At the October 18 meeting, Defendants and their officers established an operational plan for SWAT teams to surround La Catedral, create a perimeter that prevented exit, detain everyone on site, and move detainees through the ICE Tent for immigration processing. *Id.* ¶¶ 176–78.

At the Raid—under the auspices of executing the warrants that SA Sheridan obtained—FBI officers under SSA Sheehan's supervision worked seamlessly with officers from State Defendants' agencies and ICE to detain everyone on site, sort them into groups based in part on perceived ethnicity, and then move each detainee through the ICE Tent. *Id.* ¶¶ 182–93. After the

Raid, SSA Sheehan emailed other Defendants describing the operation to execute warrants for five people accused of non-violent crimes, in a location where people have been screened for weapons, as a "nearly impossible task" and a "massive undertaking that took over 200 law enforcement personnel" that he "could not have done" without each Defendant:

> **Subject:** [External] Operation
>
> All,
>
> I wanted to take a minute to thank each and every one of you, your agencies, and your personnel who assisted in the operation yesterday. We absolutely could not have done this without you. You made a nearly impossible task have a very successful outcome. This was a massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states. Thank you again for your continued partnership, trust, and shared commitment to enforcing the laws of this state and country. It's an honor to stand alongside of you. Thank you again and stay safe.
>
> **SSRA CHRISTOPHER SHEEHAN**
> **Supervisory Senior Resident Agent**
> **Federal Bureau of Investigation**
> **Boise and Pocatello Resident Agencies**

*Id.* ¶ 213. He also received emails on the same thread from Director Porter praising the Raid as a successful immigration operation, and from Sheriff Donahue affirming his participation in the Raid. *Id.* ¶¶ 214–15.

In the months leading up to the Raid, the Trump Administration had conscripted FBI officers to assist ICE with immigration enforcement, including by abusing warrants to detain large groups of Latino people for immigration sweeps without individualized suspicion. *Id.* ¶¶ 124–26, 134–35; 157–62.

It is reasonable to infer that: officers from FBI, ICE, and State Defendants' agencies acted in concert during the Raid to detain hundreds of attendees and interrogate them for immigration purposes because SSA Sheehan directed his officers to do so, *id.* ¶ 181; FBI officers under SSA Sheehan's supervision would not have executed the operation without his full direction, participation and involvement, and therefore SSA Sheehan directed, supervised, and was responsible for the FBI's role in violating Plaintiffs' rights during the Raid, *id.* ¶ 166(i); and, given

that for the FBI executing warrants for five people accused of non-violent, low-level offenses is not a "massive undertaking" as described in SSA Sheehan's email, the plan was not merely to execute those narrow warrants. *Id.* ¶ 164.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, and that SSA Sheehan knowingly failed to prevent the conspiracy.

### D. FBI SAC Bohls: Appointed Amidst Deportation Pressure

SAC Bohls is the Special Agent in Charge of the Salt Lake City FBI. *Id.* ¶ 20. SA Sheridan, an FBI officer under his chain of command, obtained the warrants for five people accused of non-violent unlicensed gambling that served as the purported basis for the Raid. *Id.* ¶ 90. The investigation that led to the warrants made clear that 250–500 people attend events at La Catedral, and that attendees are screened for weapons upon entry. *Id.* ¶¶ 95, 98, 140. That investigation also relied on assumptions about immigration status of La Catedral attendees based on apparent ethnicity. *Id.* ¶ 140.

The Task Force—in which SAC Bohls and most Defendants are partners—coordinated the plan to execute the warrants through the Raid. *Id.* ¶¶ 51, 169. SAC Bohls, or officers under his supervision, routinely communicated and coordinated with other Task Force Defendants to pursue shared law enforcement goals. *Id.* ¶ 170. Additionally, SAC Bohls, or officers under his supervision, participated in meetings to plan the Raid. *Id.* ¶¶ 175–78. During the Raid, FBI officers under SAC Bohls' command coordinated with officers from ICE and State Defendants' agencies to detain everyone at La Catedral, sort them into groups based in part on perceived ethnicity, and move them through the ICE Tent. *Id.* ¶¶ 182–93. After the Raid, SAC Bohls stated—even though the criminal complaints and indictments secured after the Raid contained no charges of drugs or

violence—that "[i]llegal gambling isn't a victimless crime" and "[t]hese operations can create an increase in violent crime, drug activity, and violence, putting communities at risk." *Id.* ¶ 206.

SAC Bohls took his post after the forced resignation of his predecessor, and amid rising pressure from the Trump Administration for the FBI to coordinate with ICE to generate immigration arrests, including by targeting large groups of Latinos without individualized suspicion. *Id.* ¶¶ 124–27; 157–62.

It is reasonable to infer from these allegations that FBI officers under SAC Bohls' command acted in lockstep with officers from ICE and State Defendants' agencies to detain everyone and process them for immigration violations because that is what SAC Bohls directed them to do. *Id.* ¶¶ 150, 166(i)–(ii), 181. Further, it is reasonable to infer that FBI officers under his command would not have executed the Raid without his full direction, participation, and involvement, and therefore that SAC Bohls directed, supervised, and was responsible for the FBI's role in violating Plaintiffs' rights during the Raid. *Id.* ¶ 166(i).

