BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

REGINALD M. SKINNER
Senior Trial Counsel, Torts Branch

/s/ Paul C. Quast
JULIANA M. BARRETT
CONNOR HACKERT
PAUL C. QUAST
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, TORTS BRANCH
P.O. BOX 7146
WASHINGTON, D.C. 20044
Tel: (202) 616-4150
Email: Paul.C.Quast@usdoj.gov

*Attorneys for Federal Defendants Kenneth Porter, Robert Bohls, Chris Sheehan, and Jake Sheridan*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

JUANA RODRIGUEZ, *on behalf of herself and her minor child* Y.R.; X.Z., *on behalf of himself and his minor child* Y.Z.; IVAN POPOCA, *on behalf of himself and his minor children* E.I.P. *and* A.S.P.; *and on behalf of all others similarly situated*,

Plaintiffs,

v.

KENNETH PORTER, Acting Director of the Boise U.S. Immigration and Customs Enforcement Field Sub-Office, *in his individual capacity*; ROBERT BOHLS, Special Agent in Charge of the Salt Lake City Office of the Federal Bureau of Investigation, *in his individual capacity*, CHRIS SHEEHAN Supervisory Special Agent of the Federal Bureau of Investigation's Boise Resident Agency, *in his individual capacity*; JAKE SHERIDAN, Special Agent of the Federal Bureau of Investigation, *in his individual capacity*; KIERAN DONAHUE, Canyon County Sheriff, *in his individual capacity*; REX INGRAM, Chief of the Caldwell Police Department, *in his individual capacity*; JOE HUFF, Chief of the Nampa Police Department, *in his individual capacity*; BILL GARDINER, Director of the Idaho State Police, *in his individual capacity*; CANYON COUNTY; CITY OF CALDWELL; CITY OF NAMPA; and JOHN DOES 1-20, *in their individual capacities*,

Defendants.

Case No. 1:26-CV-00075-AKB

**REPLY IN SUPPORT OF FEDERAL DEFENDANTS KENNETH PORTER, ROBERT BOHLS, CHRIS SHEEHAN, AND JAKE SHERIDAN'S CONSOLIDATED MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## TABLE OF CONTENTS

**ARGUMENT** .......... 2

**I. Plaintiffs' Pivotal Concession is Fatal to their Section 1983 claims.** .......... 2

A. Action under color of "state" law by the defendant is an essential element of a Section 1983 claim. .......... 2

B. Plaintiffs' allegations of conspiracy do not transform the Federal Defendants into state actors. .......... 3

**II. The Federal Defendants Are Entitled to Qualified Immunity.** .......... 7

A. Plaintiffs do not plausibly allege personal participation or a conspiracy. .......... 7

1. Fourth Amendment .......... 8

2. Fourteenth Amendment and 42 U.S.C. §§ 1985(3) and 1986 .......... 8

B. The Federal Defendants Did Not Violate Plaintiffs' Constitutional Rights, Let Alone Rights that Were Clearly Established Under the Circumstances. .......... 15

1. Plaintiffs do not allege a clearly established equal protection violation. .......... 15

2. The Federal Defendants did not clearly violate the Fourth Amendment. .......... 16

i. The search warrant is not subject to reasonable dispute. .......... 16

ii. Muehler v. Mena permitted Plaintiffs' detentions. .......... 18

iii. Plaintiffs' efforts to skirt Mena misconstrue the law and their allegations. .......... 18

iv. The Federal Defendants are not liable for the duration of detention. .......... 23

v. The Federal Defendants are not vicariously liable for individual acts of others. .......... 24

3. Plaintiffs Fail to Allege a Clearly Established Violation of Sections 1985(3) or 1986. .......... 24

**CONCLUSION** .......... 25

## TABLE OF AUTHORITIES

Cases

*Adickes v. S. H. Kress & Co.*,
398 U.S. 144 (1970) .... 3
*Arizona v. Johnson*,
555 U.S. 323 (2009) .... 22, 24
*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .... 20, 21
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... passim
*Bailey v. United States*,
568 U.S. 186 (2013) .... 18, 19
*Barnhill v. Bondi*,
138 F.4th 123 (4th Cir. 2025) .... 11
*Barrera v. U.S. Dep't of Homeland Sec.*,
No. 07-cv-3879, 2009 WL 825787 (D. Minn. Mar. 27, 2009) .... 13
*Bazzi v. City of Dearborn*,
658 F.3d 598 (6th Cir. 2011) .... 13
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 10, 15
*Big Cats of Serenity Springs, Inc. v. Rhodes*,
843 F.3d 853 (10th Cir. 2016) .... 6
*Billings v. United States*,
57 F.3d 797 (9th Cir. 1995) .... 2, 6
*Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*,
727 F.3d 917 (9th Cir. 2013). .... 11
*Blight v. City of Manteca*,
944 F.3d 1061 (9th Cir. 2019) .... 17
*Bray v. Alexandria Women's Health Clinic*,
506 U.S. 263 (1993) .... 9, 24, 25
*Bretz v. Kelman*,
773 F.2d 1026 (9th Cir. 1985) .... 4
*Cabrera v. Martin*,
973 F.2d 735 (9th Cir. 1992) .... 5
*Crim v. King*,
65 F. App'x 591 (9th Cir. 2003) .... 14
*Crowe v. County of San Diego*,
608 F.3d 406 (9th Cir. 2010) .... 11
*D.C. v. Carter*,
409 U.S. 418 (1973) .... 2, 15
*D.C. v. Wesby*,
583 U.S. 48 (2018) .... 16
*Davis v. Wigen*,
82 F.4th 204 (3d Cir. 2023) .... 9

*Dean v. Warren*,
12 F.4th 1248 (11th Cir. 2021) ............................................................................ 15, 25
*Dennis v. Sparks*,
449 U.S. 24 (1980)............................................................................................................ 4
*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ......................................................................................... 11
*Elliot-Park v. Manglona*,
592 F.3d 1003 (9th Cir. 2010) ....................................................................................... 16
*Fernandes v. City of Broken Arrow*,
No. 16-cv-0630, 2017 WL 471561 (N.D. Okla. Feb. 3, 2017)......................................... 6
*Flores v. Pierce*,
617 F.2d 1386 (9th Cir. 1980) ....................................................................................... 16
*Franklin v. Fox*,
312 F.3d 423 (9th Cir. 2002) ....................................................................................... 2, 5
*Franks v. Delaware*,
438 U.S. 154 (1978)........................................................................................................ 17
*Hawkins v. Comparet-Cassani*,
251 F.3d 1230 (9th Cir. 2001) ....................................................................................... 20
*Henry v. Essex County*,
113 F.4th 355 (3d Cir. 2024) ........................................................................................... 7
*Hernandez v. Causey*,
124 F.4th 325 (2024).......................................................................................................... 6
*Howerton v. Gabica*,
708 F.2d 380 (9th Cir. 1983) ....................................................................................... 3, 4
*Hughes v. Rodriguez*,
31 F.4th 1211 (9th Cir. 2022) ......................................................................................... 23
*Ibrahim v. Dep't of Homeland Sec.*,
538 F.3d 1250 (9th Cir. 2008) ......................................................................................... 5
*Jackson v. Murphy*,
No. 22-cv-1630, 2026 WL 1506004 (D.N.J. May 28, 2026)........................................... 12
*Johnson v. Orr*,
780 F.2d 386 (3d Cir. 1986).............................................................................................. 6
*Jones v. Williams*,
297 F.3d 930 (9th Cir. 2002) ......................................................................................... 24
*Lacey v. Maricopa County*,
693 F.3d 896 (9th Cir. 2012) ........................................................................................... 9
*Leveto v. Lapina*,
258 F.3d 156 (3d Cir. 2001)............................................................................................ 23
*Lindke v. Freed*,
601 U.S. 187 (2024)...................................................................................................... 2, 4
*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982).......................................................................................................... 4
*Mena v. City of Simi Valley*,
354 F.3d 1015 (9th Cir. 2004) ................................................................................. 18, 25
*Michigan v. Summers*,
452 U.S. 692 (1981)........................................................................................................ 18