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, as well as SAC Bohls' knowing failure to prevent the conspiracy.

### E. Canyon County Sheriff Donahue: Boots on the Ground and Deployed SWAT to Get "The Enemy"

Sheriff Donahue is the Canyon County Sheriff. *Id.* ¶ 23. As a partner on the Task Force, he regularly coordinated and communicated with Task Force Defendants on shared state/federal goals, including the Raid. *Id.* ¶¶ 51, 169. Further, he participated in, or sent officers to participate in, the October 14 and 18 meetings. *Id.* ¶¶ 173–78. The day of the Raid, Sheriff Donahue led or directed an officer under his command to lead a tactical briefing which Colonel Gardiner, Chief Ingram, and Chief Huff or their officers joined ("October 19 meeting"). *Id.* ¶ 179.

Sheriff Donahue sent officers under his command, including his SWAT team, to execute the Raid. *Id.* ¶¶ 166(ii), 219. He also personally participated in the Raid. *Id.* ¶ 166(ii). During the Raid, as planned, officers under Sheriff Donahue's command coordinated with officers from other State Defendants' agencies, FBI, and ICE to detain everyone, sort them into groups based in part on perceived ethnicity, and funnel them through the ICE Tent. *Id.* ¶¶ 182–91.

After the Raid, Sheriff Donahue publicly stated that it "was not an ICE-led enforcement action." *Id.* ¶ 210. Meanwhile, privately, he responded to SSA Sheehan's email that thanked all Raid organizers for the "massive undertaking" and "nearly impossible" task, *id.* ¶ 213:

> Thank you, Chris. As always, it is an honor to work with you and to be a part of operations like this as we pursue public safety and enforce the rule of law.

*Id.* ¶ 214.

He also received the email on the same thread from Director Porter thanking the Raid organizers for their help "putting Boise ICE on the map!" *Id* ¶ 215.

Sheriff Donahue is the President of the National Sheriff's Association, where he has used language criminalizing and dehumanizing Latino people in furtherance of his immigration enforcement priorities. *Id.* ¶ 130. In this role, Sheriff Donahue communicates and coordinates with the Trump Administration in efforts to stop the "cartels infiltrating this country" through partnerships on immigration enforcement. *Id.* Sheriff Donahue has described "gangs and Mexican Cartels who are destroying our communities" as "the monster we're fighting– this is the enemy"; *id.* ¶ 136. He has warned of "ongoing efforts by Mexican drug cartels to infiltrate communities across the United States and poison our citizens with illicit drugs," *id.*, and stated that there is a "a very active Hispanic gang population" including "the Mexican cartels" who are "[t]he enemy behind the gates" and "they're brutal they are violent," *id.* ¶ 137. He said: "[W]e have to protect

our communities and this criminal element is out there. But I see an opportunity to start surgically removing that criminal element from our society, from our citizens." *Id.* ¶ 138.

From these allegations, it is reasonable to infer that: officers under Sheriff Donahue's command seamlessly coordinated with officers from other Defendants' agencies to detain everyone and process them through the ICE Tent because that is what Sheriff Donahue directed them to do; Sheriff Donahue directed, supervised, and was responsible for the Canyon County Sheriff Office's role in violating Plaintiffs' rights during the Raid, *id.* ¶ 166(ii); Sheriff Donahue knew about the federal government's comparable immigration dragnets around the country given news of the raids is widespread, and Sheriff Donahue regularly communicates with the Trump Administration about immigration enforcement, *id.* ¶ 163; and, since Sheriff Donahue received emails from SSA Sheehan and Director Porter and responded that it was an "honor" to participate in the Raid, Sheriff Donahue was involved in planning the Raid, and the Raid went according to plan. *See id.* ¶¶ 213–15.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, as well as Sheriff Donahue's knowing failure to prevent the conspiracy. They further adequately plead that Sheriff Donahue knew the Raid would constitute an unreasonable seizure and was motivated, in part, by the fact that it targeted a group of Latino people, and that his acts caused the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

### F. Caldwell PD Chief Ingram: Deployed SWAT to Get the "Cartels"

Chief Ingram is the Chief of the Caldwell PD. *Id.* ¶ 24. He is a partner on the Task Force, where he regularly communicated and coordinated with Task Force Defendants on shared federal and state goals, including the Raid. *Id.* ¶¶ 51, 169. Chief Ingram participated in, or sent officers to participate in, the October 14, 18, and 19 meetings. *Id.* ¶¶ 169, 173–81. Chief Ingram directed

officers under his command, including his SWAT team, to execute the Raid. *Id.* ¶¶ 166(ii), 220–21. During the Raid, as planned, Caldwell PD officers acted in lockstep with other State Defendants' officers, FBI, and ICE to seize everyone at La Catedral, sort them into groups based in part on perceived ethnicity and process them through the ICE Tent. *Id.* ¶¶ 182–91.