*Monroe v. Pape*,
365 U.S. 167 (1961) ........ 5
*Montana Med. Ass'n v. Knudsen*,
119 F.4th 618 (9th Cir. 2024) ........ 6
*Morales v. City of New York*,
752 F.3d 234 (2d Cir. 2014) ........ 14
*Muehler v. Mena*,
544 U.S. 93 (2005) ........ 18, 22, 23
*Mullenix v. Luna*,
577 U.S. 7 (2015) ........ 16
*Noem v. Vasquez Perdomo*,
146 S. Ct. 1 (2025) ........ 16
*O.W. v. Carr*,
172 F.4th 337 (4th Cir. 2026) ........ 10
*O'Handley v. Weber*,
62 F.4th 1145 (9th Cir. 2023) ........ 3, 8, 10
*Ohio Adjutant Gen.'s Dep't v. Fed. Lab. Rels. Auth.*,
598 U.S. 449 (2023) ........ 6
*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013) ........ 12
*Perez Cruz v. Barr*,
926 F.3d 1128 (9th Cir. 2019) ........ 20, 21, 22
*Rivas-Villegas v. Cortesluna*,
595 U.S. 1 (2021) ........ 16, 21
*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ........ 11
*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) ........ 12
*Thai v. County of Los Angeles*,
127 F.4th 1254 (9th Cir. 2025) ........ 3, 5
*Trump v. Illinois*,
146 S. Ct. 432 (2025) ........ 16
*United Bhd. of Carpenters, Local 610 v. Scott*,
463 U.S. 825 (1983) ........ 25
*United States v. Alexander*,
761 F.2d 1294 (9th Cir. 1985) ........ 17
*United States v. Parkins*,
92 F.4th 882 (9th Cir. 2024) ........ 19
*United States v. Price*,
383 U.S. 787 (1966) ........ 4
*United States v. Williams*,
687 F.2d 290 (9th Cir. 1982) ........ 19
*Walden v. City of Duncan*,
No. 23-cv-1075, 2025 WL 2701504 (W.D. Okla. Sept. 22, 2025) ........ 6
*Walker v. Gomez*,
370 F.3d 969 (9th Cir. 2004) ........ 15

*Ward v. City of Barstow*,
749 F. App'x 529 (9th Cir. 2018) .......... 17
*West v. Atkins*,
487 U.S. 42 (1988) .......... 2, 4, 5
*Wood v. Moss*,
572 U.S. 744 (2014) .......... 12
*Yassin v. Weyker*,
39 F.4th 1086 (8th Cir. 2022) .......... 5
*Zelaya v. Hammer*,
516 F. Supp. 3d 778 (E.D. Tenn. 2021) .......... 13, 14
*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 21

Statutes

42 U.S.C. § 1983 .......... 1, 2
42 U.S.C. § 1985(3) .......... 12
42 U.S.C. § 1986 .......... 25

A *Bivens* suit is the only vehicle for Plaintiffs to recover damages from the Federal Defendants for the alleged constitutional violations in this case. But Plaintiffs understand that a *Bivens* suit is a dead end under controlling Supreme Court law, so they were forced to find some other avenue of attack. Like trying to hammer a square peg in a round hole, they sued the Federal Defendants under 42 U.S.C. § 1983, which Congress enacted to redress constitutional violations perpetrated under color of *state* law. In their opposition brief, however, Plaintiffs concede that the Federal Defendants were acting under color of *federal*, not state, law. ECF 44 ("Opp.") at 17. This concession is fatal to their claims under 42 U.S.C. § 1983.

Plaintiffs try to elude this fatal blow by arguing that the Federal Defendants joined a "conspiracy" with state and local officials to violate Plaintiffs' constitutional rights. But even assuming the truth of Plaintiffs' "conspiracy" claims, the Federal Defendants acted under *federal* authority and were not converted into state actors merely by planning and executing a joint federal-state operation. Section 1983 simply does not provide Plaintiffs with the backdoor *Bivens* remedy they were hoping for. These claims must be dismissed.

As for Plaintiffs' claims under 42 U.S.C. §§ 1985(3) and 1986, those fail under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Iqbal* established the bedrock principle that in civil rights actions against government officials, a plaintiff cannot rely on vicarious or supervisory liability. Instead, the complaint must plead specific, nonconclusory facts showing that **each individual defendant**, through their **own personal actions**, violated the plaintiff's constitutional rights.

Plaintiffs' §§ 1985(3) and 1986 claims run headlong into *Iqbal*. The complaint is bereft of factual allegations demonstrating that the Federal Defendants personally held discriminatory intent or participated in the alleged racially motivated conduct by other unidentified officers on the ground. Plaintiffs try to bridge the yawning gap between the alleged line-level misconduct of

unidentified officers to the Federal Defendants by alleging a broad, multi-agency "conspiracy." But Plaintiffs' ubiquitous conspiracy allegations are just another way to claim that the Federal Defendants are liable *vicariously* for the alleged conduct of other officers. *Iqbal* forbids exactly that.

As explained in the Federal Defendants' Motion to Dismiss, *see* ECF 38-1 ("MTD"), and below, Plaintiffs' claims against the Federal Defendants should be dismissed in full with prejudice.

## ARGUMENT

### I. Plaintiffs' Pivotal Concession is Fatal to their Section 1983 claims.

#### A. Action under color of "state" law by the defendant is an essential element of a Section 1983 claim.

The Federal Defendants at all times acted under color of federal—not state—law. MTD at 11–18. Plaintiffs concede as much. Opp. at 17. This forecloses their Section 1983 claim. The Supreme Court and the Ninth Circuit have held that Section "1983 provides no cause of action against federal agents acting under color of federal law." *Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995); *see D.C. v. Carter*, 409 U.S. 418, 424–25 (1973). To circumvent this bedrock principle, Plaintiffs try to rewrite Section 1983 to advance a novel theory that federal actors may be liable based on a conspiracy with state actors *even when federal actors do not* "*themselves act under color of state law*." Opp. at 18 n.9. That is wrong.

Plaintiffs make no effort to reconcile their theory with Section 1983's text, which imposes personal liability only on a "person who, under color of" *state* law violates another's constitutional rights. 42 U.S.C. § 1983. By the statute's plain language, the "person" to be held liable must act under color of state law. *See Lindke v. Freed*, 601 U.S. 187, 194 (2024). This is an "essential element" of a § 1983 claim. *West v. Atkins*, 487 U.S. 42, 49 (1988); *Franklin v.*

*Fox*, 312 F.3d 423, 444 (9th Cir. 2002). Fundamentally, "[i]f the [Federal Defendants] were not acting under color of state law, then § 1983 cannot apply." *Thai v. County of Los Angeles*, 127 F.4th 1254, 1259 (9th Cir. 2025).