Afterwards, Chief Ingram publicly described the Raid, without evidence, as "a criminal investigation into, really, a cartel" and explained that he directed Caldwell PD to participate because "I don't want cartels in Idaho." *Id.* ¶ 205. He also publicly stated that the Raid "was not an ICE-led enforcement action." *Id.* ¶ 210. Privately, Chief Ingram received the emails to Raid organizers from Director Porter, SSA Sheehan, and Sheriff Donahue, describing the Raid as a "nearly impossible task" that "put[] the Boise ICE office on the map." *Id.* ¶¶ 213–15.

From these allegations, it is reasonable to infer that: Caldwell PD officers coordinated with other Defendants' officers to detain everyone and process them for immigration violations because Chief Ingram directed them to; Chief Ingram directed, supervised, and was responsible for Caldwell PD's role in violating Plaintiffs' rights during the Raid, *id.* ¶ 166(i); Chief Ingram knew of the federal government's comparable immigration dragnets given their widespread media coverage, *id.* ¶ 163; his public post-Raid statements attempted to justify the Raid's gratuitousness and conceal its immigration purpose, *id.* ¶¶ 205, 210; and, since he was on the post-Raid email thread, he was involved in planning the Raid and the Raid went according to plan, *id*. ¶¶ 213–15.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, as well as Chief Ingram's knowing failure to prevent the conspiracy. They further adequately plead that Chief Ingram knew the Raid would constitute an unreasonable seizure and was motivated, in part, by the fact that it targeted a

group of Latino people, and that his acts caused the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

### G. Nampa PD Chief Huff: Deployed SWAT in Lockstep with Task Force

Chief Huff is the Chief of the Nampa PD. *Id.* ¶ 25. As a Task Force partner, he regularly coordinated and communicated with Task Force Defendants on shared state/federal goals, including the Raid. *Id.* ¶¶ 51, 169. Further, he participated in, or sent officers to participate in, the October 14, 18, and 19 meetings. *Id.* ¶¶ 169, 173–81. Chief Huff directed officers under his command, including his SWAT team, to execute the Raid. *Id.* ¶¶ 166(ii); 222–23. At the Raid, as planned, Nampa PD officers under his command worked in lockstep with other Defendants' officers to automatically detain everyone at La Catedral, sort them into groups based in part on perceived ethnicity and move them through the ICE Tent. *Id.* ¶¶ 182–91. Chief Huff was on the emails with Director Porter, SSA Sheehan, and Sheriff Donahue, describing the Raid as a "nearly impossible task" that "put[] the Boise ICE office on the map." *Id.* ¶¶ 213–15.

From these allegations, it is reasonable to infer that: Nampa PD officers acted in lockstep with other Defendants' officers to detain everyone and process them for immigration violations because Chief Huff directed them to; Chief Huff directed, supervised, and was responsible for Nampa PD's role in violating Plaintiffs' rights during the Raid, *id.* ¶ 166(i); he knew of the federal government's comparable immigration dragnets given their widespread media coverage, *id.* ¶ 163; and, since he was on the post-Raid email thread, he was involved in planning the Raid and the Raid went according to plan, *id*. ¶¶ 213–15.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, and that Chief Huff knowingly failed to prevent the conspiracy. They further adequately plead that Chief Huff knew the Raid would constitute an unreasonable seizure and was motivated, in part, by the fact that it targeted a group

of Latino people, and that his acts caused the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

### H. ISP Colonel Gardiner: Deployed SWAT to Fulfill Idaho Governor's Immigration Directive

Colonel Gardiner is the Director of ISP. *Id.* ¶ 26. He worked with other Defendants to plan the Raid, including by directing his SWAT Commander to participate in the October 14 meeting and through participating in, or sending his officers to participate in, the October 18 and 19 meetings. *Id.* ¶¶ 173–81. Colonel Gardiner directed his officers, including his SWAT team, to execute the Raid. *Id.* ¶¶ 166(ii), 224. At the Raid, ISP officers under his command worked seamlessly with officers from other State Defendants' agencies, FBI, and ICE to detain everyone, sort them into groups based in part on perceived ethnicity, and then force them through the ICE Tent. *Id.* ¶¶ 182–93. Colonel Gardiner was on the emails with Director Porter, SSA Sheehan, and Sheriff Donahue, describing the Raid as a "nearly impossible task" that "put[] the Boise ICE office on the map." *Id.* ¶¶ 213–15.

When Governor Little appointed Colonel Gardiner to lead ISP in 2024, he noted that he would work closely with Colonel Gardiner to "support border security efforts." *Id.* ¶ 26. After the Raid, Governor Little stated—absent evidence—that La Catedral had featured "animal abuse, illegal weapons trafficking, and large sums of money that end up in the hands of cartel bosses." *Id.* ¶ 207. This echoed statements made by then-Secretary Noem describing immigrants as threats and invaders. *See id.* ¶ 134.

From these allegations, it is reasonable to infer that: ISP officers acted in lockstep with other Defendants' officers to detain everyone and process them for immigration violations because Colonel Gardiner directed them to; Colonel Gardiner directed, supervised, and was responsible for ISP's role in violating Plaintiffs' rights during the Raid; *id.* ¶ 166(i); he knew of the federal

government's comparable immigration dragnets given their widespread media coverage, *id.* ¶ 163; he advanced Governor Little's immigration agenda, as he was tasked to do, which targeted Latinos and conflated them with criminality and illegality, *see id.* ¶¶ 144, 207; and, since he was on the post-Raid email thread, he was involved in planning the Raid and the Raid went according to plan, *id.* ¶¶ 213–15.