Plaintiffs also make no effort to reconcile their theory with Supreme Court precedent. Plaintiffs' opposition fails to cite a single Supreme Court opinion on color of law. *See* Opp. at 17–20. Rather, their theory rests on the mistaken premise that two independent avenues exist to hold a non-state actor liable under Section 1983: *either* by showing he or she acted under color of state law *or* by showing he or she conspired with state actors. Opp. at 18 n.9. There are not two tests, only one. Conspiracy is simply one way to show that a private individual acted under color of state law. The Supreme Court's seminal Section 1983 conspiracy case, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), so illustrates. There, a white teacher accompanied by six Black students alleged that a restaurant conspired with local police to deny her service and arrest her for vagrancy. *Id.* at 146–47, 149. The Court confirmed that Section 1983 "requires that the plaintiff show that the defendant acted 'under color of [state] law.'" *Id.* at 150. It held that a plaintiff could establish that a private entity was a state actor by showing that the private entity joined a conspiracy with state officials. *Id.* at 152. Consistent with *Adickes*, the Ninth Circuit has described conspiracy as one way to establish that a private party acted under color of state law—not a separate test. *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983); *O'Handley v. Weber*, 62 F.4th 1145, 1159 (9th Cir. 2023). Critically, this joint action test does not apply to *federal* officials, who operate under their own, independent source of (federal) authority. MTD at 14–15.

Plaintiffs concede that the Federal Defendants did not act under color of state law. Opp. at 18 n.9. Under Section 1983's text and Supreme Court precedent, this dooms their claims.

**B. Plaintiffs' allegations of conspiracy do not transform the Federal Defendants into state actors.**

Even without the concession that the Federal Defendants acted under color of federal law, Plaintiffs' Section 1983 claims still fail. The Supreme Court has established various tests for determining whether conduct is taken under color of state law, *Howerton*, 708 F.2d at 382–83, but they all boil down to whether a defendant can "be said to be a state actor" such that conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Plaintiffs' conspiracy allegations do not convert the Federal Defendants into state actors. An individual acts under color of state law "only if" he has "actual authority" derived from the State and purports to use that authority. *Lindke*, 601 U.S. at 198; *see* MTD at 12. Plaintiffs do not allege that the Federal Defendants possessed any Idaho authority. Allegations of conspiracy do not alter that basic fact.

The Supreme Court has only ever held that *private* actors may be liable under Section 1983 based on a conspiracy with state officials, and for good reason. Unlike federal officials, private actors have no inherent governmental authority. When a private actor conspires with a state actor who wields state authority, he "put[s] the weight of the State behind" his actions. *Lugar*, 457 U.S. at 940. The actions of the private person and the State are one and the same. Under those circumstances, a conspiracy satisfies "[t]he traditional definition of acting under color of state law": the defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (cleaned up). Ample caselaw illustrates as much. Private actors have no authority to issue a court injunction, *Dennis v. Sparks*, 449 U.S. 24, 29 (1980), to release prisoners from jail, *United States v. Price*, 383 U.S. 787, 795 (1966), or to institute criminal charges, *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985), so when they conspire with state authorities to take such actions, their conduct is fairly attributable to the State. That is not true of federal actors.

Federal officers act under their own federal authority. And so, when they act alongside state officers in pursuit of a joint mission, they do not "exercise[] [state] power." *West*, 487 U.S. at 49. "Federal and state officers work together all the time without clouding their distinct sources of authority." *Yassin v. Weyker*, 39 F.4th 1086, 1091 n.3 (8th Cir. 2022). So, even assuming an alleged conspiracy, *see infra* Part II.A., the Federal Defendants did not act under color of state law because they did not possess any authority derived from the State, and thus their conduct was not attributable to the State. *Franklin*, 312 F.3d at 444 ("Section 1983 liability attaches only to individuals 'who carry a badge of authority of a State and represent it in some capacity." (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).

Plaintiffs do not cite any Ninth Circuit case holding that a federal officer who exercised his or her own federal authority was liable under Section 1983 based on a purported conspiracy. They rely heavily on *Cabrera v. Martin*, 973 F.2d 735 (9th Cir. 1992), but that case is hardly on point. The issue in *Cabrera* was whether attorney's fees were available when federal officials were sued in their *official* capacities for *prospective* relief. *Id.* at 741. Here, Plaintiffs sue federal officials in their *individual* capacities for *money damages*. Regardless, *Cabrera*'s stray remark on which Plaintiffs rely, *see* Opp. at 17, is dicta; *Cabrera* did not involve a conspiracy. If anything, the case underscores that a federal official is not "transform[ed] . . . into a state actor" unless his conduct may "*fairly be attributed to the State* as opposed to the federal government." 973 F.2d at 742–43. That is the "touchstone" of the analysis, *id.* at 744, and aligns with ample, more recent Ninth Circuit precedent. *See Thai*, 127 F.4th at 1262 (Section 1983 claim unavailable absent "evidence that 'the authority of the state was exerted in enforcing the law' such that the officers' conduct [wa]s fairly attributable to the state"); *Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1257 (9th Cir. 2008) (finding no Section 1983 liability against "federal defendants [who]

acted pursuant to federal laws"); *Billings v. United States*, 57 F.3d 797, 801 (9th Cir. 1995) (federal officers who act "pursuant to the procedures and protocols of their agency" do not act under color of state law). Plaintiffs' arguments are irreconcilable with Section 1983's text, Congress's intent, and Supreme Court and Ninth Circuit precedent.

Neither *Johnson v. Orr*, 780 F.2d 386, 392 (3d Cir. 1986), *see* Opp. at 20 n.11, nor cases cited by the Federal Defendants, are to the contrary. *Johnson* is inapplicable, as none of the Federal Defendants fall within the "unique category" of dual-status National Guard technicians. *Ohio Adjutant Gen.'s Dep't v. Fed. Lab. Rels. Auth.*, 598 U.S. 449, 453 (2023). Cases cited by the Federal Defendants also do not support Plaintiffs' theory, Opp. at 18. Those cases explain why allegations of conspiracy are generally *not* sufficient to hold federal officials liable under Section 1983. *See Hernandez v. Causey*, 124 F.4th 325, 337–38 (2024) (explaining that a constitutional deprivation must have "its source in state authority" and noting the absence of "any state authority directive" to violate plaintiff's rights); *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 870 n.8 (10th Cir. 2016) (noting "a higher level of coordination [is likely needed] to show federal officers . . . acted under color of state law," because Congress "did not intend for federal officers to be subject to § 1983 litigation"). Merely enlisting the help of, or coordinating with, state law enforcement officers is not action under color of state law. Where federal officials are neither "participants in the *state scheme*" nor "vindicat[ing] any state or county interest," they are "acting under color of *federal* law." *Big Cats*, 843 F.3d at 870–71.[1]

[1] To the extent Plaintiffs suggest the Federal Defendants acted under color of *both* federal and state law, no law supports that theory. Color of law is rooted in authority. For a given act, a law enforcement officer "may not exercise state and federal authority simultaneously." *Fernandes v. City of Broken Arrow*, No. 16-cv-0630, 2017 WL 471561, at *3 (N.D. Okla. Feb. 3, 2017); *cf. Walden v. City of Duncan*, No. 23-cv-1075, 2025 WL 2701504, at *2 (W.D. Okla. Sept. 22, 2025). Even if it was possible, federal law is superior, resulting in a "presumption" that officers "are acting pursuant to supreme"—i.e. federal—law. *Big Cats*, 843 F.3d at 870 n.8; *cf. Montana*

The Federal Defendants were not converted into state actors and therefore cannot be liable under Section 1983. Plaintiffs' Section 1983 claims against them fail.