These alleged facts and reasonable inferences from them sufficiently plead a meeting of the minds and overt acts in furtherance of the conspiracy, and that Colonel Gardiner knowingly failed to prevent the conspiracy. They further adequately plead that Colonel Gardiner knew the Raid would constitute an unreasonable seizure and was motivated, in part, by the fact that it targeted a group of Latino people, and that his acts caused the violations of Plaintiffs' Fourth and Fourteenth Amendment rights.

* * *

These extensive factual allegations and reasonable inferences from them, taken as a whole, sufficiently plead conspiracy for the individual Federal and State Defendants as well as supervisory liability for the individual State Defendants. Defendants artificially focus on each time the Complaint mentions their name, while overlooking circumstantial allegations and other allegations against them as a group, such as those regarding all Federal and State Defendants (which, definitionally, includes each defendant, *id.* ¶¶ 33–34) and the Task Force (which, definitionally, includes all Defendants on the Task Force, *id.* ¶¶ 51, 169).

Defendants' attempt to discard the subset of allegations against them as a group as impermissible "group pleading" and "shotgun pleading" misstates the law.[19] The Ninth Circuit has made clear that "[t]here is no flaw in a pleading . . . where collective allegations are used to describe

---

[19] Federal MTD at 20–21, 24; State MTD at 14–15; County MTD at 18–19; Cities MTD at 12–13.

the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018); *see also Simmers v. King Cnty.*, No. 21-cv-00100, 2022 WL 3585146-BJR-JRC, at *11 (W.D. Wash. Aug. 22, 2022) (denying motion to dismiss and explaining that the "complaint's allegations are not automatically insufficient under the pleading standards articulated in *Iqbal* simply because they collectively address a group of defendants"). Further, in sharp contrast to the causes of action in *Gibson v. City of Portland*, 165 F. 4th 1265 (9th Cir. 2026), each cause of action here pertains to only one claim, articulates the defendants to whom it applies, and contains specific factual allegations.[20]

To the extent there are factual questions regarding Defendants' specific roles, discovery is necessary and Plaintiffs are entitled to proceed.

## V. Canyon County, Caldwell, and Nampa Bear Municipal Liability.

Plaintiffs have stated a claim under Sections 1983, 1985(3), and 1986 against Municipal Defendants based on "decision[s] officially adopted and promulgated by [those Defendants'] officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *see also Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.1992).[21] Municipalities and counties may be liable under Section 1983 for "the acts of [their] policymaking officials," which constitute official municipal policy. *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Christie v. Iopa,* 176 F.3d 1231, 1235 (9th Cir. 1999).

First, Municipal Defendants are liable for the deliberate acts of their final policymakers. Defendants do not dispute that Sheriff Donahue, Chief Ingram, and Chief Huff are final

[20] *Compare, e.g.*, Compl. ¶¶ 257–62 (Plaintiffs' Section 1985(3) cause of action) *with* First Amended Complaint ¶¶ 257–58, *Gibson v City of Portland*, No. 23-cv-00833-AB (D. Or. Sept. 27, 2023), ECF No. 17, https://perma.cc/PDP4-7QLK (Section 1985(3) cause of action in Gibson).

[21] Other than authorities that establish high-level principles, Municipal Defendants fail to cite a single case to support their *Monell* liability arguments based on the facts alleged in the Complaint.

policymakers. *See* County MTD at 16 n.3; Cities MTD at 11; *see also* Compl. ¶¶ 23–25, 166, 233–34. Plaintiffs allege each was directly involved in planning a mass seizure and immigration dragnet in violation of Plaintiffs' constitutional rights and deliberately directed officers under their command to execute that unlawful plan. *See* Compl. ¶¶ 233–34; *supra* Section IV. The same allegations that establish these policymakers' individual liability also establish municipal liability. *See De Anda v. City of Long Beach*, 7 F.3d 1418, 1420–21 & n.5 (9th Cir. 1993) (finding evidence of conspiracy against the chief and the municipality "would likely be duplicative").

Defendants' contention that "a single multi-agency operation" cannot trigger municipal liability, Cities MTD at 10–11, County MTD at 16, is contradicted by binding precedent. "Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, (1986) (plurality opinion); *see also Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) ("A municipality can be liable for an isolated constitutional violation[.]") (cleaned up). Liability attaches "where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official [] responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

Second, Canyon County and City of Caldwell are independently liable because their final policymakers ratified their officers' unlawful conduct in several ways. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); *see also Christie*, 176 F.3d at 1239 (9th Cir. 1999). Plaintiffs allege ratification through Sheriff Donahue's and Chief Ingram's public and private affirmance of their subordinate's actions. Compl. ¶¶ 205 (Chief Ingram publicly affirmed Caldwell PD's partnership in the Raid), 210