## II. The Federal Defendants Are Entitled to Qualified Immunity.

### A. Plaintiffs do not plausibly allege personal participation or a conspiracy.

Plaintiffs do not claim that the Federal Defendants directly violated their rights. Plaintiffs devote pages of their opposition to what they claim are allegations of personal involvement of each Federal Defendant. *See* Opp. at 41–47. But even a cursory review reveals these allegations are hardly personal at all. *Id.* The only actions attributed to the Federal Defendants are attending a planning meeting (Sheehan: Opp. at 44; Compl. ¶ 175);[2] sending emails or making statements after the operation (Porter: Opp. at 41, Compl. ¶¶ 156, 215; Sheehan: Opp. at 45, Compl. ¶¶ 145, 213; Bohls: Opp. at 46–47, Compl. ¶ 206); and obtaining the search and arrest warrants, the validity of which Plaintiffs do not challenge (Sheridan: Opp. at 43, Compl. ¶¶ 90, 149, 172). Otherwise, Plaintiffs' allegations center on the actions of unnamed officers supposedly under the Federal Defendants' "command" or "supervision." Opp. at 41 ("ICE officers under Director Porter's command"), 44 ("FBI officers under SSA Sheehan's supervision"); 46–47 ("SAC Bohls, or officers under his supervision"; "FBI officers under SAC Bohls' command"); *see also* Opp. at 43 (attributing actions of "undercover FBI officers" to Defendant Sheridan).

Alleging a conspiracy does not permit Plaintiffs to circumvent decades of settled precedent establishing that they must allege facts demonstrating what each Federal Defendant did to violate their rights. *Iqbal*, 556 U.S. at 676. To show the Federal Defendants joined an actionable conspiracy, the seven named Plaintiffs must allege facts plausibly showing *their*

---

*Med. Ass'n v. Knudsen*, 119 F.4th 618, 623 (9th Cir. 2024). Plaintiffs come nowhere near overcoming that presumption. *See Henry v. Essex County*, 113 F.4th 355, 360 (3d Cir. 2024).

[2] This was not the meeting at which the "operational plan was established." Compl. ¶ 177.

constitutional rights were violated *and* that the Federal Defendants "shared [a] specific intent" motivated by invidious discriminatory animus. *O'Handley*, 62 F.4th at 1162. Plaintiffs have not done so. Therefore, all their claims against the Federal Defendants must be dismissed.

### 1. Fourth Amendment

Because the four Federal Defendants did not act under color of state law, and Plaintiffs' Fourth Amendment claim requires as much, the Court need not determine whether the four shared an intent to violate the Fourth Amendment. But even assuming the four could be liable under Section 1983, Plaintiffs have not plausibly alleged that they conspired with a specific intent to violate Plaintiffs' Fourth Amendment rights. As the Federal Defendants explain, *see* MTD at 28–39; *infra* Part II.B.2, detaining attendees at an illegal gambling event pursuant to lawfully obtained search and arrest warrants is not a specific intent to violate rights, even where immigration authorities assist in executing the warrants.

### 2. Fourteenth Amendment and 42 U.S.C. §§ 1985(3) and 1986

As to their racial discrimination claims, Plaintiffs' theory is essentially that hundreds of federal and state law enforcement officers pretextually sought and executed warrants at La Catedral to target Latinos for removal, on the assumption that many undocumented people would be in attendance. The complaint alleges no facts regarding the timing or scope of the unlawful agreement, who actually "agreed" to it, or how the illegal "plan" was communicated down to the line officers who Plaintiffs now (inexplicably) say did not "share[] [its] unlawful goal." Opp. at 12. In broad brush, Plaintiffs claim there was an agreement to separate and treat Latino people differently than the white people present during the warrants' execution, and yet detain and question "*each*" attendee—regardless of ethnicity—about immigration status, releasing only those who established lawful presence. Compl. ¶¶ 152–53. Under that implausible theory, La

Catedral was not targeted because the FBI obtained a warrant for the property and established probable cause to believe its owner and his alleged criminal associates were conducting illegal gambling there, but to discriminate against attendees based on race. Each Federal Defendant purportedly knew this was the plan, agreed to its unlawful objective, and instructed subordinates (who did not share in its goal) to act accordingly. The core problem is that Plaintiffs' allegations cannot sustain their imaginative theory. Opp. at 31–39.

Moreover, to hold the Federal Defendants liable under a conspiracy theory, Plaintiffs must allege that they conspired *with the individuals who committed the unlawful act*. *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (en banc) ("[T]he fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired."). Plaintiffs fail to do this. In fact, they specifically disclaim that the officers on the ground who allegedly committed the unlawful acts "shared [in the conspiracy's] unlawful goal." Opp. at 12. This independently dooms their claims. Regardless, there was no conspiracy.

First, Plaintiffs offer little facts to support their conclusory and collective allegation that "Defendants knew they would encounter a large number of Latino individuals." Compl. ¶ 131. But even if that were true, they offer no non-conclusory allegations to support that La Catedral was chosen or "targeted" *because of* that fact. Awareness that conduct may have an outsized effect on one ethnic group does not mean it is motivated by discriminatory animus. *See* MTD at 42–43; *Davis v. Wigen*, 82 F.4th 204, 215 (3d Cir. 2023). As the Supreme Court has repeatedly said, "[d]iscriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part *because of*, not merely *in spite of*, its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993) (cleaned up)

(emphasis added). Rather than intentional discrimination based on Latino ethnicity, the "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), is that La Catedral was targeted because there was probable cause to believe it was hosting a large-scale gambling operation (a fact no party here contests), and warrants existed to search the property and arrest individuals on it. Plaintiffs offer no plausible allegations to support the notion that the Federal Defendants were motivated by racial animus. To be sure, Defendant Sheridan's affidavits in support of arrest warrants mentioned that some arrestees were "Mexican [citizens] and undocumented," Opp. at 33, 43 (citing Compl. ¶ 149), but disclosing that factual information to let a court know of an immigration dimension to the arrest is appropriate; it evidences no specific intent to discriminate. Regardless, it is not reasonable to infer from such a passing remark in a warrant affidavit that the entire operation was motivated by invidious discrimination. Doing so improperly equates immigration enforcement with invidious discrimination.

Plaintiffs also heavily rely on paragraph 140 of their complaint, *see* Opp. at 7, 8, 33, 43, 44, 46, which deserves careful examination. It begins with a collective and conclusory allegation of racial profiling: "Defendants made assumptions about the immigration status of attendees at La Catedral events based on apparent ethnicity." Compl. ¶ 140. That allegation "amount[s] to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and is not entitled to an assumption of truth. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. 544 at 555); *see O'Handley*, 62 F.4th at 1164 ("A cursory assertion of differential treatment unsupported by factual allegations is insufficient to state a claim for relief."); *O.W. v. Carr*, 172 F.4th 337, 355 (4th Cir. 2026) ("[C]onclusory assertions regarding intent cannot stand in for actual evidence of an unlawful, conspiratorial objective."). Next, Paragraph 140 alleges that undercover agents "determined that there were aliens unlawfully present at prior La Catedral

events" and "anticipated encountering aliens unlawfully present" during the execution of the warrants. Compl. ¶ 140. Standing alone, this particular allegation—the sole *factual* allegation in the paragraph—is facially neutral.