(Sheriff Donahue and Chief Ingram publicly affirmed their departments' leading roles in the Raid), 213–14 (Sheriff Donahue emailed other Defendants calling it "an honor . . . to be a part of operations like this"). Email exchanges that included Sheriff Donahue and Chief Ingram further bolster the inference that they ratified the basis of the Raid. The "nearly impossible task" that was "a massive undertaking that took over 200 law enforcement personnel from different jurisdictions and states" and "put[] the Boise ICE office on the map" referred to the excessive mass seizure and immigration operation, not a narrow warrant execution for five individuals for non-violent gambling charges. *Id.* ¶¶ 213–15; *see Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 979 (N.D. Cal. 2017), *aff'd in part, dismissed in part*, 897 F.3d 1125 (9th Cir. 2018) (holding police chief ratified officers' acts by publicly supporting their actions and failing to reprimand officer misconduct). Plaintiffs also allege ratification through Sheriff Donahue's and Chief Ingram's attempt to conceal the Raid's wanton execution and immigration purpose. Compl. ¶¶ 205 (Chief Ingram stating, absent evidence, that the investigation into non-violent, unlicensed gambling was "a criminal investigation into, really, a cartel"); 210 (both stating Raid "was not an ICE-led enforcement action"); *see Quinto-Collins v. City of Antioch*, No. 21-cv-06094-VC, 2022 WL 18574, at *1 (N.D. Cal. Jan. 3, 2022) (holding police chief ratified officers' actions by intentionally misrepresenting what happened at a call for service).

Defendants' efforts to downplay Plaintiffs' allegations, County MTD at 16, Cities MTD at 1, 11, ignore Plaintiffs' detailed factual account and fail to draw reasonable inferences in Plaintiffs' favor. *J.T. v. City & Cnty. of San Francisco* is directly on point. No. 23-cv-06524-LJC, 2024 WL 3012791 (N.D. Cal. June 13, 2024). There, officers arrested 113 people, detained them for at least two hours, searched them, handcuffed them with painful plastic zip-ties, and denied restroom access. *Id.* at *2. Plaintiffs alleged the police chief, who was not present during the operation,

nevertheless authorized and monitored the police response, approved of the mass arrest, publicly thanked his officers, and disseminated a false narrative to justify the arrests. *Id.* at *3. The court held these allegations supported *Monell* liability for plaintiffs' Fourth Amendment claims due to both the police chief's involvement and ratification. *Id.* at *14 (denying motion to dismiss); *cf. supra* Section IV (for supervisory liability, presuming police chiefs control their departments when conducting large-scale operations). Likewise, here, based on the scale of the Raid and Municipal Defendants' involvement in planning, executing, and attempting to sanitize the Raid, it is reasonable to infer Sheriff Donahue, Chief Ingram, and Chief Huff at least knew of, authorized, and ratified the Raid.

City Defendants' argument that the Complaint does not sufficiently allege causation, Cities MTD at 12, ignores Plaintiffs' theory of liability and the totality of the allegations. Where, as here, a final policymaker intentionally takes an unlawful action, both the deliberate action and causation prongs of *Monell* liability are typically established. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1144 (9th Cir. 2012) (concerns of culpability and causation are typically "not present" under the "direct path" to municipal liability). In any case, as detailed *supra* Section IV.F–G, the decisions by City Defendants' final policymakers to participate in planning the Raid, commit SWAT resources to it, and direct those officers to execute the Raid as planned are directly connected to the constitutional violations. Additionally, the Complaint alleges that Caldwell PD admitted to zip-tying children—a specific, agency-attributed act that Caldwell omits from its motion. Compl. ¶ 202; *cf.* Cities MTD at 8 (referring to "[g]eneral allegations that officers from 'Defendants' agencies' used zip-ties."). Further, Director Porter and SSA Sheehan confirmed that City and County Defendants' participation was essential to the constitutional violations, stating that the

Raid "absolutely could not have [been] done [] without you". Compl. ¶ 213; *accord id.* ¶ 215. Municipal Defendants' motions, thus, should be denied.

## VI. Defendants' Qualified Immunity Claims Fail.

Unable to prevail on the merits, Individual Defendants retreat to invoking qualified immunity.[22] *See* Federal MTD 43–45; County MTD 4–8; Cities MTD 5–8. Those arguments each lack merit.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Martinez v. City of Clovis*, 943 F.3d 1260, 1270 (9th Cir. 2019) (citation omitted). "To determine whether an official is entitled to qualified immunity," courts evaluate whether "(1) the alleged facts constitute a violation of a constitutional right, and (2) the constitutional right was clearly established at the time of the violation." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 937 (9th Cir. 2020) (citing *Mitchell v. Washington*, 818 F.3d 436, 443 (9th Cir. 2016)). Although courts have "discretion" to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), courts in the Ninth Circuit "tend[] to address both prongs of qualified immunity where the two-step procedure promotes the development of constitutional precedent," *Martinez*, 943 F.3d at 1270.