To color these allegations with discriminatory intent and racial animus, Paragraph 140 speculates that the unspecified "undercover agents" *must* have racially profiled La Catedral attendees because it is inconceivable that attendees volunteered their immigration status to undercover agents. *Id.* ("Upon information and belief, the only way agents could have determined immigration status while remaining undercover is if attendees disclosed their status in conversation.").[3] That is not true. In any event, this is not a *factual* allegation; it is argument and speculation that is not entitled to the presumption of truth. *See Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 (9th Cir. 2014) ("conclusory assertions" lacking "factual support" not presumed true); *Barnhill v. Bondi*, 138 F.4th 123, 131 (4th Cir. 2025) (a court "need not accept as true unwarranted inferences, unreasonable conclusions or arguments"). Moreover, even if the Court accepted Plaintiffs' racial profiling hypothesis as a proper factual allegation, it is about the behavior of unidentified undercover agents, not any Federal Defendant. For that reason, it cannot support liability under §§ 1983, 1985(3), or 1986. *See Iqbal*, 556 U.S. at 676; *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010).

Plaintiffs' other attempts at alleging discriminatory intent by the Federal Defendants fare no better. Without citation to authority, they say the "uncharacteristically intrusive and gratuitous manner" of the warrants' execution is evidence of discriminatory intent. Opp. at 35. But

---

[3] Allegations made upon "information and belief" are not presumed true here unless Plaintiffs plead specific facts to support them or the information is solely within the other party's possession. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926–27 (9th Cir. 2013).

executing a warrant, even in an allegedly harsh or heavy-handed way, is not evidence of discriminatory purpose on the part of line officers, let alone those who purportedly planned the operation. The hallmark of discrimination is differential treatment based on impermissible categories. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023). The question is not whether this operation was larger or more complex than a "typical" warrant execution. Opp. at 35. It is whether Plaintiffs plausibly allege facts showing that each of the four Federal Defendants held a specific discriminatory intent to conspire "for the purpose of" depriving the named Plaintiffs of the equal protection of the laws based on their Latino ethnicity. 42 U.S.C. § 1985(3). They have not done so.

Discrete instances of alleged discriminatory conduct by line officers on the day of the operation, *see* Opp. at 35 (discussing race-based assaults, selective zip-tying, racial slurs, and denials of water), also is not proof of discriminatory intent *by the four Federal Defendants*. Even if some unknown law enforcement officers among 200 participating officers from multiple agencies allegedly used racial epithets, that does not mean any of the four Federal Defendants held this behavior as a "common objective" of the operation. This Court may not "infer from alleged instances of misconduct on the part of particular agents an unwritten policy" or directive to discriminate and then "attribute that supposed policy" to the Federal Defendants. *Wood v. Moss*, 572 U.S. 744, 763–64 (2014); *see Pahls v. Thomas*, 718 F.3d 1210, 1236–37 (10th Cir. 2013) ("[E]ven if it is reasonable to infer that one public official acted with discriminatory intent, it does not necessarily follow that another official did so as well."). Imputing discriminatory motive from these acts to the Federal Defendants is just "respondeat superior by another name." *Jackson v. Murphy*, No. 22-cv-1630, 2026 WL 1506004, at *5 (D.N.J. May 28, 2026) (collecting cases). That is impermissible.

Nor do the remarks of government officials referenced by Plaintiffs (Opp. 36–37) show that the Federal Defendants harbored any discriminatory animus. Defendant Bohls' comment that illegal gambling is not a victimless crime, Opp. at 36, 47 (citing Compl. ¶ 206), and similar statements by others, do not do so. *See id.* at 36–37 (citing comments by non-federal Defendants describing gangs and cartels as violent, favoring immigration enforcement, and decrying the drug trade and human trafficking). Remarks made by high-level federal officials also cannot be imputed to the Federal Defendants. Unlike in the cases Plaintiffs rely on, Opp. at 36, the remarks by high-level officials here were made in contexts unconnected to La Catedral. *Id.* at 36–37 (describing statements by White House officials and a department head about nationwide immigration and law enforcement objectives and agency recruiting material). The problem with these statements is not that they are "circumstantial evidence" (*id.* at 36)—all Plaintiffs' evidence is "circumstantial"; it is that they are almost entirely made by individuals other than the Federal Defendants and do not show that the Federal Defendants shared in a discriminatory common objective in planning the operation. *See Bazzi v. City of Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) ("The 'web of inference[s] is too weak' on the alleged facts to permit a finding, 'absent sheer speculation,' that Thompson shared this larger unlawful objective." (citation omitted)).

Plaintiffs rely heavily on *Zelaya v. Hammer*, 516 F. Supp. 3d 778 (E.D. Tenn. 2021). But that out-of-circuit district court decision is not only questionable,[4] but materially distinguishable. There, the Court inferred that a meatpacking plant raid was motivated by a planned purpose to discriminate where "white individuals were the ostensible targets of the IRS investigation" but *only* the Latino employees were detained, handcuffed, transported to a separate location, and

[4] *Cf. Barrera v. U.S. Dep't of Homeland Sec.*, No. 07-cv-3879, 2009 WL 825787, at **1–2, 4–8 (D. Minn. Mar. 27, 2009).

subject to immigration screening. *Id.* at 787–90, 806. Given that systemic and uniform treatment of Latinos, the court found it reasonable to infer that "the raid was planned to be executed in the way described, as opposed to dozens of officers coincidentally executing it in the same manner." *Id.* at 806. In contrast to *Zelaya*, Plaintiffs here allege that the subjects of the arrest warrants were Mexican citizens and undocumented, and that *all* race attendees were detained, questioned about immigration status, and only those found to lack lawful status were taken into custody. Compl. ¶¶ 149, 152–53. To be sure, this case and *Zelaya* include allegations of discrete instances of alleged discrimination (e.g., racially-charged statements by on-scene officers, *id.* ¶ 57), but those isolated acts cannot be imputed to the Federal Defendants as evidence of their specific intent in allegedly planning the operation. *Supra* 11–12; *cf.* Opp. at 12 (agreeing that not all 200 officers "shared" an "unlawful goal"). Even if *Zelaya* was correctly decided, the kind of systemic, uniform discrimination indicative of a plan there is not alleged here.

Whereas *Zelaya* is neither binding nor persuasive, *Iqbal* controls here. MTD at 41–43. Plaintiffs cite *Iqbal* only twice, *see* Opp. at 38, but do not grapple with its facts or application. *Iqbal* fatally undermines Plaintiffs' argument (which heavily relies on pre-*Iqbal* precedent) that claims of intentional discrimination are "rarely decided pre-trial." Opp. at 33. *Iqbal* itself was decided on a motion to dismiss, and its principles necessitate the dismissal of Plaintiffs' claims.

Plaintiffs also focus on the coordination and planning of the operation here between the different law enforcement entities. Opp. at 12–14. But such cooperation is not a conspiracy. *See Crim v. King*, 65 F. App'x 591, 593 (9th Cir. 2003) (acting "together to execute a warrantless search and arrest" does not suggest conspiracy); *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014) ("Rather than alleging a conspiracy between the NYPD defendants and Arnett, however, Morales alleged only that Arnett and the NYPD defendants worked together.").