With respect to the second prong, "[a] constitutional right is 'clearly established' if 'every reasonable official would have understood that what he is doing violates that right' at the time of

[22] Municipal Defendants aptly do not assert qualified immunity in response to Plaintiffs' municipal liability claims because "[a] municipality is not entitled to assert the defense of qualified immunity." *William v. City of Sparks*, 112 F. 4th 635, 646 (9th Cir. 2024); *see Leatherman v. Tarrant Cnty. Narcotics Intel. &Coordination Unit*, 507 U.S. 163, 166 (1993).

his conduct." *Sampson v. Cnty. of Los Angeles ex rel. Los Angeles Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018–19 (9th Cir. 2020) (citation omitted). Courts thus "ask 'whether the state of the law at the time of the officials' conduct gave them fair warning that their alleged conduct was unconstitutional.'" *Id*. at 1019 (cleaned up). To achieve that kind of notice, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015); *see also Sampson*, 974 F.3d at 1019. "[T]he prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (citation omitted).

Importantly, "'[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances' where there are no prior cases with 'fundamentally similar' or 'materially similar' facts." *Sampson*, 974 F.3d at 1019 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see, e.g.*, *Taylor v. Riojas*, 592 U.S. 7, 9 (2020). Where "a general constitutional rule already identified in the decisional law . . . [applies] with obvious clarity to the specific conduct in question," the law may be clearly established for purposes of the qualified immunity inquiry, "even though 'the very action in question has [not] previously been held unlawful.'" *Hardwick v. Cnty. of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017) (quoting *Hope*, 536 U.S. at 741).

Moreover, qualified immunity at the pleadings stage "raises special problems for legal decision making" due to the incomplete factual record. *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018); *see also Cahoo v. SAS Inst., Inc.*, 71 F.4th 401, 407 (6th Cir. 2023) ("Courts . . . sometimes benefit from waiting to resolve qualified immunity until summary judgment—with the benefit of discovery—rather than settling the issue immediately through a motion to dismiss."). Therefore, a court must reject qualified immunity "[i]f the operative complaint contains even one

allegation of a harmful act that would constitute a violation of a clearly established [] right." *Keates*, 883 F.3d at 1235; *see also O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (holding "dismissal is not appropriate unless [the court] can determine, based on the complaint itself, that qualified immunity applies"). As set forth below, Defendants cannot clear that bar.

### A. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Fourth Amendment Claims.

Defendants erroneously contend that they are immune from Plaintiffs' Fourth Amendment claims because it is not clearly established that *Summers* and *Mena* are inapplicable to their mass detention scheme at La Catedral. *See* Federal MTD at 43–45; County MTD at 4–8; Cities MTD at 5–8.[23] County and City Defendants go further, arguing that the manner of Plaintiffs' detention also did not violate clearly established law. *See* County MTD at 9–11; Cities MTD at 7–8.

Defendants fail both prongs of the qualified immunity analysis. The "alleged facts constitute a violation of a constitutional right" for all the reasons set forth above, *see supra* Section II. And Ninth Circuit precedent and longstanding principles of constitutional law show that it was "clearly established at the time of the violation," *Reynaga Hernandez*, 969 F.3d at 937 (citation omitted), that the initial mass detention and manner of detention violated Plaintiffs' Fourth Amendment rights.

#### 1. It Is Clearly Established That the Initial Seizure of the Plaintiff Class Violated the Fourth Amendment.

Controlling precedent provided Defendants ample "notice" that the initial seizure of the Plaintiff Class violated the Fourth Amendment. *Sharp*, 871 F.3d at 911. *Perez Cruz*—which is "controlling" precedent for purposes of this inquiry—clearly establishes "'the violative nature of [Defendants'] *particular* conduct.'" *Sharp*, 871 F.3d at 910–11 (quoting *Mullenix v. Luna*, 577

[23] Colonel Gardiner rightly does not raise this argument. *See* State MTD at 7–8 (arguing qualified immunity related to the extent of his participation, which is addressed below, *infra* Section VI.C).

U.S. 7, 12 (2015)) (emphasis in original). As noted, *Perez Cruz* "h[e]ld that *Summers*' categorical authority to detain incident to the execution of a search warrant does not extend to a preexisting plan whose central purpose is to detain, interrogate, and arrest a large number of individuals without individualized reasonable suspicion." 926 F.3d at 1143. That is precisely what is alleged here. As explained above, the factual parallels between this case and *Perez Cruz* are extensive. *See supra* Section II.A.

The only set of defendants to even engage with *Perez Cruz*, Federal Defendants, identify no material distinction between Defendants' conduct here and that in *Perez Cruz*. *See supra id.* Their attempt to cast doubt on *Perez Cruz* fares no better. They rely on *Chavez v. Wynar*, No. 21-16094, 2023 WL 2535266 (9th Cir. Mar. 16, 2023), an unpublished, nonprecedential decision that never mentioned *Perez Cruz* and addressed an altogether different question—whether denying a detainee access to a cell phone for an hour and 20 minutes during a *Summers* detention was clearly unlawful, *see id.* at *1–2. Federal Defendants' further suggestion that *Perez Cruz* is "in tension with *Summers*[]," Federal MTD at 44, only confirms they have no acceptable response. Again, *Perez Cruz* is "controlling" precedent for purposes of the qualified immunity inquiry, *Sharp*, 871 F.3d at 911. Moreover, *Perez Cruz* is entirely consistent with *Summers* exception, including its "categorical" nature when it applies. *See Mena*, 544 U.S. at 98. The Supreme Court recognized that suspicionless seizures pursuant to a general scheme are categorical in the "limited circumstances in which the usual rule [for individualized suspicion] does not apply." *See Edmond*, 531 U.S. at 37 (collecting cases). This means that during a proper *Summers* detention, officers need not justify the seizure on the specific facts of the case. But, as the Ninth Circuit and Supreme Court have held, the categorical rule ceases to apply if "objective evidence [] suggest[s] that the [suspicionless] intrusion was not made for the purpose" underlying the general scheme. *Anderson*,

101 F.4th at 594 (citation omitted); *see also Perez Cruz*, 926 F.3d at 1139–40; *Edmond*, 531 U.S. at 47. Such is the case here.