Cooperation alone is insufficient to sustain a conspiracy claim.

Plaintiffs' allegations do not demonstrate that the Federal Defendants conspired to violate Plaintiffs' rights. Their claims about what other people said or did, facially neutral actions and statements by the Federal Defendants, and their conclusory assertions of racial animus do not show that, in planning an otherwise lawful execution of search and arrest warrants, the Federal Defendants each sought specifically to, and did, treat a class of individuals differently *because of* "perceived Latino ethnicity." Compl. ¶ 140. Alleging invidious discriminatory animus is a "high bar," *Dean v. Warren*, 12 F.4th 1248, 1260 (11th Cir. 2021), and a serious charge. Given the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, that the Federal Defendants were simply planning the execution of lawfully obtained warrants for an illegal gambling operation at a time gambling was likely to take place (and which has led to ongoing prosecutions), "invidious discrimination" on the part of any of the four Federal Defendants "is not a plausible conclusion." *Iqbal*, 556 U.S. at 682.

### B. The Federal Defendants Did Not Violate Plaintiffs' Constitutional Rights, Let Alone Rights that Were Clearly Established Under the Circumstances.

#### 1. Plaintiffs do not allege a clearly established equal protection violation.

"[T]he commands of the Fourteenth Amendment are addressed only to the State or to those acting under color of its authority." *Carter*, 409 U.S. at 423. The Federal Defendants acted at all times under color of federal—not state—law, so the Fourteenth Amendment does not apply to them. *Supra* 1–5. The sole, unpublished district court case Plaintiffs cite to the contrary, Opp. at 32 n.17, does not grapple with *Carter* and is unpersuasive. *See supra* 1–5.

Plaintiffs are also wrong that they are exempt from the need to show that a Fourteenth Amendment violation is clearly established, *Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004), and engage in the classic error of defining the right at issue at too "high level of generality,"

*Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see* Opp. at 64 (defining the right "to be free from invidious discrimination" as "well established"). The cases Plaintiffs cite shed no light on "the violative nature of [the] *particular* conduct" of the four Federal Defendants. *Mullenix*, 577 U.S. at 12. This case has nothing to do with delayed issuance of a liquor licenses, *Flores v. Pierce*, 617 F.2d 1386, 1388 (9th Cir. 1980), and 46 years of intervening law has circumvented the "defense of good faith immunity" that *Flores* applied, *id.* at 1391–92. This case also has nothing to do with immigration protests or the deployment of the national guard, even accepting the dubious proposition that a single-Justice concurrence could clearly establish the law. Opp. at 64 (citing *Trump v. Illinois*, 146 S. Ct. 432, 436 n.4 (2025) (Kavanaugh, J. concurring)). *But see Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 3 (2025) (Kavanaugh, J. concurring)). Finally, it has nothing to do with a failure by law enforcement to investigate a crime or make an arrest based on a victim's race. *Elliot-Park v. Manglona*, 592 F.3d 1003, 1005–08 (9th Cir. 2010). Each is "materially distinguishable and thus does not govern the facts of this case." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021). Plaintiffs cite no authority "clearly prohibit[ing]" the Federal Defendants' specific "conduct in the[se] particular circumstances." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). The Federal Defendants are entitled to qualified immunity.

**2. The Federal Defendants did not clearly violate the Fourth Amendment.**

The Federal Defendants are also entitled to qualified immunity because their alleged conduct did not clearly violate the Fourth Amendment.

*i. The search warrant is not subject to reasonable dispute.*

This Court should reject Plaintiffs' attempts to cast doubt on the validity and scope of the search warrant. Plaintiffs focus largely on the *arrest* warrants, incorrectly characterizing them and the preceding investigation as "limited" or "narrow." Opp. at 1–4, 10, 24, 37, 46, 56, 62.

Even when they address the *search* warrant, they implicitly criticize the judge who issued it by asking to "probe the circumstances surrounding obtaining and executing it," and they baldly claim its language is "subject to reasonable dispute." *Id.* at 28 n.16.

Plaintiffs nowhere allege that the search warrant was improperly obtained. Nor do they assert a claim under *Franks v. Delaware*, 438 U.S. 154 (1978). At bottom, the contents of the warrant *affidavit* are irrelevant to the scope of the search authorized by the court because it is the warrant itself and the attachments that define its scope. That warrant indisputably "forms the basis" of Plaintiffs' claims, so consideration of it and its contents is "proper." *Ward v. City of Barstow*, 749 F. App'x 529, 531 (9th Cir. 2018). Its contents are also not subject to *reasonable* dispute. Plaintiffs allege that they were detained "on the racetrack." Compl. ¶¶ 58, 64, 76, 184. The warrant "authorizes . . . access to and to search" the "racetrack" and a "spectator area." If that were not enough, the warrant has a diagram that outlines in red the search area. ECF 38-2, Att. A. Plaintiffs also make no effort to explain facts that suggest that the warrant contemplated detaining La Catedral attendees, including outlining a "*spectator search area*" and expressly authorizing the use of drones for aerial "surveillance" before and during its execution. *Id.* at 17.

To be sure, the "property to be searched" in the warrant included over 24 acres of land, *id.* at 5, but that is no reason to doubt its validity. The FBI had arrest warrants for the *landowner*, Ivan Tellez, and his alleged criminal associates, and established probable cause that the land was being used to run a large, illegal gambling operation. In other words, "the entire property [was] suspect" and under Tellez's "control." *United States v. Alexander*, 761 F.2d 1294, 1300–01 (9th Cir. 1985) (upholding search of forty-acre ranch as "not overbroad"); *Blight v. City of Manteca*, 944 F.3d 1061, 1067–68 (9th Cir. 2019). So, when Plaintiffs ask this Court to "consider the implications" of a soccer-stadium search or other hypotheticals, Opp. at 28–29, they omit key

facts, including that (1) law enforcement established probable cause to believe the owner, and his associates, were using stadium grounds to conduct unlawful activity; (2) that unlawful activity likely involved event attendees; and (3) a federal judge signed a warrant authorizing a daytime search of the premises. What Plaintiffs really take issue with, then, is that when a judge signed the warrant here, that necessarily authorized their detentions under Supreme Court precedent.

*ii.* Muehler v. Mena *permitted Plaintiffs' detentions.*

As the Federal Defendants explained, MTD at 28–29, the Supreme Court in *Michigan v. Summers*, 452 U.S. 692 (1981), and *Muehler v. Mena*, 544 U.S. 93 (2005), created a bright-line, "categorical" rule that "allows detention incident to the execution of a search warrant." *Bailey v. United States*, 568 U.S. 186, 193 (2013). Plaintiffs pay scant attention to *Mena* and barely try to distinguish it. Opp. at 24 n.14. That's because *Mena*'s facts show their detentions were lawful. In *Mena*, local police (not "the FBI," *see id.*) brought an immigration officer to execute a search warrant for a gang shooting investigation because police knew "illegal immigrants" were in the gang. 544 U.S. at 96. The Court never suggested the constitutionality of plaintiff's detention or her questioning turned on whether immigration was an "ancillary" or "central" purpose, as Plaintiffs say. Opp. at 24 n.14. The immigration officer was not involved in the gang shooting investigation, after all, and local police asked the officer to accompany them presumably *only* for immigration purposes. 544 U.S. at 100–01. In fact, the Court implicitly rejected a lower court finding that immigration enforcement was impermissible. *See Mena v. City of Simi Valley*, 354 F.3d 1015, 1017 (9th Cir. 2004) (Kleinfeld, J., dissenting from denial of r'hrg en banc) (noting immigration enforcement is "[s]urely one constitutionally permissible goal of law enforcement"). *Mena* is on all fours here and shows that Plaintiffs' detentions were lawful. *See* MTD at 30.