Even if *Perez Cruz* were not on all fours with this case (it is), the initial mass seizure of the Plaintiff Class is an "obvious case" of constitutional misconduct and therefore does not "require a precise factual analogue in our judicial precedents." *Sharp*, 871 F.3d at 911 (quoting *Brosseau v. Haugen*, 543 U.S. 194,199 (2004) (per curiam)*; see also Hardwick*, 844 F.3d at 1117.

Here, the general rule is that a seizure is unreasonable absent "particularized suspicion," *Wardlow*, 528 U.S. at 124. *Bailey* makes clear that the *Summers* exception is "limited to the immediate vicinity" of the search—i.e., "the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant." 568 U.S. at 201. In light of those well-established principles, Defendants had ample "notice that their conduct violate[d] established law." *Hope*, 536 U.S. at 741. Deliberately planning to ambush a community gathering, detain hundreds of people across a sprawling 24-acre property, and interrogate them for immigration purposes on the pretense of executing a narrow search warrant goes far beyond the bounds of what *Summers* or *Mena* could conceivably permit. *See supra* Section II.A. Both cases involved limited detentions of a handful of individuals within a private residence "in which [the] occupant[s] pose[d] a real threat to the safe and efficient execution of a search warrant." *Bailey*, 568 U.S. at 201. Defendants do not point to any case—and counsel is not aware of any, let alone controlling precedent—in which a court held that *Summers* and *Mena* permitted officers to detain hundreds of individuals across a multi-acre venue.

The obvious unconstitutionality of Defendants' conduct is further confirmed by the sheer scale and premeditation involved. Defendants planned for weeks (if not more) to execute the mass immigration operation, assembling a force of over 200 officers equipped with tactical gear,

armored vehicles, snipers, drones, flashbang grenades, a helicopter, and enough zip-ties for hundreds of people. Compl. ¶¶ 47, 90, 99, 101, 145. And they erected a dedicated tent for immigration interrogations and arranged for vans to transport detainees to detention centers. Compl. ¶¶ 75, 80–82, 84. No reasonable officer in Defendants' positions involved in or aware of those preparations could have believed the operation was merely incident to executing a search warrant as in *Summers* or *Mena*. Even assuming *Perez Cruz* were not squarely on point (again, it is), the Court "need not wait" for such a case to conclude Defendants had "notice that their conduct violate[d] established law." *Hope*, 536 U.S. at 741.

Again, the implications of Defendants' theory confirm the point. No court would grant qualified immunity to an army of officers that descended on the Athletic Club Boise Soccer Stadium or even the Boise State homecoming game and detained all attendees on the pretense of executing warrants for illegal gambling—nor would a court grant qualified immunity to the leaders who planned the operation. There is no free pass for egregious constitutional violations simply because no one has tried them before. The "officials [would] still be on notice that their conduct violates established law" even though the circumstance was "novel." *Hope*, 536 U.S. at 741; *see also United States v. Lanier*, 520 U.S. 259, 271 (1997). That reasoning applies here.

**2. It Is Clearly Established That the Manner of Plaintiffs' Detention Violated the Fourth Amendment.**

County and City Defendants' contention that the manner in which Plaintiffs were detained did not violate clearly established law, *see* County MTD at 9–11; Cities MTD at 7–8, is equally unavailing. It is clearly established that detaining individuals for an "unreasonable duration" without a diligent investigative purpose violates the Fourth Amendment, even where the delay is far shorter than the four-plus hours alleged here. *Liberal v. Estrada*, 632 F.3d 1064, 1080–81 (9th Cir. 2011), *abrogated on other grounds by Hampton v. California*, 83 F.4th 754 (9th Cir. 2023);

*see Rodriguez*, 575 U.S. at 354. It is likewise clearly established that placing tight zip-ties on non-threatening detainees who are not the subjects of investigation—and failing to loosen them despite complaints of pain—violates the Fourth Amendment. *Meredith*, 342 F.3d at 1063. The same is true of the rule that the manner of any *Summers* detention "must be 'carefully tailored' to the law enforcement interests that . . . justify detention while a search warrant is being executed." *Id*. at 1061–62 (quoting *Ganwich*, 319 F.3d at 1122). For all the reasons set forth above, *see supra* Section II.B, the prolonged and unnecessarily harsh conditions of Plaintiffs' detention plainly exceeded what any reasonable officer could have understood as lawful under these clearly established standards.