*iii. Plaintiffs' efforts to skirt* Mena *misconstrue the law and their allegations.*

Plaintiffs try to evade *Mena* in two ways. Each is a non-starter. First, they wrongly insist that, under *Bailey*, they were not detained in "the 'immediate vicinity' of the search." Opp. at 22, 26–29. That misquotes *Bailey* and misapprehends its holding. There, the Supreme Court limited *Summers* to the "immediate vicinity *of the premises to be searched*," as the Court stated twelve times. *Bailey*, 568 U.S. at 192, 194, 197, 199, 200–202 (emphasis added). "[P]remises" includes "land and buildings thereon." *United States v. Williams*, 687 F.2d 290, 293 (9th Cir. 1982). And Plaintiffs cannot redefine that term to mean only "buildings" on the premises. Compl. ¶ 76. The warrant here stated that the "property to be searched" was "premises 1," which encompassed two parcels and over 24 acres of land; it authorized "law enforcement access to and to search . . . a spectator area, and a racetrack, named La Catedral Arena"—neither of which are buildings—as well as several structures on the multi-acre property. ECF 38-2 at 5.

*Bailey* shows that a search is defined "by the full geographic boundary lines identified in the" warrant. Opp. at 27. In *Bailey*, officers obtained a warrant to search a home, followed two individuals who left in a car, and stopped them .7 miles away, while other officers executed a warrant at the home. 568 U.S. at 190. The Court started by noting that the detentions in *Mena* and *Summers* were lawful as the persons detained in those cases were "within" or "immediately outside" the premises. *Id.* at 193. In holding that a parking lot detention .7 miles away was "beyond any reasonable understanding of the immediate vicinity of the premises," the Court said that where, as here, a warrant "has a spatial or geographical boundary," *that* is "the area within which both the search and detention incident to that search may occur." *Id.* at 201. Only if an individual is "beyond" or "away from the premises" or "scene" must a court analyze if the distance is in the "immediate vicinity." *Id.* at 195–96, 199–201. Plaintiffs were detained "within the 'lawful limits'" of the premises to be searched here, *United States v. Parkins*, 92 F.4th 882,

890 (9th Cir. 2024), and point to no caselaw supporting their interpretation of *Bailey*.[5]

Plaintiffs next try to skirt *Mena* by relying on *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019). For starters, Supreme Court precedent can never be "foreclosed by" a "Ninth Circuit" decision. Opp. at 21. Regardless, *Perez Cruz* does not establish a Fourth Amendment violation or clearly establish the wrongfulness of the Federal Defendants' particular conduct here.

*Perez Cruz* erects a high bar. As Plaintiffs concede, they must show their detentions never would have happened absent some impermissible goal. Opp. at 22. Of course, *Perez Cruz* arose out of an administrative removal proceeding; it was not an individual-capacity damages case like the one before this Court. And Plaintiffs do not try to square *Perez Cruz* with *Mena*—which was an individual-capacity case—or the general rule that "the Fourth Amendment regulates conduct rather than thoughts." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011). They also decline to say whether *Perez Cruz* requires divining the individual purpose of each officer (or entity) here who joined in a large, multi-agency warrant execution. *See* MTD at 36; Opp. at 12 (disclaiming that all 200 officers "shared" an "unlawful goal"). In fact, Plaintiffs cite no case where an officer was held individually liable for allegedly planning to execute a valid criminal search warrant as part of a multi-agency operation based on the operation's supposed "central purpose." *Perez Cruz*, 926 F.3d at 1143. That alone makes the law not clearly established.

Delving deeper underscores why Plaintiffs cannot establish that "every reasonable

---

[5] Plaintiffs argue that they at least plausibly "alleged that not all 400 attendees" were detained within the immediate vicinity of the premises. Opp. at 29. But the *seven named Plaintiffs* cannot represent a class if each does not allege a Fourth Amendment violation for themselves. *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1238 (9th Cir. 2001) ("A named plaintiff cannot represent a class alleging constitutional claims that the named plaintiff does not have . . . ."). Fourth Amendment rights are "personal rights," after all, and cannot be "vicariously asserted." MTD at 28. Yet beyond their factual recitation, *see* Opp. at 4–5, 9, Plaintiffs' opposition never mentions any of the named Plaintiffs or the circumstances of their specific detentions. *Id.* at 10–67.

official" in Defendants Porter, Sheehan, Sheridan, and Bohl's shoes, *al-Kidd*, 563 U.S. at 741, would have "known for certain" that their conduct in planning to execute lawfully obtained warrants was unlawful, *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017). Plaintiffs' arguments to the contrary focus on labels, not substance. They contend in conclusory fashion that the operation was a "pretext" or "ruse," and there was a conspiracy "to abuse" the warrants to detain them "for an immigration dragnet." Opp. at 2, 25, 43. Those characterizations lack factual support. *Perez Cruz* heavily relied on evidence that unmistakably showed a "preplanned" purpose "to administratively arrest" hundreds, MTD at 35–36, but Plaintiffs do not claim to have similar allegations of fact. Opp. at 25. As discussed, Plaintiffs' only allegation against the Federal Defendants is that one of them obtained the warrants, that one of the three FBI Defendants attended a meeting in advance of the operation that included a plan to detain event attendees, that "part of the plan" included coordinating with DHS for ICE officers to join the operation and question detainees about immigration status, and that two of them exchanged congratulatory emails afterward. Compl. ¶¶ 150, 172–81, 213–15. None of that is impermissible. *Perez Cruz* is thus "materially distinguishable." *Rivas-Villegas*, 595 U.S. at 6.

So, Plaintiffs turn to how the operation was executed—i.e., that ICE was brought in, individuals were asked about immigration status, and everyone present was detained. But that says little about whether a "preexisting," impermissible "plan" existed to negate the presumption that the operation was focused on "a safe and efficient search." *Perez Cruz*, 926 F.3d at 1142–43. Plaintiffs contend that the operation was a ruse from the start, but many facts illustrate that the operation was focused on illegal gambling and a safe and efficient search. For example, evidence of gambling was seized from arrestees and some attendees, and indictments were secured for federal gambling charges. MTD at 38. These prosecutions are still ongoing. Officers also asked

for and obtained authority to utilize drones; that authority would be unnecessary if officers were unconcerned about flight, destruction of evidence, or safety. *See* ECF 38-2 at 13. Plaintiffs dismiss these facts by pointing to "fruits of the operation," Opp. at 25, like the amount of people arrested for unlawful presence in the country. But that sheds little light on the operation's "preplanned" purpose. *Perez Cruz*, 926 F.3d at 1142. Indeed, had ICE not been present for the operation, officers had authority to and likely would have detained all attendees to prevent them from interfering with the execution of the arrest and search warrants. As the Federal Defendants explained, no authority supports that officers should have simply "dispersed the crowd" and allowed attendees to go free. MTD at 31 (citing Compl. ¶ 110). Plaintiffs have not demonstrated that they never would have been detained during the warrant execution.