**B. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Claims of Intentional Discrimination.**

Qualified immunity is not available for claims of intentional discrimination. As the Ninth Circuit held in *Flores v. Pierce*, "act[ing] with intent to discriminate based on racial or ethnic hostility . . . is inconsistent with the subjective state of mind required for the defense of good faith immunity." 617 F.2d 1386, 1392 (9th Cir. 1980). "The constitutional right to be free from [] invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Id.*; *see also Trump v. Illinois,* 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J. concurring) (calling "longstanding and clear" the rule that "officers must not make interior immigration stops or arrests based on race or ethnicity"); *Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010) (holding police cannot "reasonably believe they could treat individuals disparately based on their race").

While Sheriff Donahue wrote, in a subheading, that Plaintiffs' equal protection claims are not clearly established, the text of that subsection does not argue immunity. County MTD at 12–

14. The remaining State Defendants rightly do not even attempt to raise immunity for the equal protection claims.

Nevertheless, Federal Defendants attempt to invoke qualified immunity by arguing it is not clearly established that conduct purportedly "supported by lawful law enforcement motives" could qualify as "invidiously discriminatory animus." Federal MTD at 45; *see also* Cities MTD at 9; County MTD at 13–14 (with respect to the sufficiency of the pleadings—not qualified immunity—claiming it is not plausible that a discriminatory purpose was the sole basis for Defendants' actions). Federal Defendants' citation to *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993), is inapposite. *Bray* considered whether targeting people seeking an abortion constituted the type of discrimination against which Section 1985(3) protects. *Bray*, 506 U.S. at 274. There is no question, however, that Section 1985(3) protects against targeting an ethnic group, as Plaintiffs allege here. Moreover, it is clearly established that an equal protection violation can occur during otherwise lawful police action. *Whren*, 517 U.S. at 813; *see supra* Section III. And Plaintiffs need not allege "a particular purpose was the 'dominant' or 'primary' one"; ethnicity need only be a "motivating" factor. *Arlington Heights*, 429 U.S. at 265–66. Pointing to other allegedly lawful law enforcement motives does not sanitize Defendants' discriminatory motivations for the Raid.

**C. Qualified Immunity Does Not Shield Defendants from Plaintiffs' Conspiracy Claims.**

Defendants' cursory assertions that qualified immunity bars Plaintiffs' conspiracy claims lack merit. Federal Defendants argue in a throwaway line that "no case clearly established that the Federal Defendants participated in an unlawful conspiracy on the facts alleged." Federal MTD at 45. Colonel Gardiner likewise claims that he "reasonably might not have known that [his alleged]

planning could be labeled as conspiracy under the statute." State MTD at 7 (quoting *K.O. v. U.S. Immigr. & Customs Enf't*, 468 F. Supp. 3d 350, 368 (D.D.C. 2020)).

As a threshold matter, the relevant question is "whether the violative nature of *particular conduct* is clearly established," *Mullenix* , 577 U.S. at 12 (per curiam) (emphasis added)—not whether a chosen vehicle for *liability* is clearly established. *See Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021) ("The question is not whether rules of individual liability for the conduct were clearly established at the time. The question is whether the *wrongfulness of the defendant's conduct* was clearly established.") (emphasis in original); *accord Foster v. Echols Cnty. Sch. Dist.*, 169 F.4th 1291, 1300 (11th Cir. 2026); *Gray v. Baker*, 399 F.3d 1241, 1245 (10th Cir. 2005); *O'Connor v. Eubanks*, 83 F.4th 1018, 1025 (6th Cir. 2023) (Thapar, J., concurring). Regardless, it is clearly established that federal and state officials may be liable under Section 1983 for unlawfully conspiring to violate civil rights, and that actors from distinct entities may be liable for Sections 1985(3) and 1986 conspiracy. *See supra* Section I. Further, as just described—and as Colonel Gardiner does not dispute, State MTD at 7–8—the "violative nature of [Defendants'] particular conduct is clearly established." *Mullenix*, 577 U.S. at 12; *see supra* Sections VI.A–B.

Colonel Gardiner's reliance on the D.D.C. decision in *K.O.* is misplaced. That case involved doctrinal uncertainty about intracorporate-conspiracy. 468 F. Supp. 3d at 368. Here, by contrast, the alleged conspiracy spans distinct state and federal entities, *see supra* Section I.D, and there is no uncertainty about whether the alleged conduct was unlawful, *see supra* Section VI.A–B.

Accordingly, the Court should reject Defendants' qualified immunity arguments.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions to dismiss in their entirety. To the extent there are factual questions, they should be resolved in discovery. Alternatively, any dismissal should be without prejudice.

Dated: September 8, 2026

Respectfully submitted,

Jorge M. Castillo*
Allison Frankel*
Jenn Rolnick Borchetta*
Emma Andersson*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

Paul Carlos Southwick (ISB No. 12439)
Emily Myrei Croston (ISB No. 12389)
ACLU OF IDAHO FOUNDATION

*/s/ Wendy J. Olson*
Wendy J. Olson (ISB No. 7634)
STOEL RIVES LLP

Simona Agnolucci*
Eduardo Santacana*
Jade Ford*
COOLEY LLP

**Admitted pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States District Court of the District of Idaho using the CM/ECF system.

Dated: September 8, 2026

*/s/ Wendy J. Olson*
Wendy J. Olson