To be sure, Plaintiffs argue that they never would have been asked about immigration status absent an "immigration purpose." Opp. at 24–25. Putting aside that *Perez Cruz* did not declare an "immigration purpose" unlawful, *see* 926 F.3d at 1142–43, that is also not the relevant inquiry. *Mena* makes clear that questioning about "immigration status" is not "a discrete Fourth Amendment event." 544 U.S. at 101. Nor was immigration enforcement the primary purpose of their detentions. Even without ICE, FBI agents could ask detainees about immigration status or other "matters unrelated" to their detention. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *see* Compl. ¶ 126. It makes little sense to say, then, that because the FBI "anticipated" the presence of undocumented individuals (like those subject to arrest warrants), such that "part of the plan" was to bring ICE, Compl. ¶¶ 140, 181, that the operation was tainted at the outset by some illicit purpose that made all detentions unlawful. Even if that were so, the "limits of *Summers* are not well defined," so the Federal Defendants could not have been on notice under the circumstances that the unlawfulness of their particular conduct was "beyond debate." MTD at 43–45.

*iv. The Federal Defendants are not liable for the duration of detention.*

Plaintiffs' attempts to hold the four Federal Defendants liable for the duration of their detentions must also be rejected. *See* Opp. at 29–31. Only one named Plaintiff, Mr. Z, alleges he was detained for four hours; Plaintiffs' complaint contains no allegations as to the detention lengths of the other six. *See* MTD at 31 (citing Compl. ¶ 67). In fact, Plaintiffs allege that attendees were released on "a rolling basis" after verifying immigration status. Compl. ¶ 154; Opp. at 3, 5, 30. They also repeatedly cite three paragraphs of their complaint that do not carry the weight attributed to them. Opp. at 27, 29. Those paragraphs do not say "attendees were detained well after officers fully executed the warrants." *Id.* at 29. They allege only that attendees were not detained near buildings, Compl. ¶ 5, that, upon "information and belief," officers did not start "processing detainees" until "after completing their searches of the buildings," *id.* ¶ 76, and that officers took "into custody" some who were subjects of arrest warrants "soon after law enforcement arrived," *id.* ¶ 105. To state a claim that their detentions were not "coextensive" with the execution of the search warrant, the seven named Plaintiffs must allege how long they were each detained in relation to it. Opp. at 27. They do not.

Regardless, a four-hour detention while officers execute four arrest warrants and a search warrant covering an over 24-acre property with hundreds of people on it for a potentially large-scale gambling operation is not clearly unreasonable. *See Mena*, 544 U.S. at 100 (holding 2- to 3-hour detention for search of single home lawful); *Leveto v. Lapina*, 258 F.3d 156, 173–74 (3d Cir. 2001) (eight-hour detention during search of veterinary hospital not clearly unlawful). At minimum, clearly established law did not proscribe a four-hour detention here. Plaintiffs offer no case involving a large-scale search holding otherwise, *see* Opp. at 27, 29, as they must in order to overcome the Federal Defendants' assertion of qualified immunity. *See Hughes v. Rodriguez*, 31

F.4th 1211, 1223 (9th Cir. 2022). Nor do Plaintiffs allege facts showing that there was no "need to control the scene" before those four hours elapsed. *Johnson*, 555 U.S. at 333.

v. *The Federal Defendants are not vicariously liable for individual acts of others.*

The Federal Defendants are also not liable for mistreatment of the seven named Plaintiffs by unidentified officers from unspecified agencies. MTD at 20–24, 28, 33. Plaintiffs do not contest that none of the four Federal Defendants directly mistreated them. They also ignore that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates" and are "only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 676–77. Yet they now make clear that they are not just suing 200 "John Doe" officers for excessive force, *see* Compl. at 62–63, Claim 7 & 8, but apparently seek to represent a class of up to 400 for individual-capacity claims against the four Federal Defendants for mistreatment. Opp. at 29–31. Their complaint only asserts claims against the Federal Defendants premised on a "conspiracy," *see* Compl. at 55–58, Claims 1 & 2, without any allegation of agreement between the officers who allegedly mistreated them and the Federal Defendants. *See* Opp. at 12. There is also no allegation that any Federal Defendant ordered or directed the mistreatment of any named Plaintiff. *See, e.g.*, Compl. ¶¶ 55–69 (alleging denials of water or bathroom access, refusal to loosen zip-ties, rough handling, and shows of authority). Plaintiffs cannot bring claims alleging "individual liability" based on "team liability" without "a showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002).

**3. Plaintiffs Fail to Allege a Clearly Established Violation of Sections 1985(3) or 1986.**

Plaintiffs have not alleged any unlawful motive by the Federal Defendants, much less invidiously discriminatory animus as required under Section 1985(3). *See Bray*, 506 U.S. at 274.

While Plaintiffs attempt to distinguish *Bray* by noting it involved a different subject matter, Opp. at 65, they fail to grapple with its established principles. "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Bray*, 506 U.S. at 275. Whether the group is women or Latinos, or the subject matter is abortion or immigration enforcement, the rule remains: "The right must be aimed at; its impairment must be a conscious objective of the enterprise." *Id.* (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 833 (1983)) (citation omitted); *Dean*, 12 F.4th at 1262. That principle controls here. "Whether one agrees or disagrees with the goal of" enforcing immigration law, "that goal in itself (apart from the use of unlawful means to achieve it, which is not relevant to our discussion of animus) does not remotely qualify for such harsh description [as invidious discriminatory animus], and for such derogatory association with racism." *Bray*, 506 U.S. at 274; *cf. Mena*, 354 F.3d at 1017 (Kleinfeld, J., dissenting from denial of r'hrg en banc).

Plaintiffs assert that the "Defendants" "failed to intervene to stop [the] unlawful plan," Opp. at 20, but do not allege facts supporting the Federal Defendants' awareness of any conspiracy under Section 1985(3). As discussed above, the facts alleged in the complaint do not support an inference that general "collaboration on the Task Force" *id.*, resulted in a plan motived by the shared specific purpose of invidious discriminatory animus against Latinos. *See supra* Sec. II.A.2. Moreover, Plaintiffs do not allege that the Federal Defendants were aware of the purported instances of discriminatory conduct that Plaintiffs alleged, nor that the Federal Defendants were present for those actions or had an opportunity to intervene. Therefore, Plaintiffs have failed to allege facts sufficient to state a claim under 42 U.S.C. § 1986.

## CONCLUSION

The Court should grant the Federal Defendants' motion to dismiss.

Dated: October 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JONATHAN D. GUYNN
Deputy Assistant Attorney General
Torts Branch

PAUL E. WERNER
Assistant Director, Torts Branch

REGINALD M. SKINNER
Senior Trial Counsel, Torts Branch

By: *<u>/s/ Paul C. Quast</u>*_________________
Juliana M. Barrett
Connor J. Hackert
Paul C. Quast
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146
Washington, D.C. 20044
Tel: (202) 616-4150
Email: Paul.C.Quast@usdoj.gov

*Attorneys for Defendants Kenneth Porter, Robert Bohls, Chris Sheehan & Jake Sheridan*

## CERTIFICATION OF SERVICE

I certify that on October 13, 2026, the foregoing was filed electronically through ECF/CM, served on ECF participating parties via ECF.

By: /s/ *Paul C. Quast*
PAUL C. QUAST
Senior Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 7146
Washington, D.C. 20044
Tel: (202) 616-4150
Email: Paul.C.Quast@usdoj.gov